**EXHIBIT L**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | : | Chapter 11 |
| | : | |
| KB TOYS, INC., *et al.*, | : | Case No. 04-10120 (JBR) |
| | : | (Jointly Administered) |
| Debtors. | : | |
| | : | |
| BIG LOTS STORES, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Adversary No. 04-53134 (JBR) |
| | : | |
| KB ACQUISITION CORPORATION, *et al.*, | : | |
| | : | |
| Defendants. | : | |

### AFFIDAVIT OF L. MICHAEL WATTS

Now comes L. Michael Watts, being first duly cautioned and sworn, deposes and states as follows:

1.    I am over the age of 18 years and have personal knowledge of the facts contained in this affidavit.

2.    I am the Vice President, Tax for Big Lots Stores, Inc. ("Big Lots"). I have held that position for 6 years. I am involved in all aspects of the preparation of Big Lots' income tax returns. I am responsible for ensuring that Big Lots complies with all applicable tax codes and regulations. Prior to becoming employed by Big Lots, I was a tax partner with Deloitte & Touche, LLP. I worked with clients on various issues including preparation of income tax returns, compliance with tax codes, tax regulations and mergers and acquisitions.

3.    I was involved in the sale of the KB Toy business (the "KB Entities") by Big Lots to KB Acquisition Corporation ("KB Acquisition"). The KB Entities were sold to KB

In Re KB Toys, Inc., et al., Case No. 04-10120 (JBR)
Big Lots Stores, Inc. v. KB Acquisition Corporation,
Adversary No. 04-53134 (JBR)
Affidavit of L. Michael Watts

Acquisition through a stock sale.  Attached as Exhibit 1 is a true and accurate copy of the text of

the Stock Purchase Agreement.  The schedules to the Stock Purchase Agreement are not attached

hereto.

       4.      I was responsible for, among other things, negotiation of the tax

agreements contained in Article VIII of the Stock Purchase Agreement and implementation of

those agreements by Big Lots and KB Acquisition.

       5.      Two dates are critical to determining the consideration paid by KB

Acquisition to Big Lots for the KB Entities:  the "Balance Sheet Date" and the "Closing Date."

       6.      Section 1.01(a) of the Stock Purchase Agreement defines the "Balance

Sheet Date" to mean October 28, 2000.  The same Section defines "Closing Date" to mean the

date of the closing which was December 7, 2000.

       7.      In accordance with Section 1.01 of the Agreement, balance sheets,

including a consolidated balance sheet, were prepared by KB management in Pittsfield,

Massachusetts that reflected the assets and liabilities of the KB Entities on October 28, 2000, the

"Balance Sheet Date."  Attached as Exhibit 2 is a true and accurate copy of the October 28, 2000

consolidated balance sheet for the KB Entities that summarizes the assets and liabilities owned

by the KB Entities on that date.

       8.      The October 28, 2000 balance sheet identifies certain income and

miscellaneous estimated tax refunds to which the KB Entities would be entitled (the "Refunds of

Taxes").  By way of example, the estimates of certain income tax refunds identified on Line Nos.

2258, 2259, 2270, 2271, 2272, 2273, 2274, 2277,2278, 2280, 2281, 2282, 2283 and 2284 are part

of the Refunds of Taxes that are at issue in this lawsuit.

-2-

In Re KB Toys, Inc., et al., Case No. 04-10120 (JBR)
Big Lots Stores, Inc. v. KB Acquisition Corporation,
Adversary No. 04-53134 (JBR)
Affidavit of L. Michael Watts

      9.     Pursuant to Section 2.01 of the Agreement, the aggregate price to be received by Big Lots for the KB Entities consisted of three elements: (1) "Cash Consideration"; (2) a note; and (3) stock warrants.

      10.    The "Cash Consideration" to be paid by KB Acquisition was based upon an "effective close" for pricing purposes on October 28, 2000, the "Balance Sheet Date." Because the transaction was not closed until over a month later, the "Cash Consideration" was adjusted to account for permitted business activities of the KB Entities between the "Balance Sheet Date" and the ultimate "Closing Date." Among other things, any net cash provided to or swept from the KB Entities in the interim period from the Balance Sheet Date to the Closing Date increased or decreased, respectively, the price paid by KB Acquisition to Big Lots. Likewise, any assets contributed to, or removed from, the KB Entities prior to the Closing Date increased or decreased the price paid by KB Acquisition to Big Lots.

      11.    The Cash Consideration was also subject to a Working Capital Adjustment. The Working Capital Adjustment is defined in Section 1.01 of the Stock Purchase Agreement as the difference between the Balance Sheet Date Working Capital and Target Working Capital amount. Both the Balance Sheet Date Working Capital and Target Working Capital are defined in Section 1.01 of the Stock Purchase Agreement and were negotiated by the Buyer and Seller.

      12.    Under Section 1.01 of the Stock Purchase Agreement, the "Balance Sheet Date Working Capital" was $378,346,244. Working capital is defined as the excess of current assets over current liabilities. The agreed upon Balance Sheet Date Working Capital was less than the actual working capital reflected in the October 28, 2000 balance sheet. That is because,

In Re KB Toys, Inc., et al., Case No. 04-10120 (JBR)
Big Lots Stores, Inc. v. KB Acquisition Corporation,
Adversary No. 04-53134 (JBR)
Affidavit of L. Michael Watts

among other reasons, not all assets and liabilities of the KB Entities were being sold.  Therefore,

the Balance Sheet Date Working Capital was calculated using only selected accounts from the

October 28, 2000 balance sheet.

13.    Tax refunds are typically considered working capital as they are current

assets, but because the Refunds of Taxes were not being sold, none of the tax refund accounts

were included in the "Balance Sheet Date Working Capital."  Therefore the Refunds of Taxes

were not included in the purchase price paid by KB Acquisition to Big Lots.

14.    Article VIII of the Stock Purchase Agreement generally addresses tax

matters, including any tax liabilities or the Refunds of Taxes.  Pursuant to Section 8.03(f), Big

Lots was responsible for paying all state, foreign and local income tax for the KB Entities for all

periods ending on or before the "Closing Date," December 7, 2000.  Pursuant to Section 8.03(i),

Big Lots was responsible for causing the preparing and filing of Miscellaneous Taxes on or

before the Closing Date.  However, pursuant to Section 8.01, and in line with an "effective close"

on the Balance Sheet Date, Big Lots was economically responsible for Miscellaneous Taxes for

Pre-Balance Sheet Tax Periods (including refunds of Miscellaneous Taxes as set forth in Section

8.03(d)(ii)) to the extent the actual liability was different from the amount provided on the

October 28, 2000 balance sheet but with the exception of Schedule 8.06(b)(i) personal property

taxes.

15.    Pursuant to Section 8.03(k), the Buyer, KB Acquisition, was required to

cause the KB Entities to prepare final financial documents, including a consolidated balance

sheet, that reflected the financial condition, including the assets and liabilities contained in the

KB Entities, on the "Closing Date."  Section 8.03(k) required KB Acquisition to provide copies

In Re KB Toys, Inc., et al., Case No. 04-10120 (JBR)
Big Lots Stores, Inc. v. KB Acquisition Corporation,
Adversary No. 04-53134 (JBR)
Affidavit of L. Michael Watts

of the "Closing Date" financial documents prepared by the KB Entities to Big Lots in electronic

format and also hard copy. Attached as Exhibit 3 is a true and accurate copy of the final

"Closing Date" consolidated balance sheet provided to Big Lots by KB Acquisition in electronic

format. Attached as Exhibit 4 is a true and accurate copy of the final "Closing Date"

consolidated balance sheet provided to Big Lots by KB Acquisition in hard copy. Exhibits 3 and

4 were prepared by KB Acquisition as required by Section 8.03(k) and are true and accurate

statements of the assets and liabilities of the KB Entities transferred from Big Lots to KB

Acquisition. The Refunds of Taxes identified on Line Nos. 2258, 2259, 2270, 2271, 2272, 2273,

2274, 2277, 2278, 2280, 2281, 2282, 2283 and 2284 are blank because they were not transferred

with the KB Entities.

16.    A corporation records the acquisition or disposal of assets on its financial

records by journal entries. Any acquisition or disposal of the Refunds of Taxes had to be

recorded on the books of the KB Entities by journal entry. Attached as Exhibit 5 is a true and

accurate copy of the KB Entities' journal entries prepared by the KB Entities. Therein are

journal entries that remove the Refunds of Taxes from the KB Entities' balance sheet because the

Refunds of Taxes were retained by Big Lots prior to the closing of the Stock Purchase

Agreement. In fact, the journal entries are labeled as "Deferred Tax Assets as of 10/28-Trans to

Seller (CNS)." At the time of the sale Big Lots was known as Consolidated Stores and its stock

symbol was "CNS."

17.    Despite the fact that the Refunds of Taxes were not sold by Big Lots, it

was impractical, if not impossible, for Big Lots to arrange to have the Refunds of Taxes paid to it

directly by the taxing authorities. That is because the Refunds of Taxes are paid to the name of

In Re KB Toys, Inc., et al., Case No. 04-10120 (JBR)
Big Lots Stores, Inc. v. KB Acquisition Corporation,
Adversary No. 04-53134 (JBR)
Affidavit of L. Michael Watts

the filer on the return ("taxpayer"). Here the taxpayers, the various KB Entities, are subsidiaries

of KB Acquisition. Likewise, any checks received would have to be signed by officers of the KB

Entities. Thus, Section 8.03(d) requires KB Acquisition to cause prompt payment to Big Lots of

the Refunds of Taxes received by the subsidiaries.

        18.    In addition, pursuant to Section 8.03(a) of the Stock Purchase Agreement,

Big Lots and KB Acquisition made a joint election under Section 338(h)(10) of the Internal

Revenue Code. Any stock sale that is subject to an election under Section 338(h)(10), is treated

as an asset sale for income tax purposes. Pursuant to the Section 338(h)(10) election, the old KB

Entities owned by Big Lots are treated as having sold their assets and liabilities on the Closing

Date to new KB Entities owned by KB Acquisition. The old KB Entities are then treated as if

they have been liquidated on the Closing Date and all of their income tax attributes, whether

liabilities or refunds, flow up to, and are assets or liabilities of, the parent company, Big Lots.

An IRS letter ruling (PLR 8714019) makes it clear that the tax attributes of the selling subsidiary

are kept by the selling group. The new KB Entities owned by KB Acquisition are treated as

having had no income tax history.

        19.    Pursuant to Section 338(h)(10) (and the Regulations thereunder) and

Section 8.03(a) of the Stock Purchase Agreement, Big Lots and KB Acquisition were required to

agree on a "Price Allocation." The "Price Allocation" allocates the purchase price paid by KB

Acquisition to the assets transferred in the sale. If the Refunds of Taxes had been transferred to

KB Acquisition as part of this sale, Big Lots and KB Acquisition would have been required to

allocate a portion of the sales price paid by KB Acquisition to the Refunds of Taxes.

In Re KB Toys, Inc., et al., Case No. 04-10120 (JBR)
Big Lots Stores, Inc. v. KB Acquisition Corporation,
Adversary No. 04-53134 (JBR)
Affidavit of L. Michael Watts

     20.     Attached as Exhibits 6 and 7 are true and accurate copies of the

correspondence between Big Lots and KB Acquisition pertaining to the Price Allocation required

by Section 338(h)(10) (and the Regulations relating thereto) and Section 8.03(a) of the Stock

Purchase Agreement. Exhibit 7 is the final Price Allocation agreed upon by KB Acquisition and

Big Lots. Attached as Exhibits 8 and 9 are true and accurate copies of the balance sheets utilized

by KB Acquisition and Big Lots in the Price Allocation. Treasury Regulation §1.338(h)(10) -

1T(d)(4)(i) requires the parties to allocate the purchase price as if the transaction had actually

occurred, thus any asset transferred must have a price allocated to it. No part of the purchase

price was allocated to the Refunds of Taxes because they were not an asset of the KB Entities

sold by Big Lots to KB Acquisition Corporation. Indeed, a significant portion of the Refunds of

Taxes were generated <u>as a result of the loss to Big Lots on this deemed sale</u> and it was impossible

for them to be sold because they did not exist at the time of the Closing.

     21.     Big Lots is aware that KB Acquisition and the KB Entities have received

Refunds of Taxes which are owned by Big Lots. Additional Refunds of Taxes that are owned by

Big Lots will be received by KB Acquisition and the KB Entities. Despite demands by Big Lots,

KB Acquisition and the KB Entities have refused to turn over the Refunds of Taxes to Big Lots.

     Further affiant sayeth naught.

                          *L. Michael Watts*

                         L. Michael Watts

Sworn to and subscribed in my presence this 20th day of May, 2004

                          *C. Angela Schmidt*

     Notary Public

                      **C. ANGELA SCHMIDT**
                      NOTARY PUBLIC, STATE OF OHIO
                 MY COMMISSION EXPIRES OCTOBER 31, 2006

05/20/2004 - 9458790.4

**1**

[EXECUTION COPY]

STOCK PURCHASE AGREEMENT

dated as of

December 7, 2000

between

KB ACQUISITION CORP.

("Buyer")

and

CONSOLIDATED STORES CORPORATION

("Seller")

# TABLE OF CONTENTS

ARTICLE I - DEFINITIONS ............................................................................................2

    Section 1.01.  Definitions............................................................................................2

ARTICLE II - PURCHASE AND SALE ........................................................................10

    2.01.  Purchase and Sale ............................................................................................10

    2.02.  Closing..............................................................................................................11

    2.03.  Statements Relating to Purchase Price............................................................12

    2.04.  Adjustment of Purchase Price..........................................................................13

ARTICLE III - REPRESENTATIONS AND WARRANTIES OF SELLER...............13

    3.01.  Corporate Existence and Power........................................................................14

    3.02.  Corporate Authorization ..................................................................................14

    3.03.  Governmental Authorization ...........................................................................14

    3.04.  Non-Contravention ..........................................................................................14

    3.05.  Capitalization ...................................................................................................15

    3.06.  Subsidiaries......................................................................................................15

    3.07.  Required and Other Consents ..........................................................................16

    3.08.  Financial Statements........................................................................................16

    3.09.  Absence of Certain Changes............................................................................17

    3.10.  Properties .........................................................................................................19

    3.11.  No Undisclosed Material Liabilities ...............................................................20

    3.12.  Litigation..........................................................................................................20

    3.13.  Material Contracts............................................................................................20

    3.14.  Licenses and Permits.......................................................................................22

    3.15.  Insurance Coverage..........................................................................................22

3.16. Leases ..............................................................................................................22

3.17. Compliance with Laws .....................................................................................23

3.18. Intellectual Property ........................................................................................23

3.19. Employees .........................................................................................................24

3.20. Benefit Representations ....................................................................................24

3.21. Environmental Matters .....................................................................................24

3.22. Transactions with Affiliates .............................................................................25

3.23. Finders' Fees .....................................................................................................25

3.24. Purchase for Investment ...................................................................................26

3.25. Products .............................................................................................................26

ARTICLE IV - REPRESENTATIONS AND WARRANTIES OF BUYER ...............................26

4.01. Organization and Existence ..............................................................................26

4.02. Corporate Authorization ...................................................................................26

4.03. Governmental Authorization ............................................................................26

4.04. Non-Contravention ...........................................................................................26

4.05. Finders' Fees .....................................................................................................27

4.06. Financing ...........................................................................................................27

4.07. Purchase for Investment ...................................................................................27

4.08. Litigation ...........................................................................................................27

4.09. Net Worth ..........................................................................................................27

4.10. HSR Matters ......................................................................................................28

ARTICLE V - COVENANTS OF SELLER ..........................................................................28

5.01. Conduct of the Business ...................................................................................28

5.02. Access to Information ........................................................................................29

5.03. Notices of Certain Events ................................................................................

5.04. Capital Expenditures ..........................................................................................29

5.05. Resignations ........................................................................................................30

5.06. Confidentiality ....................................................................................................30

5.07. Risk of Loss ........................................................................................................30

5.08. Other Offers ........................................................................................................30

5.09. Non-Competition; Non-Solicitation ..................................................................31

5.10. Books and Records; Personnel ..........................................................................31

5.11. Transfer of LLC Interests ..................................................................................32

5.12. Insurance Policies and Administration ............................................................32

ARTICLE VI - COVENANTS OF BUYER ..................................................................33

6.01. Confidentiality ....................................................................................................33

6.02. Access ..................................................................................................................33

6.03. Notices of Certain Events ..................................................................................34

6.04. Financing ............................................................................................................34

6.05. Change of Control of Buyer ..............................................................................35

ARTICLE VII - COVENANTS OF BOTH PARTIES ................................................35

7.01. Reasonable Best Efforts; Further Assurances ................................................35

7.02. Certain Filings ....................................................................................................35

7.03. Public Announcements ......................................................................................35

7.04. Certain Matters Relating to Lease Consents ..................................................36

7.05. Information ..........................................................................................................38

7.06. Lease Indemnity ..................................................................................................38

7.07. Intercompany Accounts and Agreements ........................................................38

iii

ARTICLE VIII - TAX MATTERS.................................................................................39
    8.01. Tax Definitions ....................................................................................39
    8.02. Tax Representations................................................................................39
    8.03. Tax Covenants ....................................................................................40
    8.04. Termination of Existing Tax Sharing Agreements ...........................................41
    8.05. Cooperation on Tax Matters .....................................................................46
    8.06. Indemnification by Seller..........................................................................46
    8.07. Indemnification by Buyer .........................................................................47
    8.08. Tax Treatment of Indemnity ......................................................................48

ARTICLE IX - EMPLOYEE BENEFITS ......................................................................49
    9.01. Employees..........................................................................................49
    9.02. Seller Employee Benefit Plans...................................................................49
    9.03. No Third Party Beneficiaries .....................................................................51

ARTICLE X - CONDITIONS TO CLOSING ..................................................................51
    10.01. Conditions to the Obligations of Each Party.................................................51
    10.02. Conditions to Obligation of Buyer.............................................................51
    10.03. Conditions to Obligation of Seller .............................................................52

ARTICLE XI - SURVIVAL: INDEMNIFICATION .........................................................53
    11.01. Survival...........................................................................................53
    11.02. Indemnification...................................................................................54
    11.03. Procedures ; Exclusivity ........................................................................55
    11.04. Limitation of Indemnification...................................................................56
    11.05. Other Indemnification............................................................................57

ARTICLE XII - TERMINATION...............................................................................58

12.01. Grounds for Termination ................................................................. 58

12.02. Effect of Termination ..................................................................... 58

12.03. Termination Fee ............................................................................ 59

ARTICLE XIII - MISCELLANEOUS ................................................................. 59

13.01. Notices ......................................................................................... 59

13.02. Amendments; No Waivers ............................................................ 60

13.03. Expenses ...................................................................................... 61

13.04. Successors and Assigns ................................................................. 61

13.05. Governing Law ............................................................................. 61

13.06. Jurisdiction .................................................................................. 61

13.07. Arbitration ................................................................................... 61

13.08. Counterparts; Effectiveness ......................................................... 62

13.09. Third Party Beneficiaries ............................................................ 62

13.10. Entire Agreement ......................................................................... 62

13.11. Validity of Provisions .................................................................. 63

13.12. Further Assurances ...................................................................... 63

13.13. Captions ...................................................................................... 63

SCHEDULES AND EXHIBITS .......................................................................... 65

# STOCK PURCHASE AGREEMENT

AGREEMENT dated as of December 7, 2000 between Consolidated Stores Corporation, an Ohio corporation ("Seller"), and KB Acquisition Corp., a Delaware corporation ("Buyer").

## W I T N E S S E T H:

WHEREAS, Seller is the owner of 100 shares of common stock (the "Company Shares") of K.B. Consolidated, Inc., an Ohio corporation (the "Company"), constituting 100% of the issued and outstanding capital stock of the Company;

WHEREAS, Seller, through the Subsidiaries (as defined below) of the Company, conducts the KB Toy business, which includes the marketing, sale and distribution of toy merchandise through mall-based retail stores, strip shopping centers and outlet retail stores, an on-line toy store and distribution centers (collectively, the "KB Toy Business");

WHEREAS, immediately prior to the Closing (as defined below), the Company shall dividend the Company Dividend Note (as defined below) to Seller;

WHEREAS, immediately after the issuance of the Company Dividend Note and immediately prior to the Closing, Seller shall sell the Company Shares to Havens Corners Corporation, a Delaware corporation ("HCC"), in exchange for the HCC Note (as defined below) and 100% of the issued and outstanding capital stock of HCC, consisting of 100 shares of common stock, par value $.001 per share (the "Shares");

WHEREAS, at the Closing, Buyer desires to purchase the Shares from Seller, and Seller desires to sell the Shares to Buyer, upon the terms and subject to the conditions hereinafter set forth; and

WHEREAS, as soon as reasonably practicable on the day following the Closing Date, the Company shall repay in full the Company Dividend Note;

NOW, THEREFORE, for and in consideration of good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, together with the mutual representations, warranties, covenants and agreements herein contained, the parties hereto agree as follows:

ARTICLE I

DEFINITIONS

Section 1.01. Definitions. (a) The following terms, as used herein, have the following meanings:

"1934 Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such Person. For purposes of this definition, (i) the term "control," as used with respect to any Person means the power to, directly or indirectly, direct the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise, and (ii) the terms "controlled" and "controlling" have correlative meanings; provided, that neither the Company nor any of its Subsidiaries shall be considered an Affiliate of Seller.

"Balance Sheet" means the unaudited balance sheet of the Company and its Subsidiaries as of October 28, 2000 referred to in Section 3.08.

"Balance Sheet Cash" means $20,672,661, which amount excludes the agreed upon $2,000,000 of Store operating cash.

"Balance Sheet Date" means October 28, 2000.

"Balance Sheet Date Interim Net Cash Swept Amount" means $0.

"Balance Sheet Date Working Capital" means $378,346,244, which amount includes the agreed upon $2,000,000 of Store operating cash.

"Benefit Arrangement" means any employee benefit plan, program or policy (including, without limitation, each "employee benefit plan" within the meaning of section 3(3) of ERISA, employment agreements, stock plans and fringe benefit plans), written or oral, that is maintained or otherwise contributed to by the Seller or any of its Affiliates under which benefits are provided to consultants, directors, employees or beneficiaries of employees, or former employees or beneficiaries of former employees of the Company or its Subsidiaries, or for which the Company or its Subsidiaries has or may have any liability (including without limitation contingent liability) or obligation.

"Buyer Holdings" means KB Holdings, Inc., a Delaware corporation and the holder of 100% of the capital stock of Buyer.

2

"Cash Consideration" means an amount equal to (i) $185,000,000 plus (ii) the Working Capital Adjustment plus (iii) Balance Sheet Cash minus (iv) the Transferred Debt minus (v) the Night Before Interim Net Cash Swept Adjustment or the Final Change in Net Cash Swept Adjustment, as specified.

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended.

"Charter" means, with respect to any juridical Person, the certificate or articles of incorporation, or other analogous organizational or constituent documents of such Person (including, in the case of a partnership, such partnership's partnership agreement, or, in the case of a limited liability company, such limited liability company's operating agreement).

"Closing Date" means the date of the Closing.

"Closing Date Interim Net Cash Swept Amount" means the net amount properly credited or charged pursuant to Section 2.03(h) to the "Interim Net Cash Swept Account" line item of the Company's ledger in respect of Permitted Payments, Permitted Charges and Required Credits after the close of business on the day prior to the Closing Date through the close of business on the Closing Date, determined without giving effect to the Closing and related transactions.

"Company Dividend Note Amount" means $236,925,515.

"Company Dividend Note" means a promissory note, due in full on the date immediately following the Closing Date, in the aggregate principal amount equal to the Company Dividend Note Amount, bearing interest at the Reference Rate, in the form attached hereto as Exhibit A-2.

"Contribution" means with respect to any Lease, the "Four Wall contribution" of the Store that is the subject of such Lease for the fiscal year ended January 29, 2000, as reflected in its Store Profit and Loss Statement for the same period (a sample of which is attached as Appendix I). The Four Wall Contribution shall be equal to Total Operating Profit/(Loss) [Line 60] plus Depreciation [Line 35] plus Home Office Allocation [Line 40] plus Distribution Allocation [Line 41] plus Other Administrative Allocations [Line 42] plus Interest Expense [Line 46]. The Contribution of a New Store Lease shall be deemed to be equal to the Lease Book Value of such New Store Lease.

"CSC" means Consolidated Stores Corporation, a Delaware corporation.

"Debt" means all obligations of the Company and its Subsidiaries, contingent or otherwise, to any Person (including Seller or any of its Affiliates) in respect of, without duplication: (i) borrowed money; (ii) indebtedness evidenced by notes, debentures or similar instruments; (iii) capitalized lease obligations; (iv) the deferred purchase price of assets, services or securities (other than trade payables); (v) conditional sale or other title retention agreements; (vi) reimbursement obligations with respect to letters of credit, bankers' acceptances or surety bonds (without duplication of other obligations included in this definition which are guaranteed

3

thereby); (vii) dividends payable to any Person other than the Company or any of its Subsidiaries; (viii) cash overdrafts; and (ix) interest, premium, penalties and other amounts owing in respect of the items described in the foregoing clauses (i) through (viii).

"Effective Rent" means, with respect to any Lease, the Original Minimum Rent of such Lease plus the Original Percentage Rent of such Lease.

"Environmental Laws" means any and all federal, state and local statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, codes, injunctions, permits and governmental restrictions, relating to human health, the environment or to emissions, discharges or releases of pollutants, contaminants, Hazardous Substances or wastes into the environment, including without limitation ambient air, surface water, ground water, soils or land, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of pollutants, contaminants, Hazardous Substances or wastes or the clean-up or other remediation thereof.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Final Cash Consideration" means Cash Consideration calculated on the basis of the Final Change in Net Cash Swept Adjustment (i) as set forth in the statement of Final Cash Consideration delivered pursuant to Section 2.03(c), if no notice of disagreement with respect thereto is delivered pursuant to Section 2.03(d) or (ii) if such a notice of disagreement is delivered. (A) as agreed by the parties pursuant to Section 2.03(e) or (B) in the absence of such agreement, as shown in the Arbitrator's calculation delivered pursuant to Section 2.03(e); provided, that the Final Cash Consideration shall not in any event be more than the amount set forth in the notice of disagreement delivered pursuant to Section 2.03(d) nor less than the amount set forth in the statement delivered pursuant to Section 2.03(c).

"Final Change in Net Cash Swept Amount" means the amount properly set forth in the "Interim Net Cash Swept Account" line item of the Company's ledger as of the close of business on the Closing Date, determined without giving effect to the Closing and related transactions.

"Final Change in Net Cash Swept Adjustment" means the amount equal to the Final Change in Net Cash Swept Amount minus the Balance Sheet Date Interim Net Cash Swept Amount.

"GAAP" means United States generally accepted accounting principles in effect from time to time, applied on a basis consistent with the principles, practices and procedures of the KB Toy Business as applied in the preparation of the financial statements of the Company and its Subsidiaries as of January 29, 2000 previously furnished to Buyer.

"Hazardous Substance" means any hazardous substances (as defined in CERCLA); hazardous waste (as defined in RCRA or the regulations adopted thereunder); polychlorinated biphenyls; petroleum and/or petroleum products; or solid waste, except for solid waste that Seller or its Affiliates are authorized to manage under any applicable Environmental Laws.

4

"HCC Note" means a senior subordinated note of HCC in the principal amount of $45,000,000, containing the terms and conditions set forth in Exhibit A-1.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"Intellectual Property Right" means any rights arising from or related to any trademark, service mark, registration thereof or application for registration therefor, trade name, invention, patent, patent application, trade secret, know-how, copyright, copyright registration, application for copyright registration, copyrightable work, proprietary data and information arising from or relating to customers, or any other type of proprietary intellectual property, together with the embodiments of the foregoing.

"Intercompany Accounts" means any account maintained by Seller or any of its Affiliates with respect to transactions between the Seller or any of its Affiliates, on the one hand, and the Company or any of its Subsidiaries, on the other.

"KB Store No. 1013 Litigation" means any litigation relating to the fire at the Store located at 30-81 Steinway Street, Astoria, New York 11103.

"Landlord" means the lessor or sublessor, as the case may be, under any Lease.

"Landlord Objection" means written notice from a Landlord to Buyer, the Company, any of its Subsidiaries or Seller to the effect that Landlord specifically objects to the transactions contemplated by this Agreement or that Landlord refuses to grant a Landlord Consent with respect to such transactions.

"Lease" means each real property lease, sublease or month-to-month tenancy arrangement by which the Company or any of its Subsidiaries is a tenant or has the right to occupy real property, other than a Non-Store Lease.

"Lease Book Value" means, with respect to any Lease, the net book value of the fixed assets of the Store that is the subject of such Lease included in the Balance Sheet.

"Lease Consent Costs" means the sum of (i) all Rent Increases and (ii) all Release Payments paid by Buyer, the Company or any of its Subsidiaries or Affiliates in connection with obtaining a Landlord Consent.

"Lease Enforcement Proceedings" means, with respect to a Lease, the Landlord has, prior to the Lease Termination Enforcement Date, commenced legal proceedings to terminate the applicable Lease or enjoin the sale of the Shares or any of the other transactions contemplated by this Agreement.

"Lease Restoration Costs" means the sum of (i) all Inventory Shipping Costs with respect to Terminated Leases and (ii) all Restoration Costs with respect to Terminated Leases.

"Lease Termination Costs" means, with respect to each Terminated Lease, the sum of (i) the Lease Book Value of such Terminated Lease, (ii) the Lease Restoration Costs for such Terminated Lease and (iii) the net present value of the Contribution for such Terminated Lease (applying a discount rate equal to the Reference Rate) for what would have been the remaining term (excluding options to extend or renew) of the subject Lease (except that a Lease having a remaining term of less than one year and a month-to-month Lease shall be treated as having a remaining term of one year and a Lease having a remaining term of greater than two years shall be treated as having a remaining term of two years).

"Lease Termination Enforcement Date" means the later of (i) one year after the Closing Date or (ii) six months after the delivery of the applicable Landlord Objection; provided, that if any entity other than an Affiliate of Buyer acquires all or substantially all of the assets or a majority of the capital stock of the Company or any of its Subsidiaries, whether by merger, consolidation or otherwise, then the Lease Termination Enforcement Date shall be the date immediately prior to the consummation of such transaction.

"Lien" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind in respect of such asset.

"Losses" means any and all obligations, damages, losses, fines, penalties, expenses, fees, costs, amounts paid in settlement (including reasonable attorneys' and expert witness fees and disbursements in connection with investigating, defending or settling any action or threatened action) and actual liabilities.

"Material Adverse Change" means, with respect to the Company and its Subsidiaries, a material adverse change in the business, assets, condition (financial or otherwise) or results of operations of the Company and its Subsidiaries, taken as a whole.

"Material Adverse Effect" means, with respect to the Company and its Subsidiaries, a material adverse effect on the business, assets, condition (financial or otherwise) or results of operations of the Company and its Subsidiaries, taken as a whole.

"Multiemployer Plan" means each Employee Plan that is a multiemployer plan, as defined in Section 3(37) of ERISA.

"Night Before Cash Consideration" means the Cash Consideration calculated on the basis of the Night Before Interim Net Cash Swept Adjustment as set forth in the statement of Night Before Cash Consideration delivered pursuant to Section 2.03(a).

"Night Before Interim Net Cash Swept Adjustment" means the amount equal to the Night Before Interim Net Cash Swept Amount minus the Balance Sheet Date Interim Net Cash Swept Amount.

"Night Before Interim Net Cash Swept Amount" means the amount properly set forth in the "Interim Net Cash Swept Account" on the Company's ledger as of the close of business on the day prior to the Closing Date.

"New Store Lease" means a Lease entered into after January 1, 2000.

"Non-Store Lease" means each of the real property leases or subleases set forth on Schedule 1.01(a).

"Original Minimum Rent" means, with respect to any Lease, the amount provided for by such Lease as minimum, base or other fixed amount of rent for or properly allocable to the most recent 12-month period ending prior to the Balance Sheet Date.

"Original Percentage Rent" means, with respect to any Lease, the amount of percentage rent provided for by such Lease, calculated in accordance with the percentages and breakpoints provided for in such Lease, for or properly allocable to the most recent 12-month period ending prior to the Balance Sheet Date.

"Permitted Charges" means such term as defined on Appendix II.

"Permitted Payments" means such term as defined on Appendix II.

"Person" means an individual, corporation, partnership, limited liability company, association, trust or other entity or organization, including a government or political subdivision or an agency or instrumentality thereof.

"RCRA" means the Resource Conservation and Recovery Act, as amended.

"Reference Rate" means a rate per annual equal to the prime reference rate from time to time of National City Bank.

"Release" means any discharge, emission or release, including without limitation a Release as defined in CERCLA, at 42 U.S.C. §9601(22). The term "Released" has a corresponding meaning.

"Release Payment" means any payment, other than a Rent Increase, made to any Landlord by Buyer, the Company or any of its or their Subsidiaries or Affiliates in connection with obtaining a Landlord Consent, regardless of whether such payment is required pursuant to the terms of the applicable Lease or is otherwise required by such Landlord (including, but not limited to, any additional remodeling costs, transfer of assignment charges, administration fees and fees and expenses of counsel in connection therewith).

"Rent Increase" means an increase in amounts payable under a Lease as rent (including, if applicable, retroactive rent to the Closing Date), agreed to by Buyer, the Company or any of its

or their Subsidiaries or Affiliates in connection with obtaining a Landlord Consent; provided, that an increase in rent shall be deemed to be a Rent Increase only to the extent of the net present value (applying a discount rate equal to the Reference Rate) of the amount by which the aggregate annual rent, including both minimum rent and percentage rent (assuming the same sales from the subject Store as were achieved during the most recent 12-month period), will exceed the Effective Rent over the remaining term (excluding options to extend or renew) of the subject Lease (except that a Lease having a remaining term of less than one year and a month-to-month Lease shall be treated as having a remaining term of one year and a Lease having a remaining term greater than two years shall be treated as having a remaining term of two years).

"Required Credits" shall mean such term as defined in Appendix II.

"Shared Lawsuits" means the cases captioned (i) John Flores, et al. vs. K*B Toys, et al. (Case No. GIC757012, Superior Court of California, County of San Diego) and (ii) Avis E. Buchanan, et al. vs. Consolidated Stores Corp. d/b/a KB Toys (Civil Action No. DKC99CV3766, U.S. District Court for the District of Maryland, Southern Division).

"Stores" means, collectively, the stores that are the subject of the Leases, each of which individually is referred to as a Store.

"Subsidiary" means any Person of which any other specified Person shall at the time, directly or indirectly, through one or more of its Subsidiaries, (a) own at least 50% of the outstanding capital stock (or other shares of beneficial interest) entitled to vote generally, (b) hold at least 50% of the partnership, limited liability company, joint venture or similar interests or (c) be a general partner or joint venturer.

"Target Working Capital Amount" shall mean $305,865,560, which amount includes the agreed upon $2,000,000 of Store operating cash.

"Terminated Lease" means any Lease (i) the Store of which Buyer or the Company and its Subsidiaries are deprived the possession of as a result of Lease Enforcement Proceedings, but only after (A) a final court order for which all applicable appeal periods have expired or (B) a provided that (x) at such time as the aggregate Lease Termination Costs exceed $7,500,000, if the Lease Termination Costs with respect to such Terminated Lease would exceed $400,000 or (y) at such time as the aggregate Lease Termination Costs exceed $10,000,000, if such settlement would result in a liability to Seller pursuant to Section 7.04(d) in excess of $200,000, then, in either case, such settlement shall be subject to the prior approval of Seller, which approval shall not be unreasonably conditioned, delayed or withheld; or (ii) which Seller and Buyer at any time mutually agree in writing is a Terminated Lease.

"Title IV Plan" means an Employee Plan, other than any Multiemployer Plan, subject to Title IV of ERISA.

"Transferred Debt" means (i) $7,179,346 of principal, interest and other obligations in respect of the mortgage with respect to the Pittsfield (Berkshire) distribution center, (ii) $3,225,800 of principal, interest and other obligations in respect of the capitalized lease with respect to the Metro (Mt. Pocono, PA) distribution center and (iii) $353,786 of principal, interest and other obligations with respect to the COMDISCO and KBkids.com capitalized leases .

"Warrants" means the warrants to purchase 2.5% of the Class A Common Stock, par value $.001 per share, of Buyer Holdings, containing the terms and conditions set forth in Exhibit B.

"Working Capital Adjustment" means the amount equal to the Balance Sheet Date Working Capital minus the Target Working Capital Amount.

(b)  Each of the following terms is defined in the Section set forth opposite such term:

| Term | Section |
| --- | --- |
| Accounting Referee | 13.07 |
| Action | 11.03 |
| Allocation Statement | 8.03(a) |
| Arbitration | 2.03(e) |
| Arbitrator | 13.07 |
| Buyer | Preamble |
| Buyer Indemnitees | 11.02 |
| Buyer's Tax Loss | 8.01 |
| Buyer Performance Group | 7.06 |
| Cash Consideration | 2.01 |
| Clayton Act | 4.10 |
| Closing | 2.02 |
| Code | 8.01 |
| Company | Preamble |
| Company Securities | 3.05(b) |
| Company Shares | Preamble |
| Disputed Items | 2.03(d) |
| Financial Statements | 3.08 |
| Financing | 4.06 |
| **Term** | **Section** |
| HCC | Preamble |
| Income Tax | 8.01 |
| Indemnified Party | 11.08 |
| Indemnifying Party | 11.08 |
| Inventory Shipping Costs | 7.04(d) |
| KB Toy Business | Preamble |
| Landlord Consent | 7.04(a) |