| | |
|---|---|
| Lease Guaranty | |
| Miscellaneous Taxes | 7.04(a) |
| Other Consent | 8.01 |
| Permit | 3.07 |
| Permitted Lien | 3.14 |
| Post-Closing Tax Period | 3.10 |
| Pre-Closing Tax Period | 8.01 |
| Price Allocation | 8.01 |
| Purchase Price | 8.03(a) |
| Real Property | 2.01 |
| Required Consent | 3.10 |
| Return | 3.07 |
| Restoration Costs | 8.02 |
| Sahara | 7.04(d) |
| Section 338(h)(10) Election | 5.11 |
| Seller | 8.03(a) |
| Seller Group | Preamble |
| Seller Indemnitees | 8.01 |
| Seller Release | 11.02 |
| Seller's Expense | 7.04(a) |
| Share Purchase Price | 8.03(b) |
| Shares | 2.01 |
| Sonoran | Preamble |
| Subsidiary Securities | 5.11 |
| Tax | 3.06(b) |
| Tax Packages | 8.01 |
| Transfer Tax | 8.03(g) |
| Transferred Company Plan | 8.01 |
| Transferred Employee | 3.20(a) |
| | 9.01 |

(c)  Definitions shall be equally applicable to both the singular and plural forms of the terms defined, and references to the masculine, feminine or neuter gender shall include each other gender. For purposes hereof, "including" shall mean "including without limitation."

## ARTICLE II

## PURCHASE AND SALE

2.01.  <u>Purchase and Sale</u>.  Upon the terms and subject to the conditions of this Agreement, Seller agrees to sell to Buyer or its designee, and Buyer agrees to purchase, or cause its designee to purchase, from Seller the Shares at the Closing. The purchase price for the Shares (the "Share Purchase Price") is (i) an amount in cash equal to the Cash Consideration less the Company Dividend Amount and (ii) the Warrants. Notwithstanding the foregoing, the parties acknowledge and agree that the aggregate purchase price of the transactions contemplated by this

Agreement shall be equal to the Share Purchase Price, plus the Company Dividend Amount, plus the HCC Note (the "Purchase Price"). The Purchase Price shall be paid as provided in Section 2.02, subject to adjustment as provided in Section 2.04.

2.02.    Closing.  (a) The closing (the "Closing") of the purchase and sale of the Shares shall take place at the offices of Ropes & Gray, One International Place, Boston, Massachusetts on December 7, 2000, or at such other time or place as Buyer and Seller may agree.

(b) Immediately prior to the Closing,

(i)    Buyer shall cause the lenders involved in the Financing to transfer to an account in the name of Mall of America Kay-Bee Toy, Inc., a wholly-owned Subsidiary of the Company, an amount in immediately available funds equal to the Company Dividend Note Amount;

(ii)    the Company shall declare and issue a dividend to Seller in the form of the Company Dividend Note; and

(iii)    the Seller shall sell the Company Shares to HCC in exchange for the Shares and the HCC Note.

(c)  At the Closing,

(i)    Buyer shall deliver to Seller (A) a wire transfer to an account designated by Seller to Buyer at least two business days prior to the Closing in the amount of the Night Before Cash Consideration less the Company Dividend Note Amount in immediately available funds and (B) the Warrants; and

(ii)    Seller shall deliver to Buyer or its designee certificates for the Shares duly endorsed or accompanied by stock powers duly endorsed in blank, with any required transfer stamps affixed thereto, and in form proper for transfer.

(d)  As soon as reasonably practicable on the day following the Closing Date,

(i)    the Company shall repay in full the Company Dividend Note.

(e)  Within seven business days after the Closing, Seller shall deliver to Buyer a wire transfer to an account designated by Buyer to Seller at least two days prior to the Closing an amount in immediately available funds equal to the Closing Date Interim Net Cash Swept Amount as set forth in Buyer's statement delivered pursuant to Section 2.03(b), provided that if the calculation of the Closing Date Interim Net Cash Swept Amount results in a negative number then, in lieu of Seller paying Buyer, Buyer shall pay Seller an equivalent positive amount in the manner set forth in clause (c)(i) above.

2.03.  <u>Statements Relating to Purchase Price</u>.  (a) Not later than two business days prior to Closing, Seller will deliver to Buyer statements setting forth the following amounts: Balance Sheet Date Working Capital, Balance Sheet Cash and Transferred Debt, together with bank and loan confirmations of the account balances from which Balance Sheet Cash and Transferred Debt have been derived, as set forth on <u>Schedule 2.03(a)</u>.  Such statements shall be prepared in accordance with GAAP and shall be derived from and consistent with the Balance Sheet. Not later than 9:00 p.m. on the day prior to the Closing Date, Seller will deliver to Buyer a statement calculating the Night Before Interim Net Cash Swept Amount, the Night Before Net Cash Swept Adjustment and the Night Before Cash Consideration. Such statements shall be prepared in accordance with GAAP.

(b)  Not later than five business days after the Closing Date, Buyer will deliver a statement of the Closing Date Interim Net Cash Swept Amount. Such statement shall be prepared in accordance with GAAP.

(c)  Not later than 90 days after the Closing Date, Buyer will prepare and furnish to Seller a statement of Final Cash Consideration. Such statement shall be prepared in accordance with GAAP, it being understood that, to the extent Buyer disagrees with Seller's calculation of Night Before Cash Consideration, or with Buyer's earlier calculation of the Closing Date Interim Net Cash Swept Amount, Buyer shall be entitled to incorporate such disagreements in the calculations in Buyer's statements delivered pursuant to this Section 2.03(c); <u>provided</u>, that, for purposes of such calculation, the parties agree that the amount of the Working Capital Adjustment shall not be subject to modification.

(d)  If Seller disagrees with Buyer's calculation of Final Cash Consideration as set forth in the statements delivered pursuant to Section 2.03(c), Seller may, within 30 days after delivery of such statements, deliver a notice to Buyer disagreeing with such calculation. Such notice of disagreement shall set forth Seller's calculation of Final Cash Consideration and shall specify those items as to which Seller disagrees and the amount of each such disagreement (the "Disputed Items"), and Seller shall be deemed to have agreed with all other items and amounts reflected in Buyer's statement of Final Cash Consideration.

(e)  If a notice of disagreement shall be duly delivered pursuant to Section 2.03(d), the parties shall, during the 30 days following such delivery, use commercially reasonable efforts to reach agreement on the Disputed Items in order to determine, as may be required, the amount of the Final Cash Consideration. If, during such period, the parties are unable to reach such agreement, either party may cause the Disputed Items to be resolved by means of an arbitration conducted pursuant to Section 13.07 (an "Arbitration"). In any such Arbitration, the Arbitrator (as defined in Section 13.07) shall consider only the Disputed Items and all other items shall be calculated as proposed by Buyer.

(f)  The parties hereto agree that they will, and agree to cause their respective independent accountants to, cooperate and assist in the other party's preparation of the statements to be delivered by such party pursuant to this Section 2.03, including without limitation the making available to the extent necessary of books, records, work papers and

personnel, subject, in the case of each such independent accountant, to the execution of customary representations and/or waivers as reasonably requested of either or both of the parties by such independent accountants.

(g) The parties hereto further acknowledge and agree that all amounts to be calculated pursuant to this Section 2.03 shall be calculated in accordance with GAAP.

(h) Seller represents, warrants and agrees that (A) with respect to the period on and after the Balance Sheet Date through and including the Closing Date, (i) no transactions have been or will be recorded in the Interim Net Cash Swept Account other than (x) credits for Required Credits and (y) charges for Permitted Payments and Permitted Charges and (ii) no payments have been or will be made from cash of the Company and its Subsidiaries other than distributions to Seller and direct payments (i.e., not through the Interim Net Cash Swept Account) of Permitted Payments and (B) the opening balance in the Interim Net Cash Swept Account on the Balance Sheet Date was $0.

2.04.  <u>Adjustment of Purchase Price</u>.  (a) If Final Cash Consideration as calculated pursuant to Section 2.03 exceeds the Night Before Cash Consideration, Buyer shall pay to Seller, as an adjustment to the Purchase Price, in the manner provided in Section 2.04(b), the amount of such excess. If Night Before Cash Consideration exceeds Final Cash Consideration as calculated pursuant to Section 2.03, Seller shall pay to Buyer, as an adjustment to the Purchase Price, in the manner provided in Section 2.04(b), the amount of such excess.  In addition, Seller or Buyer, as applicable, will repay to the other the amount paid pursuant to Section 2.02(c) in respect of the Closing Date Interim Net Cash Swept Amount. Any such payment pursuant to this Section 2.04(a) shall be made at a mutually convenient time and place (i) within 30 days after Buyer's delivery of the statement of Final Cash Consideration pursuant to Section 2.03(c) if no notice of disagreement with respect thereto is delivered pursuant to Section 2.03(d) or (ii) if a notice of disagreement with respect thereto is delivered pursuant to Section 2.03(d) then within 10 days after the earlier of (A) agreement between the parties pursuant to Section 2.03(e) with respect to the Final Cash Consideration and (B) delivery by the Arbitrator of the calculation of the Final Cash Consideration referred to in Section 2.03(e).

(b) Any net payment pursuant to Section 2.04(a) shall be made by delivery by Buyer, or Seller, as the case may be, of a wire transfer of immediately available funds to the account designated by Seller or Buyer, as the case may be. The amount of any payment to be made pursuant to Section 2.04(a) shall bear interest from and including the Closing Date to but excluding the date of payment at a rate per annum equal to the Reference Rate. Such interest shall be payable at the same time as the payment to which it relates and shall be calculated on the basis of a year of 365/366 days and the actual number of days for which interest is due.

ARTICLE III

REPRESENTATIONS AND WARRANTIES OF SELLER

13

Seller hereby represents and warrants to Buyer that, as of the Closing:

3.01. Corporate Existence and Power. Each of the Seller, the Company and HCC is a corporation duly incorporated, validly existing and in good standing under the laws of its jurisdiction, and has all requisite corporate powers and all material governmental licenses, authorizations, consents and approvals required to carry on its business as now conducted. The Company is duly qualified to do business as a foreign corporation and is in good standing in each jurisdiction where the character of the property owned or leased by it or the nature of its activities make such qualification necessary, except for those jurisdictions where failure to be so qualified would not, individually or in the aggregate, have a Material Adverse Effect. Seller has heretofore made available to Buyer true and complete copies of the Charter and bylaws (or analogous governing documents) of the Company, HCC and Seller as currently in effect.

3.02. Corporate Authorization. The execution, delivery and performance by Seller of this Agreement and the consummation by Seller and HCC of the transactions contemplated hereby are within Seller's and HCC's corporate powers and have been duly authorized by all necessary corporate action on the part of Seller and HCC. This Agreement constitutes a valid and binding agreement of Seller enforceable against Seller in accordance with its terms, except as (i) the enforceability hereof may be limited by bankruptcy, insolvency, moratorium or other similar laws affecting the enforcement of creditors' rights generally and (ii) the availability of remedies may be limited by equitable principles of general applicability or public policy.

3.03. Governmental Authorization. The execution, delivery and performance by Seller for this Agreement require no action by or in respect of, or filing with, any governmental body, agency, official or authority other than (i) compliance with any applicable requirements of the 1934 Act; and (ii) notification to the Federal Trade Commission pursuant to the Consent Decree and Order effective August 14, 2000.

3.04. Non-Contravention. The execution, delivery and performance by Seller of this Agreement do not and will not (i) contravene or conflict with the Charter or bylaws (or analogous governing documents) of Seller, HCC, the Company or any of the Company's Subsidiaries; (ii) subject to compliance with the matters referred to in Section 3.03, contravene or conflict with or constitute a violation of any provision of any law, regulation, judgment, injunction, order or decree binding upon or applicable to Seller, the Company or any of the Company's Subsidiaries; (iii) subject to the obtaining of all Required Consents, constitute a default under (or any event that with notice, lapse of time or both, would constitute a default under) or give rise to any right of modification, termination, cancellation or acceleration of any right or obligation of the Company or any of its Subsidiaries or to a loss of any benefit relating to the Company or any of its Subsidiaries to which the Company or any of its Subsidiaries is entitled under any provision of any agreement, contract or other instrument (other than any Lease) binding upon the Company or any of its Subsidiaries or any license, franchise, permit or other similar authorization held by the Company or any of its Subsidiaries or (iv) result in the creation or imposition of any Lien on, or forfeiture of, any asset of the Company or any of its Subsidiaries, except, in the case of clauses (ii), (iii) and (iv), to the extent that any such violation, failure to obtain or other action, approval, consent, waiver, authorization or other action, default,

14

right, modification, Lien or forfeiture would not, individually or in the aggregate, have a Material Adverse Effect.

3.05.  Capitalization.  (a)  The authorized capital stock of the Company consists of 100 shares of common stock, of which 100 shares are issued and outstanding.

(b)  The Company Shares have been duly authorized and validly issued and are fully paid and non-assessable. Except as disclosed in Section 3.05(a), there are no outstanding (i) shares of capital stock or voting securities of the Company, (ii) securities of the Company convertible into or exchangeable for shares of capital stock or voting securities of the Company or (iii) options or other rights to acquire from the Company, or other obligation of the Company to issue, any capital stock, voting securities or securities convertible into or exchangeable for capital stock or voting securities of the Company (the items in clauses (i), (ii) and (iii) being referred to collectively as the "Company Securities"). There are no outstanding obligations of the Company or any Subsidiary to issue, repurchase, redeem or otherwise acquire, or make any payment in respect of, Company Securities.

(c)  The authorized capital stock of the HCC consists of 100 shares of common stock, of which 100 shares shall be issued and outstanding as of the Closing. To Seller's knowledge, HCC has no assets (other than all of the outstanding capital stock of the Company) or liabilities (other than the HCC Note) and has entered into no agreements or transactions other than those contemplated by this Agreement.

(d)  Upon their issuance immediately prior to the Closing, as contemplated herein, the Shares will be duly authorized and validly issued and fully paid and non-assessable.

(e)  As of the Closing, Seller will be the record and beneficial owner of the Shares, free and clear of any Lien and other limitation or restriction (including any restriction on the right to vote, sell or otherwise dispose of the Shares), and will transfer and deliver to Buyer at the Closing valid title to the Shares free and clear of any Lien and any such limitation or restriction.

3.06.  Subsidiaries.  (a) Except as set forth on Schedule 3.06(a), each Subsidiary of the Company is a corporation or limited liability company duly incorporated or created, validly existing and in good standing under the laws of its jurisdiction, has all requisite corporate powers and all material governmental licenses, authorizations, permits, consents and approvals required to carry on its business as now conducted. Each Subsidiary of the Company is duly qualified to do business as a foreign corporation or limited liability company, as the case may be, and is in good standing in each jurisdiction where such qualification is necessary except for those jurisdictions where failure to be so qualified would not, individually or in the aggregate, have a Material Adverse Effect. All Subsidiaries of the Company and their respective jurisdictions of incorporation or creation, as the case may be, issued and outstanding capital stock or other voting securities or ownership interests and the owner of such outstanding capital stock or other voting securities or ownership interests are disclosed in Schedule 3.06(a). Seller has heretofore made available to Buyer true and complete copies of the Charter and bylaws (or analogous governing

15

documents) of each Subsidiary of the Company as is currently in effect and as will be in effect immediately prior to the Closing.

(b)  Except as set forth on Schedule 3.06(b), all of the outstanding capital stock of, or other voting securities or ownership interests in, each Subsidiary of the Company, is owned by the Company, directly or indirectly, free and clear of any Lien and free of any other limitation or restriction (including any restriction on the right to vote, sell or otherwise dispose of such capital stock or other voting securities or ownership interests). All of the outstanding capital stock or other voting securities or ownership interests in each Subsidiary of the Company have been duly authorized and validly issued and are fully paid and non-assessable. Except as set forth on Schedule 3.06(b) and except for the HCC Note and the Company Dividend Note, there are no outstanding (i) securities of any such Subsidiary convertible into or exchangeable for shares of capital stock or other voting securities or ownership interests in any Subsidiary or (ii) options or other rights to acquire from the Company or any such Subsidiary, or other obligation of the Company or any such Subsidiary to issue, any capital stock or other voting securities or ownership interests in, or any securities convertible into or exchangeable for any capital stock or other voting securities or ownership interests in, any Subsidiary of the Company (the items in clauses (i) and (ii) being referred to collectively as the "Subsidiary Securities"). Except as set forth on Schedule 3.06(b), there are no outstanding obligations of the Company or any Subsidiary of the Company to issue, repurchase, redeem or otherwise acquire, or make any payment in respect of, any outstanding Subsidiary Securities. To the knowledge of the Seller, except for the Shares and the HCC Note, there are no outstanding shares of capital stock, voting securities of HCC, or rights to acquire any capital stock, voting securities or other securities of HCC.

3.07.  Required and Other Consents.  (a) Schedule 3.07(a) sets forth each agreement, contract or other instrument (excluding the Leases) binding upon Seller, the Company or any of the Company's Subsidiaries or any license, franchise, permit or other similar authorization held by the Company or any of its Subsidiaries, requiring a consent as a result of the execution, delivery and performance of this Agreement or the consummation of the transactions contemplated hereby that if not received by the Closing Date would be reasonably likely to have a Material Adverse Effect (each such consent, a "Required Consent" and together the "Required Consents").

(b)  Schedule 3.07(b) sets forth each other consent (each such consent, excluding the Landlord Consents, an "Other Consent" and together the "Other Consents") under agreements, contracts or other instruments (excluding the Leases) or licenses, franchises, permits or other similar authorizations that is necessary with respect to the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby.

3.08.  Financial Statements.  The Balance Sheet and the related unaudited statements of income and cash flows for the year-to-date period ending on the Balance Sheet Date, the unaudited balance sheet of the Company and its Subsidiaries as of January 29, 2000 and the related unaudited statements of income and cash flows of the Company and its Subsidiaries for the fiscal year ended January 29, 2000 (collectively, the "Financial Statements"), previously

16

delivered to Buyer, (a) fairly present, in all material respects, the financial position of the Company and its Subsidiaries as of such dates and their results of operations for the year-to-date period ended on the Balance Sheet Date and the fiscal year ended January 29, 2000, and (ii) have been prepared in conformity with GAAP (except as may be indicated in the notes thereto).

3.09.   Absence of Certain Changes.   Except as disclosed in Schedule 3.09 or as contemplated by this Agreement, since the Balance Sheet Date, the KB Toy Business has been conducted in the ordinary course consistent with past practices, and there has not been:

(a) any Material Adverse Change or the occurrence of any event or events which individually or in the aggregate would be reasonably likely to result in a Material Adverse Change, other than any resulting from or attributable to changes in general economic conditions that have not been materially worse for the Company and its Subsidiaries, taken as a whole, than those of similar retail or on-line businesses;

(b) excluding the Company Dividend Note, any declaration, setting aside or payment of any dividend or other distribution with respect to the Company Shares or the Shares, or any repurchase, redemption or other acquisition by the Company or any of its Subsidiaries of any outstanding shares of capital stock or other securities of, or other ownership interests in, the Company or any of its Subsidiaries;

(c) any amendment of any material term of any outstanding security of the Company or any of its Subsidiaries;

(d) other than as contemplated by Section 2.02(b), any incurrence, assumption or guarantee by the Company or any of its Subsidiaries of any indebtedness for borrowed money other than pursuant to the Intercompany Accounts in the ordinary course of business and in amounts and on terms consistent with past practices and any such indebtedness between the Company and any of its Subsidiaries;

(e) any creation or assumption by the Company or any of its Subsidiaries of any Lien on any material asset other than in the ordinary course of business consistent with past practices;

(f) any making of any loan, advance or capital contribution to or investment in any Person, other than (i) loans, advances or capital contributions to or investments between the Company and any of its Subsidiaries and (ii) loans and advances pursuant to the Intercompany Accounts;

(g) any damage, destruction or other casualty loss (whether or not covered by insurance) affecting the KB Toy Business or assets of the Company or any of its Subsidiaries which, individually or in the aggregate, has had or would reasonably be expected to have a Material Adverse Effect;

17

(h)  any transaction or commitment made, or any contract or agreement entered into, by the Company or any of its Subsidiaries relating to the KB Toy Business or any of their assets (including the acquisition or disposition of any assets) or any relinquishment, compromise or waiver by the Company or any of its Subsidiaries of any contract, lease, license or other right, in either case, material to the Company and its Subsidiaries, taken as a whole, other than transactions and commitments in the ordinary course of business consistent with past practices and those contemplated by this Agreement;

(i)  any change in any method of accounting or accounting practice by the Company or any of its Subsidiaries except for any such change after the Balance Sheet Date required by reason of a concurrent change in generally accepted accounting principles;

(j)  any (i) grant of any severance or termination pay to any employee of the Company or any of its Subsidiaries having annual compensation in excess of $100,000; (ii) entering into of any employment, deferred compensation or other similar agreement (or any amendment to or modification of any such existing agreement) with any employee of the Company or any of its Subsidiaries having annual compensation in excess of $100,000; or (iii) any increase in compensation or other benefits paid or payable to any employee of the Company or any of its Subsidiaries having annual compensation in excess of $100,000, except in each case in the ordinary course of business consistent with past practices;

(k)  any labor dispute, other than routine individual grievances, or any activity or proceeding by a labor union or representative thereof to organize any employees of the Company or any of its Subsidiaries, which employees were not subject to a collective bargaining agreement at the Balance Sheet Date, or any lockouts, strikes, slowdowns, work stoppages or threats thereof by or with respect to such employees;

(l)  any material capital expenditure, or commitment for a capital expenditure, for additions or improvements to property, plant and equipment, other than expenditures for repair and maintenance of any Stores, distribution centers or warehouses of the Company and its Subsidiaries in the ordinary course of business;

(m)  any settlement of, or agreement to settle, any material claim, action, suit, arbitration, proceeding or investigation, other than in the ordinary course of business consistent with past practices;

(n)  any canceled or compromised debt or claim, other than (i) between the Company and any of its Subsidiaries and (ii) adjustments relating to Intercompany Accounts;

(o)  any sale, lease or other disposition of any material assets (other than inventory) by the Company or any of its Subsidiaries other than in the ordinary course of business;

18

(p) any delay or postponement of the payment of any accounts payable or other liabilities by the Company or any of its Subsidiaries other than in the ordinary course of business; or

(q) any adoption, amendment, modification or termination of any Employee Plan other than in the ordinary course of business.

3.10. Properties. (a) Schedule 3.10(a) contains a list of all material real property owned, leased or subleased by the Company and its Subsidiaries (the "Real Property"), any title insurance policies and surveys with respect thereto, and any material Liens thereon.

(b) The Company and its Subsidiaries have good and marketable title to, or in the case of leased or subleased Real Property have valid leasehold or subleasehold interests in, the owned Real Property listed in Schedule 3.10(a) and all other property, rights and assets (whether real, personal, tangible or intangible) reflected on the Balance Sheet or acquired after the Balance Sheet Date, except for properties and assets sold since the Balance Sheet Date in the ordinary course of business consistent with past practices. None of such property or assets is subject to any Lien, except:

(i) Liens disclosed on the Balance Sheet;

(ii) Liens disclosed in Schedule 3.10(b);

(iii) Liens for taxes not yet due or being contested in good faith (and for which adequate accruals or reserves have been established on the Balance Sheet); or

(iv) Liens which do not materially detract from the value or materially interfere with any present or presently intended use of such property, rights or assets (clauses (i), (ii), (iii) and (iv) are, collectively, the "Permitted Liens").

(c) With respect to the Real Property that is owned by the Company and its Subsidiaries, each parcel thereof (i) is not in violation of applicable zoning laws or ordinances; (ii) has received all approvals of governmental authorities (including licenses and permits) required in connection with the ownership and operation thereof and has been developed, operated and maintained in accordance with applicable laws, rules, regulations and restrictive covenants, except where the failure to receive such approvals or to develop, operate and maintain would not have a Material Adverse Effect; (iii) has adequate utilities and other services necessary for the operation of such facility provided via public roads or via appurtenant easements benefiting such parcel; (iv) abuts a public road or has adequate vehicular access to a public road via a permanent, irrevocable exclusive easement to a public road; (v) except as set forth on Schedule 3.10(c), there are no leases or other agreements granting to any party or parties the right of use or occupancy of such parcel or any portion thereof and (vi) except as set forth on Schedule 3.10(c), there are no outstanding options or rights of first refusal to purchase such parcel or any portion thereof.

19

3.11. <u>No Undisclosed Material Liabilities</u>. There are no liabilities of the Company or any of its Subsidiaries of any kind whatsoever, whether accrued, contingent, absolute, determined, determinable or otherwise, other than:

(i) liabilities in the amounts provided for in the Balance Sheet or disclosed in the notes thereto;

(ii) liabilities incurred in the ordinary course of business consistent with past practice since the Balance Sheet Date;

(iii) liabilities disclosed in <u>Schedule 3.11</u> or contemplated by Section 2.02(b); and

(iv) other undisclosed liabilities which, individually or in the aggregate, are not material to the Company and its Subsidiaries, taken as a whole.

3.12. <u>Litigation</u>. (a) Except as set forth on <u>Schedule 3.12</u>, there is no action, suit, investigation or proceeding pending against, or to the knowledge of Seller, threatened against or affecting, the Company or any of its Subsidiaries or any of their respective properties before any court or arbitrator or any governmental body, agency or official. There are no judgments, orders, decrees, citations, fines or penalties pending against the Company or any of its Subsidiaries that materially adversely affect the Company and its Subsidiaries, taken as a whole, under any Federal, state or local law.

(b) Except for the Shared Lawsuits and the KB Store No. 1013 Litigation, there is no action, suit investigation or proceeding pending against, or to the knowledge of Seller, threatened against or affecting the Company of any of its Subsidiaries or any of their respective properties which, if determined or resolved adversely in accordance with the plaintiff's demands, would reasonably be expected to have a Material Adverse Effect.

3.13. <u>Material Contracts</u>. (a) Except as set forth on <u>Schedule 3.13</u>, neither the Company nor any of its Subsidiaries is a party to or subject to:

(i) any lease or sublease for personal property held or used by the Company or any of its Subsidiaries having an annual cost or capitalized lease obligation of $200,000 or more;

(ii) any contract for the purchase of goods, services, equipment or other assets that provides for annual payments by the Company or any of its Subsidiaries of $200,000 or more, other than purchase orders for inventory and other arrangements with suppliers entered into in the ordinary course of business;

(iii) any sales, distribution or other similar agreement providing for the sale by the Company or any of its Subsidiaries of materials, supplies, goods, services, equipment or other assets that provides for annual payments to the Company or any of its

Subsidiaries of $200,000 or more, other than sales, distribution or other similar agreements entered into in the ordinary course of business;

(iv)   any partnership, joint venture or other similar contract arrangement or agreement;

(v)   any contract relating to indebtedness for borrowed money or the deferred purchase price of property (in either case, whether incurred, assumed, guaranteed or secured by any asset), other than (A) pursuant to the Intercompany Accounts, (B) any such contract between or among the Company and its Subsidiaries, (C) contracts relating to indebtedness incurred in the ordinary course of business in an amount not exceeding $200,000 and (D) as contemplated by Section 2.02(b);

(vi)   any license, franchise or similar agreement;

(vii)   any agency, dealer, sales representative or other similar agreement that provides for annual payments by the Company or any of its Subsidiaries of $200,000 or more;

(viii)   any agreement concerning confidentiality or that limits in any material respect the freedom of the Company or any of its Subsidiaries to compete in any line of business or with any Person or in any area or which would so limit the freedom of the Buyer or the KB Toy Business after the Closing Date;

(ix)   other than as contemplated by Section 2.02(b), any mortgage, indenture, security agreement (or other agreement under which the Company or any of its Subsidiaries has a granted a Lien, other than a Permitted Lien, on any material asset), note, loan agreement or guarantee of the obligations of a third party;

(x)   any collective bargaining agreement with any labor union currently representing employees of the Company or any of its Subsidiaries;

(xi)   to the extent not disclosed pursuant to Section 3.19 or Section 3.20, any profit sharing, stock option, stock purchase, stock appreciation, deferred compensation, severance or other plan or arrangement for the benefit of the current or former directors, officers and employees of the Company or any of its Subsidiaries;

(xii)   to the extent not disclosed pursuant to Section 3.19 or Section 3.20, any agreement (A) provided for the employment or consultancy with any individual on a full-time, part-time, consulting or other similar basis that provides for annual payments by the Company or any of its Subsidiaries of $100,000 or more or (B) providing severance or retirement benefits;

(xiii)   any agreement under which the Company or any of its Subsidiaries has advanced or loaned any amount to any of its stockholders (other than pursuant to the

21

Intercompany Accounts), directors, officers or employees other than in the ordinary course of business;

(xiv) any agreement (excluding the Leases) under which the consequences of a default or termination could reasonably be expected to have a Material Adverse Effect;

(xv) any other agreement (or group of related agreements) the performance of which involves consideration in excess of $200,000 other than in respect of the Intercompany Accounts or any agreement involving Buyer and Seller; or

(xvi) any other contract or commitment not made in the ordinary course of business that is material to the Company and its Subsidiaries, taken as a whole.

(b) The Seller has made available to the Buyer a correct and complete copy of each of the written agreements, contracts, commitments, arrangements, leases or plans set forth on Schedule 3.13 or a written summary of the material terms and conditions of any oral agreement set forth on Schedule 3.13. Each agreement, contract, commitment, arrangement, lease (other than the Leases) or plan disclosed in any Schedule to this Agreement or required to be disclosed pursuant to Section 3.13(a) is a valid and binding agreement of the Company or one or more of its Subsidiaries, as the case may be, and is in full force and effect, and neither the Company nor any such Subsidiary nor, to the knowledge of Seller, any other party thereto is in default in any material respect under the terms of any such agreement, contract, commitment, arrangement, lease or plan.

3.14. _Licenses and Permits_. Schedule 3.14 contains a list of each material license, permit or other governmental authorization affecting, required for or relating in any material way to, the KB Toy Business (the "Permits"). Except as set forth on Schedule 3.14, such Permits are valid and in full force and effect and, subject to the obtaining of the related Required Consents prior to the Closing Date, are transferable by Seller, except as would not reasonably be expected to have a Material Adverse Effect. Except as set forth on Schedule 3.14, none of such Permits will, subject to the obtaining of the related Required Consents prior to the Closing Date, be terminated or impaired or become terminable as a result of the transactions contemplated hereby, except as would not reasonably be expected to have a Material Adverse Effect.

3.15. _Insurance Coverage_. Seller has furnished to Buyer a list of all material insurance policies and fidelity bonds covering the Company and its Subsidiaries, the business and operations of the KB Toy Business and the employees of the Company and its Subsidiaries. All premiums payable under all such policies and bonds have been paid and the Company and its Subsidiaries have otherwise complied in all material respects with the terms and conditions of all such policies and bonds. The insurance currently maintained by Company and its Subsidiaries provides coverage in kind and amount reasonably necessary to protect against risks inherent in or associated with the KB Toy Business.

3.16. _Leases_. (a) Seller has made available to Buyer a true and complete copy of each Lease and Non-Store Lease (other than oral month-to-month tenancy arrangements), together

with all amendments and modifications thereto, and, with respect to the Non-Store Leases, copies of all mortgages, subordination or attornment agreements and other such documents and agreements of which Seller has knowledge and to which such Non-Store Leases are subject or which affect the rights of the lessee thereunder, all of which Leases and Non-Store Leases (including any month-to-month tenancy arrangement) in effect as of the Balance Sheet Date are listed on Schedule 3.16. All of the Stores operated in the KB Toy Business are leased by the Company or one of its Subsidiaries as lessee or sublessee and each Lease and Non-Store Lease is a valid and binding agreement of the Company or one of its Subsidiaries, as the case may be, and is in full force and effect. The Company and its Subsidiaries are not (and, to the knowledge of the Seller, no other party is) in breach or default in any material respect under any Lease or Non-Store Lease, and no event has occurred which constitutes or, with the lapse of time or the giving of notice or both, would constitute such a material breach or default by the Company or any of its Subsidiaries thereunder, other than, in the case of the Leases, any breach or default resulting from the transactions contemplated by this Agreement.

(b)  As of the Closing Date, except as disclosed in Schedule 3.16, the Company and its Subsidiaries shall have paid to the Landlord under each Lease and Non-Store Lease (other than a Terminated Lease) all monies then due and owing pursuant to the provisions of such Lease or Non-Store Lease as in effect on the date hereof and shall have fulfilled all material obligations required to be performed by the Company or any such Subsidiary under such Lease or Non-Store Lease, except, in the case of the Leases, for obligations arising out of or resulting from the transactions contemplated by this Agreement.

(c)  Except as otherwise provided in any Lease, neither the Company nor any of its Subsidiaries is (i) subject to any continuous operating covenants or radius restrictions and (ii) obligated to remodel any of the premises subject to a Lease during the term of such Lease.

(d)  Except as set forth in Schedule 3.16, (i) neither the Company nor any of its Subsidiaries has assigned, transferred, conveyed, mortgaged or encumbered any interest in any Lease and (ii) the Company or the applicable Subsidiary is in peaceful and undisturbed possession under each of the Leases and such premises are currently in operation.

(e)  None of the Leases relates to a Store that has been closed.

3.17.  Compliance with Laws.  Except as set forth on Schedule 3.17, neither the Company nor any of its Subsidiaries is in violation of, nor has since January 1, 1999 violated, any applicable provisions of any laws, statutes, ordinances or regulations applicable to the Company and its Subsidiaries or the conduct of the KB Toy Business, except for violations that have not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

3.18.  Intellectual Property.  (a) Schedule 3.18 sets forth a list of all material Intellectual Property Rights, other than any common law rights, specifying as to each, as applicable: (i) the nature of such Intellectual Property Right; (ii) the owner of such Intellectual Property Right; (iii) the jurisdictions by or in which such Intellectual Property Right has been issued or registered or

in which an application for such issuance or registration has been filed, including the respective registration or application numbers; and (iv) material licenses, sublicenses and other agreements as to which the Company or any of its Subsidiaries is a party and pursuant to which any Person is authorized to use such Intellectual Property Right, including the identity of all parties thereto, a description of the nature and subject matter thereof, the applicable royalty and the term thereof.

(b) Except as set forth on Schedule 3.18, neither the Company nor any of its Subsidiaries has since October 31, 1997, (i) infringed any Intellectual Property Rights in a manner that would be reasonably likely to have a Material Adverse Effect or (ii) been sued or charged in writing with or been a defendant in any claim, suit, action or proceeding relating to the KB Toy Business that has not been finally terminated prior to the date hereof or that involves a claim of infringement of any Intellectual Property Rights that would be reasonably likely to have a Material Adverse Effect; and Seller has no knowledge of any other material claim or infringement by the Company or any such Subsidiary, and no knowledge of any continuing infringement by any other Person of any Intellectual Property Rights. To Seller's knowledge, no Intellectual Property Right is subject to any outstanding order, judgment, decree, stipulation or agreement materially restricting the use thereof by the Company or any of its Subsidiaries with respect to the KB Toy Business or materially restricting the licensing thereof by the Company or such Subsidiary to any Person.

3.19.  Employees.  Schedule 3.19 contains a list of the names, titles, annual base salaries and any other compensation not made pursuant to a Benefit Arrangement for all employees of the Company and its Subsidiaries whose annual base salary exceeds $100,000.

3.20.  Benefit Representations.  Schedule 3.20 contains a true and complete list of all Benefit Arrangements. With respect to each of the Benefit Arrangements, the Seller has made available to the Buyer a current, accurate and complete copy (or, to the extent no such copy exists, an accurate description) thereof and, to the extent applicable, any related trust agreement, annuity contract or other funding instrument and any summary plan description.

3.21.  Environmental Matters.  Except as set forth on Schedule 3.21,

(a) no notice, notification, demand, order, request for information or complaint has been received by Seller, the Company or any of its Subsidiaries and no penalty has been assessed against the Company or any of its Subsidiaries with respect to any (A) alleged material violation by the Company or any of its Subsidiaries of any Environmental Law, (B) alleged material failure by the Company or any of its Subsidiaries to have any permit, certificate, license, approval, registration or authorization required under any Environmental Law in connection with the conduct of the KB Toy Business or (C) alleged material liability of the Company or any of its Subsidiaries as a potentially responsible party in connection with any site listed on the National Priorities List or any analogous state list;

(b) neither the Company nor any of its Subsidiaries has created, nor does there exist, any condition that requires reporting, assessment or remediation under Environmental Laws except

24

for any such condition that would not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect;

(c)    the Company and its Subsidiaries are in compliance with all applicable Environmental Laws, except for such noncompliance which would not have, individually or in the aggregate, a Material Adverse Effect;

(d)    the Company and its Subsidiaries have obtained all environmental, health and safety permits, licenses or approvals necessary for the operations of the KB Toy Business, and all such permits, licenses or approvals are in good standing, and the Company and each of its Subsidiaries is in compliance with all terms and conditions of such permits, licenses or approvals, except where the failure to obtain such permits, licenses or approvals, the failure of such permits, licenses or approvals to be in good standing or the failure to comply with such terms and conditions would not, individually or in the aggregate, have a Material Adverse Effect; and

(e)    none of the Company or any of its Subsidiaries or any of their respective currently owned or leased properties is subject to any on-going investigation, order, judicial or administrative proceeding, judgment, decree or settlement relating to (i) any Environmental Law (including any liability thereunder), (ii) any remediation activity or (iii) any Release of Hazardous Substances, which would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

3.22.    Transactions with Affiliates.  Except as set forth on Schedule 3.06(b), Schedule 3.19, Schedule 3.20, Schedule 3.22 or Schedule 3.23 or as contemplated by Section 2.02(b), neither the Company nor any of its Subsidiaries is a party to or bound by any contract, commitment or understanding (other than contracts, commitments or understandings between or among the Company and its Subsidiaries) with any of the stockholders (other than the stockholders of Seller's parent corporation), directors or officers of Seller or any of its Affiliates or any member of their respective families or, with any of the directors or officers of the Company or any of its Subsidiaries or any member of their respective families, and neither Seller nor any of its Affiliates nor any of the stockholders (other than the stockholders of Seller's parent corporation), directors or officers of the Seller or any of its Affiliates or the members of their respective families or any of the directors or officers of the Company or any of its Subsidiaries or any member of their respective families owns or otherwise has any right to or interest in any asset, tangible or intangible, which is used in the KB Toy Business. Except for the guarantees of certain Leases by the Seller or its Affiliates and except for the items disclosed pursuant to this Section 3.22, (i) neither the Seller nor any of its Affiliates has guaranteed any obligations of the Company or any of its Subsidiaries and (ii) neither the Company nor any of its Subsidiaries has guaranteed any obligations of the Seller or any of its Affiliates.

3.23.    Finders' Fees.  Except for Credit Suisse First Boston Corporation, whose fees will be paid by Seller, and except as set forth on Schedule 3.23, there is no investment banker, broker, finder or other intermediary which has been retained by or is authorized to act on behalf of Seller, any of Seller's Affiliates, the Company or any the Company's Subsidiaries who might be

entitled to any fee or commission from Buyer or any of its Affiliates upon consummation of the transactions contemplated by this Agreement.

3.24.  Purchase for Investment.  Seller is acquiring the Warrants for investment for its own account and not with a view to, or for sale in connection with, any distribution thereof. Seller (either alone or together with its advisors) has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risks of its investment in the Warrants and the underlying shares of common stock and is capable of bearing the economic risks of such investment.

3.25.  Products.  Except as set forth on Schedule 3.25, all of the products marketed or sold by the Company or any of its Subsidiaries prior to the Closing Date (i) were at the time of their sale in compliance in all material respects with all applicable Federal, state and local laws and regulations (including, without limitation, statutory and common law duties) and (ii) were at the time of such sale fit for the ordinary purposes for which they were intended to be used.

ARTICLE IV

REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller that, as of the Closing:

4.01.  Organization and Existence.  Buyer is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate powers and all material governmental licenses, authorizations, consents and approvals required to carry on its business as now conducted.

4.02.  Corporate Authorization.  The execution, delivery and performance by Buyer of this Agreement and the consummation by Buyer of the transactions contemplated hereby are within the corporate powers of Buyer and have been duly authorized by all necessary corporate action on the part of Buyer. This Agreement constitutes a valid and binding agreement of Buyer, enforceable against Buyer in accordance with its terms, except as (i) the enforceability hereof may be limited by bankruptcy, insolvency, moratorium or other similar laws affecting the enforcement of creditors' rights generally and (ii) the availability of remedies may be limited by equitable principles of general applicability or public policy.

4.03.  Governmental Authorization.  The execution, delivery and performance by Buyer of this Agreement require no action by or in respect of, or filing with, any governmental body, agency, official or authority.

4.04.  Non-Contravention.  The execution, delivery and performance by Buyer of this Agreement do not and will not (i) contravene or conflict with the certificate of incorporation or bylaws of Buyer; (ii) subject to compliance with the matters referred to in Section 4.03, contravene or conflict with any provision of any law, regulation, judgment, injunction, order or decree binding upon Buyer; or (iii) constitute a default under (or any event that with notice, lapse

26

of time or both, would constitute a default under) or give rise to any right of modification, termination, cancellation or acceleration of any right or obligation of Buyer or to a loss of any benefit to which Buyer is entitled under any provision of any agreement, contract or other instrument binding upon Buyer or any license, franchise, permit or other similar authorization held by Buyer.

4.05.  Finders' Fees.  There is no investment banker, broker, finder or other intermediary which has been retained or is authorized to act on behalf of Buyer or any of its Affiliates who might be entitled to any fee or commission from Seller or any of its Affiliates upon consummation of the transactions contemplated by this Agreement.

4.06.  Financing.  Buyer has received and delivered to Seller a letter from Fleet Retail Finance Inc. and Fleet Securities Inc. (the "Commitment Letter"), with respect to debt financing (the "Financing") in an amount sufficient to fund the Company Dividend Amount and to enable Buyer or its designee to pay the Share Purchase Price, and make any other payments to be made by Buyer or its designee under this Agreement or the transactions contemplated hereby. The terms and conditions of the Commitment Letter have not been altered or amended in any manner that would have an adverse effect on Buyer's ability to perform its obligations under this Agreement, and the Commitment Letter remains in full force and effect (unless superseded by definitive documentation that would not have any adverse effect upon Buyer's ability to perform its obligations under this Agreement). Assuming the accuracy of the Seller's representations and warranties contained in this Agreement, as of the date hereof, Buyer knows of no facts that could result in any of the conditions set forth in the Commitment Letter not being satisfied.

4.07.  Purchase for Investment.  (a) Buyer is purchasing the Shares for investment for its own account and not with a view to, or for sale in connection with, any distribution thereof. Buyer (either alone or together with its advisors) has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risks of its investment in the Shares and is capable of bearing the economic risks of such investment.

(b)  The shares of common stock issuable upon exercise of the Warrants will, upon payment therefor in accordance with the terms of the Warrants, be validly issued, fully paid and non-assessable.

4.08.  Litigation.  Assuming the accuracy of Seller's representations and warranties in Section 3.12 as they relate to the representations and warranties contained in this Section 4.08, there is no action, suit, investigation or proceeding pending against, or to the knowledge of Buyer threatened against or affecting, Buyer before any court or arbitrator or any governmental body, agency or official (i) in which there is a reasonable possibility of an adverse decision which would have a material adverse effect on the business, assets, condition (financial or otherwise) or results of operations of Buyer or (ii) which in any matter challenges or seeks to prevent, enjoin, alter or materially delay the transactions contemplated hereby.

4.09.  Net Worth.  Assuming the accuracy of Seller's representations and warranties in Section 3.11 as they relate to the representations and warranties contained in this Section 4.09, as

27

of the Closing Date (after giving effect to the transactions contemplated by this Agreement, including consummation of the Financing), the consolidated net worth of the Company and its Subsidiaries will be at least $20,000,000.

4.10.  HSR Matters. Buyer Holdings is an "acquiring person" as that term is used and defined under Section 7A of the Clayton Act, 15 U.S.C., Section 18a (the "Clayton Act") and the rules promulgated under the Clayton Act; Buyer is not "controlled by" or "under common control with," as defined in Rule 801.1(b) under the Clayton Act, any other person and is its own "ultimate parent entity" as defined in Rule 801.1(a)(3) under the Clayton Act; and Buyer Holdings does not have total assets or annual net sales as referenced in Section 7A(a)(2) of the Clayton Act and determined in accordance with Rule 801.11 under the Clayton Act of $10 million or more. Neither Buyer Holdings, Buyer nor Seller is required to make any filing under the HSR Act in connection with the transactions contemplated by this Agreement.


ARTICLE V

COVENANTS OF SELLER

Seller agrees that:

5.01.  Conduct of the Business.  Except as otherwise contemplated by this Agreement or disclosed in Schedule 5.01, from the date hereof until the Closing Date, Seller will cause the Company and its Subsidiaries to conduct the KB Toy Business in the ordinary course consistent with past practice, use their reasonable best efforts to preserve intact the business organizations and relationships of the KB Toy Business with third parties and to keep available the services of the present employees of the KB Toy Business. Without limiting the generality of the foregoing, except as otherwise contemplated by this Agreement or disclosed in Schedule 5.01, from the date hereof until the Closing Date, without the prior consent of Buyer, Seller will not permit the Company or any of its Subsidiaries to:

(a)  adopt or propose any change to its Charter or bylaws (or analogous governing documents);

(b)  merge or consolidate with any other Person or acquire a material amount of assets of any other Person;

(c)  acquire a material amount of assets of any other Person;

(d)  sell, lease, license or otherwise dispose of any material assets or property except for sales, leases, licenses or other dispositions of such assets or property (i) pursuant to existing contracts or commitments and (ii) in the ordinary course consistent with past practice, except that in no event shall the Company or any Subsidiary sell, lease, license or otherwise dispose of any Real Property;

28

(e) fail to maintain the Company's and its Subsidiaries' books and records in the ordinary course of business;

(f) fail to maintain in good repair, subject to ordinary wear and tear, the premises, fixtures, machinery, furniture and equipment of the Company and its Subsidiaries in a manner consistent with past practices;

(g) except as contemplated by this Agreement and except in the ordinary course of business consistent with past practices, enter into any new Lease or Non-Store Lease or amend in any respect, extend or terminate any Lease or Non-Store Lease or permit any renewal notice period or option to lapse with respect to any such Lease or Non-Store Lease; or

(h) agree or commit to do any of the foregoing.

Seller will not, and will not permit the Company or any of its Subsidiaries to, (i) take or agree or commit to take any action that would make any representation and warranty of Seller hereunder inaccurate in any material respect at, or as of any time prior to, the Closing Date or (ii) omit or agree or commit to omit to take any action necessary to prevent any such representation or warranty from being inaccurate in any material respect at any such time.

5.02. <u>Access to Information</u>. From the date hereof until the Closing Date, Seller (a) will, and will cause the Company and each of its Subsidiaries to, give Buyer, its counsel, financial advisors, auditors, prospective lenders and other authorized representatives reasonable access during normal business hours to the offices, properties, books and records of the Company and its Subsidiaries; (b) will furnish to Buyer, its counsel, financial advisors, auditors and other authorized representatives such financial and operating data and other information relating to the Company and its Subsidiaries as such Persons may reasonably request and (c) will instruct the employees, counsel and financial advisors of Seller, the Company and its Subsidiaries to reasonably cooperate with Buyer in its investigation of the Company and its Subsidiaries; <u>provided</u> that no investigation pursuant to this Section 5.02 shall affect any representation or warranty given by Seller hereunder; and <u>provided further</u> that any investigation pursuant to this Section 5.02 shall be conducted in such manner as not to interfere unreasonably with the conduct of the business of the Company and its Subsidiaries. Notwithstanding the foregoing, Buyer shall not have access to personnel records of the Company and its Subsidiaries relating to individual performance or evaluation records, medical histories or other information which in Seller's good faith opinion is sensitive or the disclosure of which could subject Seller or its Affiliates to risk of liability.

5.03. <u>Notices of Certain Events</u>. Prior to the Closing Date, Seller shall promptly notify Buyer of:

(i)  any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement;

(ii)  any notice or other communication from any governmental or regulatory agency or authority in connection with the transactions contemplated by this Agreement; and

(iii)  any actions, suits, claims, investigations or proceedings commenced or, to Seller's knowledge threatened against, relating to or involving or otherwise affecting the Company or any of its Subsidiaries that, if pending on the date of this Agreement, would have been required to have been disclosed pursuant to Section 3.12 or that relate to the consummation of the transactions contemplated by this Agreement.

5.04.  Capital Expenditures.  Seller shall cause the Company and its Subsidiaries to make capital expenditures in the ordinary course of business and consistent with the budget for the KB Toy Business previously furnished by Seller to Buyer.

5.05.  Resignations.  Seller will deliver to Buyer resignations of all officers and directors (other than Michael Glazer) of the Company and each Subsidiary who will be officers, directors or employees of Seller or any of its Affiliates after the Closing Date from their positions with the Company or any of its Subsidiaries at or prior to the Closing Date.

5.06.  Confidentiality.  From and after the Closing Date, Seller and its Affiliates will hold, and will use their best efforts to cause their respective officers, directors, employees, accountants, counsel, consultants, advisors and agents to hold, in confidence, unless compelled to disclose by judicial or administrative process or by other requirements of law (including, but not limited to, the rules and regulations of the Internal Revenue Service or any comparable foreign or state agency or authority), all confidential documents and information concerning the Company and its Subsidiaries, and all information relating to Buyer that has been received from Buyer, except to the extent that such information can be shown to have been (i) in the case of information relating to Buyer, previously known on a nonconfidential basis by Seller or its Affiliates, (ii) in the public domain through no fault of Seller or its Affiliates or (iii) later lawfully acquired by Seller or its Affiliates from sources other than Buyer or any of its Affiliates. The obligation of Seller and its Affiliates to hold any such information in confidence shall be satisfied if they exercise the same care with respect to such information as they would take to preserve the confidentiality of their own similar information.

5.07.  Risk of Loss.  The risk of loss of the assets of the Company and its Subsidiaries shall remain with Seller until the Closing Date. If any Store or distribution center is damaged by fire or other casualty prior to the Closing Date, if the Closing occurs, on the Closing Date, Seller shall assign to Buyer (i) all insurance proceeds, if any, for such Store or such distribution center which relate to the assets of the KB Toy Business located at such Store or such distribution center and (ii) the business interruption insurance proceeds, if any, for such Store or distribution

30

center which are attributable to the period beginning on the Closing Date and continuing thereafter.

5.08.  <u>Other Offers</u>.  From the date hereof until the Closing Date or earlier termination of this Agreement, Seller will not, and will cause the Company and its Subsidiaries and their respective directors, officers, employees and representatives (including, without limitation, Credit Suisse First Boston Corporation) not to, directly or indirectly, take any action to solicit, initiate or encourage, or furnish any information in connection with, or enter into any discussions or negotiations concerning, any Acquisition Proposal; <u>provided</u>, that nothing contained in this Agreement shall prevent Seller from furnishing nonpublic information to, or affording access to the properties, books or records of the Company or any of its Subsidiaries to, or entering into discussions or an agreement with, any Person in connection with an unsolicited Acquisition Proposal by such Person, if and only if Seller shall have, prior to furnishing any such nonpublic information to, or entering into discussions or negotiations with, such Person, terminated this Agreement in accordance with this Section 5.08. Seller may terminate this Agreement pursuant to this Section 5.08 by notice of termination if and only if (i) Seller shall have received a bona fide unsolicited Acquisition Proposal, (ii) Seller shall have furnished Buyer notice of such Acquisition Proposal containing the information referred to in the last sentence of this Section 5.08 not fewer than three business days prior to such termination and (iii) the Seller's Board of Directors shall have determined in good faith after consultation with outside legal counsel that such action is prudent or necessary to comply with their fiduciary duties to the stockholders of the Seller under applicable law. For purposes hereof, an "Acquisition Proposal" means any offer or proposal for, or any indication of interest in, a business combination involving the Company and its Subsidiaries or the acquisition of any equity interest in, or a material portion of the assets of, the Company or any Subsidiary, other than the transactions contemplated by this Agreement. Seller shall promptly notify Buyer of any Acquisition Proposal, which notice shall include the identity of all relevant parties thereto and the terms and conditions of any such Acquisition Proposal.

5.09.  <u>Non-Competition: Non-Solicitation</u>.  (a)  Seller agrees that, in consideration of the payment by Buyer of the Purchase Price, Seller shall not, on or prior to the second anniversary of the Closing Date, directly or indirectly: run, own, manage, operate or control any business, venture or activity which is the same as or substantially similar to, or competes with, the KB Toy Business in the United States or any of its territories or possessions. Nothing contained in the immediately preceding sentence shall prevent Seller from, directly or indirectly, (i) selling toys to retail stores and distributors; (ii) continuing to operate its close-out business consistent with its past practices, including, but not limited to, the sale of toys; and (iii) running, owning, managing, operating or controlling a business which sells toys as an integrated part of a close-out business, including a website dedicated to the sale of close-out goods, provided such business is not primarily a sales outlet for toys and such business does not operate through a separate storefront for the sale of toys. In addition to the foregoing, Seller agrees that (x) with respect to products that are marketed by Buyer, any of its Subsidiaries or any of the Company's Subsidiaries as "KB Exclusives," to the extent that Seller and/or any of its Affiliates obtains rights to market such products from the manufacturer or distributor thereof, Seller and such Affiliates shall only sell such products to consumers and only through their retail operations and

(ii) in no event shall Seller or any of its Affiliates use the KB trademark or any variant thereof without the prior written consent of Buyer.

(b)  Except as provided by applicable law, on or prior to the second anniversary of the Closing Date, neither Seller nor any of its Affiliates shall, without the prior written consent of Buyer, solicit to employ or employ any individual who is an employee of the Company or any of its Subsidiaries on the date hereof, or at any time following the date hereof and prior to such second anniversary, and who on or prior to the Closing Date occupies a home office position (other than a secretarial or clerical position) or a management position, unless (i) such individual shall have been, or received notice that he or she will be, involuntarily terminated by the Company or any Subsidiary or (ii) at least six months shall have elapsed following the cessation of such individual's employment (other than as a result of involuntary termination) with Buyer or any of its Affiliates.

(c)  Because of (i) the difficulty of measuring economic losses to Buyer and (ii) the immediate and irreparable damage that could be caused to Buyer and its Affiliates for which they would have no other adequate remedy, in each case as a result of a breach by Seller of this Section 5.09, Buyer, in its sole and absolute discretion, may enforce the provisions of this Section 5.09 by injunction and other equitable relief, in addition to obtaining any other remedy or relief available to Buyer (including damages at law).

(d)  The parties agree that (i) the covenants set forth in this Section 5.09 are severable and separate, and the unenforceability of any specific covenant shall not affect the provision of any other covenant and (ii) if any court of competent jurisdiction shall determine that the scope, time or territorial restrictions set forth in any such covenant is unreasonable, then it is the intention of the parties that such restriction be enforced to the fullest extent which the court deems reasonable, and this Section 5.09 shall thereby be reformed.

5.10.  Books and Records; Personnel.  Seller acknowledges and agrees that from and after the Closing, the Company will be entitled to own and possess, subject to the next succeeding sentence, all documents, books, records, agreements and financial data of any sort relating to the Company, the Subsidiaries or the KB Toy Business. Seller agrees to deliver and cause its Affiliates to deliver, prior to the Closing, all such books and records in their possession to the Company or, to the extent such books and records are not readily separable from the books and records of Seller or any of its Affiliates relating to their businesses other than the KB Toy Business, true and complete copies of such books and records.

5.11.  Transfer of LLC Interests.  Immediately prior to the Closing, Seller shall cause Pheasant Kay-Bee Toy, Inc., a Subsidiary of the Company, to transfer its limited liability company membership interests in Sonoran LLC, a Delaware limited liability company ("Sonoran"), and Sahara LLC, a Delaware limited liability company ("Sahara"), to Seller. Seller represents and warrants that neither Sonoran nor Sahara has any assets or liabilities other than related to two jet aircraft that are used by Seller.

32

5.12.  <u>Insurance Policies and Administration</u>.  (a) The Seller will cause all occurrence-based insurance policies under which the Company or its Subsidiaries have been insured prior to the Closing to remain in full force and effect through their natural expiration dates. No alternations or modifications to any of these policies, even if occurring after the expiration of such policies, shall be made without the approval of Buyer, which approval shall not be unreasonably withheld, delayed or conditioned.

(b)  The Seller will cause all claims-made or occurrence-reported policies, including but not limited to Employment Practices Liability, Fiduciary Liability, Directors and Officers Liability and Employee Benefits Liability policies, under which the Company or its Subsidiaries have been insured that are presently in force shall be maintained through their natural expiration dates. All such policies shall provide coverage for a period of time such that, at a minimum, the coverage under such policies remains in force through the expiration of the statute of limitations on claims. No alternations or modifications to these policies, including but not limited to retroactive dates, limits of liability, retentions or deductibles, coverages and any other terms and conditions, even if occurring after the expiration of these policies, shall be made without the approval of the Buyer, which approval shall not be unreasonably withheld or delayed.

(c)  Seller shall maintain its claims administration function consistent with present practices as of the Closing Date, whether directly or through third parties currently engaged, for all of the claims of the Company and its Subsidiaries relating to periods through the Closing Date for the entire life of such claim. The Company will only be required to pay for Seller's costs, if any, associated with the handling of those claims for which the Company and its Subsidiaries are liable and which are not subject to reimbursement or indemnity from the Seller or insurance policies.

ARTICLE VI

COVENANTS OF BUYER

Buyer agrees that:

6.01.  <u>Confidentiality</u>.  Prior to the Closing Date and after any termination of this Agreement, Buyer and its Affiliates will hold, and will use their best efforts to cause their respective officers, directors, employees, accountants, counsel, consultants, advisors and agents to hold, in confidence, unless compelled to disclose by judicial or administrative process or by other requirements of law, all confidential documents and information concerning the Company and its Subsidiaries, Seller or any of Seller's Affiliates furnished to Buyer or its Affiliates in connection with the transactions contemplated by this Agreement, except to the extent that such information can be shown to have been (i) previously known on a nonconfidential basis by Buyer, (ii) in the public domain through no fault of Buyer or (iii) later lawfully acquired by Buyer from sources other than Seller or any of its Affiliates; <u>provided</u> that Buyer may disclose such information to its officers, directors, employees, accountants, counsel, consultants, advisors and agents in connection with the transactions contemplated by this Agreement and to its financing sources in connection with obtaining the financing for the transactions contemplated

33