by this Agreement so long as such Persons are informed by Buyer of the confidential nature of such information and are directed by Buyer to treat such information confidentially. The obligation of Buyer and its Affiliates to hold any such information in confidence shall be satisfied if they exercise the same care with respect to such information as they would take to preserve the confidentiality of their own similar information. If this Agreement is terminated, Buyer and its Affiliates will, and will use their best efforts to cause their respective officers, directors, employees, accountants, counsel, consultants, advisors and agents to, destroy or deliver to Seller, upon request, all documents and other materials, and all copies thereof, obtained by Buyer or its Affiliates or on their behalf from Seller in connection with this Agreement that are subject to such confidence.

6.02.  <u>Access</u>.  On and after the Closing Date, Buyer will afford promptly to Seller, its Affiliates and their respective agents reasonable access during normal business hours to its properties, books, records, employees and auditors to the extent necessary to permit Seller to determine any matter relating to any period ending on or before the Closing Date; <u>provided</u> that any such access by Seller shall not unreasonably interfere with the conduct of the business of Buyer and <u>provided</u> that Seller is not requesting such access for the purpose of investigating any dispute which may exist between Buyer and Seller. Notwithstanding the foregoing, Buyer shall not be required to afford Seller reasonable access pursuant to this Section 6.02 at any time there is any pending litigation or any Arbitration pursuant to Article II or VIII between Buyer and Seller, except to the limited extent reasonably required by Seller to complete an audit of CSC and its consolidated Subsidiaries as required by the 1934 Act and the rules and regulations thereunder, to prepare a Tax Return with respect to the Company or any of its Subsidiaries with respect to a Pre-Closing Tax Period or to defend an audit or other proceeding relating to Taxes of the Company or any of its Subsidiaries with respect to a Pre-Closing Tax Period.

6.03.  <u>Notices of Certain Events</u>.  Prior to the Closing Date, Buyer shall promptly notify Seller in writing of:

(a)  any notice or other communication received from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement;

(b)  any notice or other communication received from any governmental or regulatory agency or authority in connection with the transactions contemplated by this Agreement;

(c)  any actions, suits, claims, investigations or proceedings commenced or, to Buyer's knowledge, threatened against, relating to or involving or otherwise affecting Buyer that, if pending on the date of this Agreement would have been required to have been disclosed pursuant to Section 4.07 or that relate to the consummation of the transactions contemplated by this Agreement; and

(d)  any development of which Buyer becomes aware (other than developments affecting the markets for senior debt financing generally) that would reasonably be expected to have an adverse effect on the Financing.

6.04. <u>Financing</u>. Buyer will use commercially reasonable efforts to obtain the Financing. In the event that any portion of the Financing becomes unavailable, regardless of the reason therefor, Buyer will use commercially reasonable efforts to obtain alternative financing from other sources on and subject to substantially the same terms and conditions as the portion of the Financing that has become unavailable. Buyer shall use commercially reasonable efforts to satisfy at or prior to the Closing Date all requirements of the agreements related to the Financing (or such alternative financing) which are conditions to closing under such agreements and to drawing down the proceeds of the Financing (or such alternative financing) other than conditions to be satisfied by the Company and its Subsidiaries.

6.05. <u>Change of Control of Buyer</u>. For so long as Seller or any of its Affiliates remains liable as primary obligor or guarantor under any of the Leases, Buyer shall not sell all or substantially all of the assets of the KB Toy Business or the capital stock of the Company and its Subsidiaries (or of any parent company of the Company), whether by merger, consolidation or otherwise, unless (a) the Person acquiring such assets or stock, immediately after giving effect to the proposed transaction, shall have a consolidated net worth of not less than $20,000,000 or (b) the Seller provides its prior written consent to such transaction, which consent shall not be unreasonably withheld or delayed.

6.06. <u>No Intercompany Transactions</u>. Neither the Company nor any of its Subsidiaries shall engage in any intercompany transactions after the Closing on the Closing Date, including the making of any loan, advance, capital contribution, distribution or dividend.

# ARTICLE VII

## COVENANTS OF BOTH PARTIES

The parties hereto agree that:

7.01. <u>Reasonable Best Efforts: Further Assurances</u>. Subject to the terms and conditions of this Agreement, Buyer and Seller will use their reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable under applicable laws and regulations to satisfy the conditions to the other party's obligation to consummate the transactions contemplated by this Agreement. Seller and Buyer agree, and Seller, prior to the Closing, and Buyer, after the Closing, agree to cause the Company and each of its Subsidiaries, to execute and deliver, or cause to be executed and delivered, such other documents, certificates, agreements and other writings and to take, or cause to be taken, such other actions as may be necessary or desirable in order to consummate or implement expeditiously the transactions contemplated by this Agreement.

7.02. <u>Certain Filings</u>. Seller and Buyer shall cooperate with one another (i) in determining whether any action by or in respect of, or filing with, any governmental body, agency, official or authority is required, or any actions, consents, approvals or waivers are

35

required to be obtained from parties to any material contracts, in connection with the consummation of the transactions contemplated by this Agreement and (ii) in taking such actions or making any such filings, furnishing information required in connection therewith and seeking timely to obtain any such actions, consents, approvals or waivers; provided, however, that Buyer shall not be required to make any payments or accept any changes to any such contract except to the extent specifically provided in Section 7.04.

7.03.  Public Announcements.  Buyer and Seller agree not to issue any press release or make any public statement with respect to this Agreement or the transactions contemplated hereby without the prior consent of the other party, except as may be required by applicable law or any listing agreement with any national securities exchange.

7.04.  Certain Matters Relating to Lease Consents.  (a) Except as contemplated by the Transitional Services Agreement, Seller and its Affiliates shall not contact any Landlord with respect to a Lease without the prior consent of Buyer, such consent not to be unreasonably withheld, and Seller and its Affiliates shall use commercially reasonable efforts to refer all communications and inquiries from a Landlord to Buyer. Buyer shall not be required to affirmatively request a consent of the Landlord under a Lease to the transactions contemplated by this Agreement (a "Landlord Consent") from any Landlord; provided, however, that if a Landlord contacts Buyer in writing demanding a Rent Increase or Release Payment relative to a Lease pursuant to which the Seller or any Seller Indemnitee is a guarantor as a condition of granting such a Landlord Consent, Buyer shall deal with such Landlord in good faith and use reasonable, good faith efforts to obtain such Landlord Consent by:

(i)      generally describing the transactions contemplated by this Agreement;

(ii)     promptly providing all financial and other information with respect to Buyer reasonably requested by the Landlord;

(iii)    in the event Seller, or any Seller Indemnitee has guaranteed the obligations of the tenant under the Lease, executing a replacement guaranty on substantially similar terms as the guaranty by Seller or such Seller Indemnitee, to the extent the Landlord may reasonably request; and

(iv)    executing such assignment and assumption agreement with regard to the Lease as the Landlord may reasonably require.

(b)  In the event that, as of the first anniversary of the Closing Date, a Landlord Consent has not been obtained for any Lease, but the Landlord has not provided a Landlord Objection, the Landlord Consent with respect to such Lease shall be deemed to have been given and Seller shall have no further obligation of any kind whatsoever with respect to such Lease.

(c)  In the event a Landlord Objection is received or Lease Enforcement Proceedings are commenced prior to the Lease Termination Enforcement Date, Buyer shall be responsible for contesting such Landlord Objection and defending such proceedings, and Buyer and Seller shall share equally the cost and expenses of such contest and defense. If Lease Enforcement

Proceedings are commenced after the Lease Termination Enforcement Date against Seller, Buyer, the Company or any of its Subsidiaries regarding the failure to obtain any such Landlord Consent, Buyer shall be responsible for defending such action at Buyer's sole cost and expense. Seller shall promptly forward to Buyer any written objection or other similar notice received by Seller from any Landlord.

(d)  At such time as the aggregate Lease Termination Costs incurred after the date hereof exceed $10,000,000 (including Leases with negative Contribution as a deduction therefrom), for each Lease determined to be a Terminated Lease thereafter, Seller shall, in respect of the Terminated Lease that caused the aggregate Lease Termination Costs to exceed $10,000,000 and each subsequent Terminated Lease, within five business days after Buyer has vacated the subject Store pertaining to such Terminated Lease, pay in cash to Buyer an amount equal to 50% of the Lease Termination Costs for such Terminated Lease. Buyer and Seller agree that, for purposes of the calculation of any payment pursuant to this Section 7.04(d), the Contribution of a Terminated Lease that is less than zero shall be deemed to be equal to zero.

(e)  Except as otherwise provided in this Agreement, Buyer's only obligation with respect to a Terminated Lease shall be (i) to remove the inventory from the Store relating to such Terminated Lease and (ii) deliver possession of such Store to Landlord as soon as practicable in the condition required under the terms of the Lease. The cost of removing and shipping such inventory from the Store subject to the Terminated Lease to Buyer (the "Inventory Shipping Costs") and the costs of restoring the Store to the condition required under the terms of the Lease to the extent any such costs exceed the cost to restore the Store to "broom clean" condition substantially equivalent to the condition in which the Store was delivered to Buyer (the "Restoration Cost") shall be initially paid by Buyer but shall be "Lease Restoration Costs" and therefore treated as Lease Termination Costs hereunder.

(f)  From and after such time as the aggregate of the Lease Consent Costs incurred after the date hereof exceed $5,000,000, for each Lease for which Buyer agrees to a Rent Increase and/or Release Payment, Seller shall, within 30 days following written notice thereof delivered to Seller by Buyer, pay to Buyer in cash an amount equal to 50% of the (i) Release Payment, if any, for such Lease and (ii) the Rent Increase, if any, for such Lease. In agreeing to a Rent Increase or a Release Payment with respect to a Lease, Buyer may make such decisions in its sole discretion; provided, that, to the extent the total Lease Consent Costs (x) exceed $3,750,000 and the Lease Consent Costs for such Lease exceed 40% of the net present value (applying a discount rate equal to the Reference Rate) or (y) exceed $5,000,000 and the Lease Consent Costs for such Lease exceed 20% of the net present value (applying a discount rate equal to the Reference Rate), in each case, of the amount of the aggregate rent (assuming the same sales from the subject Store as was achieved during the most recent 12-month period) over the remaining term (excluding options to extend or renew) of the subject Lease (except that a Lease having a remaining term of less than one year and a month-to-month Lease shall be treated as having a remaining term of one year and a Lease having a remaining term of greater than two years shall be treated as having a remaining term of two years), Buyer may only agree to such Rent Increase and/or Release Payment with the prior written consent of Seller, which consent shall not be unreasonably withheld, delayed or conditioned.

37

(g)    Each of Buyer and Seller agree to keep the other generally apprised of the status of any matters that are the subject of this Section 7.04.

7.05.  Information.  For so long as Seller or any Seller Indemnitee is a guarantor under any Lease, Buyer shall, within 30 days after the end of each March, June, September and December, deliver to Seller a schedule of the Leases then outstanding in respect of which Seller, or any Seller Indemnitee is a guarantor, including a list of such Leases and the remaining term (including any option(s)) and the applicable rent and any other amounts payable under such Leases.  Prior to the Closing Date, Seller shall prepare and deliver to Buyer a schedule setting forth such information as of October 28, 2000.

7.06.  Lease Indemnity.  Buyer hereby indemnifies each Seller Indemnitee against and agrees to hold each Seller Indemnitee harmless from and against any and all Losses incurred or suffered by such Seller Indemnitee arising out of (i) the failure of Buyer, the Company, any of its Subsidiaries or any other entity in which the Buyer has an ownership interest or right to directly or indirectly control the management of ("Buyer Performance Group") to pay all monies due and owing pursuant to the provisions of any Lease (other than a Terminated Lease) on or after the Closing Date, (ii) the breach by any member of the Buyer Performance Group of any of the other terms, covenants and conditions of any Lease (other than a Terminated Lease) occurring on or after the Closing Date, or (iii) the failure of any member of the Buyer Performance Group to timely and completely perform each of its obligations under any guaranty or similar agreement with respect to any Lease (other than a Terminated Lease).

7.07.  Intercompany Accounts and Agreements.  As of the Closing, no intercompany accounts reflecting intercompany transactions between Seller and its Affiliates, on the one hand, and the Company and its Subsidiaries, on the other hand, will be outstanding, and all agreements relating to any such intercompany transactions (except for the Transitional Services Agreement, other agreements contemplated by the Transitional Services Agreement, other agreements involving Buyer and Seller and the  other agreements listed on Schedule 7.07) shall have been terminated. In order to avoid confusion, in the event that any such agreement relating to an intercompany transaction (except for the Transitional Services Agreement, other agreements contemplated by the Transitional Services Agreement, other agreements involving Buyer and Seller and the  other agreements listed on Schedule 7.07) remains existing on the Closing Date, Seller, on behalf of itself, the Company and each of the Company's Subsidiaries for the period ending on the Closing Date, and Buyer, on behalf of itself, the Company and each of the Company's Subsidiaries for the period beginning immediately after the Closing Date hereby terminate any such agreement effective as of the Closing. As of the Closing, the Company and its Subsidiaries shall have no liability in respect of any Debt except for (i) Transferred Debt and (ii) Debt owing between or among the Company and any of its Subsidiaries.

## ARTICLE VIII

## TAX MATTERS

8.01.    <u>Tax Definitions</u>.    The following terms, as used herein, have the following meanings:

"Buyer's Tax Loss" means any payment, or actual liability to make a payment, by Buyer, its Affiliates, or, effective after the Closing, the Company or any Subsidiary, of (i) an Income Tax of the Company or any Subsidiary with respect to any Pre-Closing Tax Period, (ii) a Transfer Tax in excess of the amount allocated to Buyer under Section 8.03(e), (iii) a Miscellaneous Tax of the Company or any Subsidiary with respect to any Pre-Balance Sheet Tax Period, (iv) any penalty or addition to Tax in respect of a Miscellaneous Tax of the Company or any Subsidiary with respect to any Pre-Closing Tax Period, (v) any Tax as a result of Treasury Regulation Section 1.1502-6 or any similar federal, state, local or foreign law, rule or regulation relating to the Seller Group and (vi) any Tax imposed on Buyer, the Company or any Subsidiary payable as a result of a breach of any representation or covenant of Seller set forth in Article VIII (<u>provided</u> that no breach of a representation or covenant of Seller set forth in Article VIII shall serve to shift the liability from Buyer to Seller for any Miscellaneous Taxes -- other than penalties or additions to Tax in respect of Miscellaneous Taxes – of the Company or any of its Subsidiaries for any Post-Balance Sheet Tax Period, plus, in connection with each of clauses (i) (ii), (iii), (iv), (v) and (vi) above, any Loss incurred by Buyer, any of its Affiliates or, effective after the Closing, the Company or any Subsidiary as a result of any assertion, assessment or imposition by any Taxing Authority of any of the above-described Taxes.

"Code" means the Internal Revenue Code of 1986, as amended.

"Income Tax" means any Tax which is, in whole or in part, based on or measured by income, net worth (other than those reflected in computing the Working Capital Adjustment), intangibles (other than those reflected in computing the Working Capital Adjustment) or gains, including the Michigan Single Business tax.

"Miscellaneous Taxes" means all Taxes other than Income Taxes and Transfer Taxes.

"Post-Balance Sheet Tax Period" means any Tax period ending after the Balance Sheet Date, excluding the portion, if any, of such Tax period up to and including the Balance Sheet Date.

"Post-Closing Tax Period" means any Tax period ending after the Closing Date, excluding the portion, if any, of such Tax period up to and including the Closing Date.

"Pre-Balance Sheet Tax Period" means any Tax period ending on or before the Balance Sheet Date; <u>provided</u> that if a Tax period ending after the Balance Sheet Date contains any days which fall prior to or on the Balance Sheet Date, any portion of such Tax period up to and including the Balance Sheet Date also shall be included in the Pre-Balance Sheet Tax Period.

"Pre-Closing Tax Period" means any Tax period ending on or before the Closing Date; provided that if a Tax period ending after the Closing Date contains any days which fall prior to or on the Closing Date, any portion of such Tax period up to and including the Closing Date also shall be included in the Pre-Closing Tax Period.

"Seller Group" means, with respect to federal income taxes, the affiliated group of corporations (as defined in Section 1504(a) of the Code) of which Seller is a member and, with respect to state income or franchise Taxes, an affiliated, consolidated, combined, unitary or similar group of which Seller or any of its Affiliates is a member; provided that neither the Company nor any of its Subsidiaries shall be considered a member of the Seller Group with respect to any Post-Closing Tax Period.

"Tax" means any net income, alternative or add-on minimum tax, gross income, gross receipts, sales, use, ad valorem, value added, franchise, profits, license, withholding on amounts paid to or by the Company or any Subsidiary, payroll, employment, excise, severance, stamp, occupation, premium, property, environmental or windfall profit tax, custom, duty or other tax, governmental fee or other like assessment or charge of any kind whatsoever, together with any interest or any penalty, addition to tax or additional amount imposed by any governmental authority (a "Taxing Authority") responsible for the imposition of any such tax (domestic or foreign).

"Transfer Tax" means any transfer, documentary, sales, use, stamp, registration and other such Taxes and fees (including any penalties and interest) incurred in connection with the transactions contemplated by this Agreement.

8.02.  **Tax Representations.**  Seller represents and warrants to Buyer as of the date hereof and as of the Closing Date that, except as set forth on Schedule 8.02, to Seller's knowledge: (i) all material Tax returns, statements, reports and forms (including estimated tax returns and reports) required to be filed with any Taxing Authority on or before the Closing Date by or on behalf of the Company or any Subsidiary (collectively, the "Returns"), have been or will be filed when due (taking into account extensions) in accordance with all applicable laws; (ii) no position is reflected in a Return referred to in clause (i) for which the applicable limitation period has not expired (and for which a closing agreement has not been entered into) which (A) was not, at the time such Return was filed, supported by substantial authority (as determined for purposes of Section 6662 of the Code, or any predecessor provision, and any comparable provisions of applicable foreign, state or local tax statutes, rules or regulations) and (B) would have a Material Adverse Effect if decided against the taxpayer; (iii) the Company and the Subsidiaries have paid or made, or will on or before the Closing Date pay or make, provision for all material Taxes payable by the Company and the Subsidiaries for any Pre-Closing Tax Periods for which no Return has yet been filed; (iv) there is no action, suit, proceeding, investigation, audit or claim now proposed in writing or pending against or with respect to the Company or any Subsidiary in respect of any material Tax; (v) the Company and each Subsidiary is a member of the Seller Group, and the Seller Group files a consolidated federal Income Tax Return; (vi) Seller has made available to Buyer correct and complete copies of all information requested by Buyer's

40

representatives with respect to the portions of federal, state and local Income Tax Returns which pertain to the Company and the Subsidiaries; (vii) Schedule 8.02 lists any statute of limitations in respect of Taxes that the Company or any Subsidiary has waived or any extension of time agreed to by the Company or any Subsidiary, with respect to a Tax audit, examination, assessment or deficiency, in each case, which shall not have expired on or prior to the Closing Date; (viii) except as otherwise disclosed pursuant to Section 3.19 or Section 3.20, neither the Company nor any Subsidiary has made any payments, is obligated to make any payments, or is a party to any agreement that under certain circumstances could obligate it to make any payments, that will not be deductible under Section 280G or 162(m) of the Code; and (ix) no Taxing jurisdiction has since June, 1996 claimed in writing that Returns that the Company and the Subsidiaries are not (in fact) filing should be filed, or that Taxes of a type not (in fact) being paid to such jurisdiction should be paid.

8.03. <u>Tax Covenants</u>. (a) Notwithstanding any other provision of this Agreement, Seller and Buyer shall make a timely, effective and irrevocable election with respect to the acquisition of the Company by HCC, and, at the request of Seller, also with respect to the acquisition of HCC by Buyer, under Section 338(h)(10) of the Code and, solely at the request of Seller, under any comparable statutes in any other jurisdiction (including Puerto Rico or any other jurisdiction outside of the United States) with respect to the Company and, solely at the request of Seller, any or all of its Subsidiaries (the "Section 338(h)(10) Election"), and to file such election in accordance with applicable regulations. Seller and Buyer acknowledge and agree that the transactions contemplated by this Agreement will permit the Section 338(h)(10) Election. Neither Seller nor Buyer shall take any action (or omit to take any action) that would jeopardize the effectiveness of the Section 338(h)(10) Election. Without limiting the generality of the foregoing, Buyer represents that it has no plan or intention to merge or liquidate Buyer or HCC. Buyer also covenants that it will not merge or liquidate Buyer or HCC for at least two years, other than in connection with a sale or other disposition of an interest in the KB Toy Business to a third party, without Seller's prior written consent. Buyer represents that it has no plan or intention to merge or liquidate Buyer or HCC in connection with a sale or other disposition of an interest in the KB Toy Business during such two-year period or otherwise. Seller and Buyer agree to cooperate (and cause their respective Affiliates to cooperate) in all respects for the purpose of effectuating a timely and effective Section 338(h)(10) Election, including, without limitation, the execution and filing of any forms or returns. The Section 338(h)(10) Election shall properly reflect the Price Allocation (as hereinafter defined). Within 120 days after the Closing Date, Seller shall deliver to Buyer a statement (the "Allocation Statement") allocating the ADSP (as such term is defined in Temporary Treasury Regulations Sections 1.338-4T and 1.338(h)(10)-1T) among the assets of the Company and its Subsidiaries in accordance with the Treasury regulations promulgated under Section 338(h)(10). Buyer shall have the right to review the Allocation Statement. If within 30 days after receipt of the Allocation Statement Buyer notifies Seller in writing that the allocation of one or more items reflected in the Allocation Statement is not a reasonable allocation, Buyer and Seller will negotiate in good faith to resolve such dispute. If Buyer and Seller fail to resolve such dispute within 30 days, such dispute shall be resolved by the Accounting Referee in accordance with Section 13.07. If Buyer does not respond within the 30-day period, or upon resolution of the disputed items, the allocation reflected in the Allocation Statement (as such may have been adjusted) shall be the "Price Allocation," which shall be

binding upon the parties hereto. Seller and Buyer agree to act in accordance with the Price Allocation in the preparation and filing of any Tax return.

(b) Buyer covenants that it will not cause or permit the Company, any Subsidiary or any Affiliate of Buyer (i) to take any action on or after the Closing Date, including but not limited to the distribution of any dividend or the effectuation of any redemption (A) other than as contemplated by this Agreement or any other agreement or document entered into in connection with the transactions contemplated by this Agreement, (B) other than in the ordinary course of business or (C) other than as required by law, which could give rise to any Tax liability of the Seller Group, the use of any Tax attribute of the Seller Group or any Loss of the Seller Group (other than a liability, attribute or Loss in respect of Miscellaneous Taxes – excluding penalties and additions to Tax in respect of Miscellaneous Taxes – with respect to any Post-Balance Sheet Tax Period) under this Agreement or (ii) except as provided in Section 8.03(c), to make or change any Tax election (other than the making of the Section 338(h)(10) Election), amend any Return or take any position on any Return, that results in any increased Tax liability for Seller, including Tax increases resulting from the reduction of any Tax attribute. Buyer agrees that Seller is to have no liability for any Tax resulting from any action, prohibited by the preceding sentence, of the Company, Buyer or any Affiliate of Buyer, and agrees to indemnify and hold harmless Seller and its Affiliates against any such Tax and any Loss incurred by Seller or any of its Affiliates as a result of any assertion, assessment or imposition by any Taxing Authority of any of the above-described Taxes (any such Loss herein referred to as a "Seller's Expense"). Seller covenants that it will not cause or permit any member of the Seller Group (i) to take any action on or after the Closing Date (A) other than as contemplated by this Agreement or any other agreement or document entered into in connection with the transactions contemplated by this Agreement, (B) other than in the ordinary course of business or (C) other than as required by law, which could give rise to any Tax liability of the Buyer, the Company or any Subsidiary, the use of any Tax attribute of the Buyer, the Company or any Subsidiary, or any Loss of the Buyer, the Company or any Subsidiary under this Agreement, or (ii) to make or change any Tax election (other than the making of the Section 338(h)(10) Election), amend any Return or take any position on any Return, that results in any increased Tax liability for Buyer or any Affiliate of Buyer, including Tax increases resulting from the reduction of any Tax attribute. Seller agrees that Buyer is to have no liability for any Tax resulting from any action, prohibited by the preceding sentence, of the Seller Group and agrees to indemnify and hold harmless Buyer, the Company and any Subsidiary against any such Tax and any Loss incurred by Buyer, the Company or any Subsidiary as a result of any assertion, assessment or imposition by any Taxing Authority of any of the above-described Taxes.

(c) With respect to Income Tax Returns for a Tax period of the Company or any Subsidiary that ends after the Closing Date, Buyer may cause or permit the Company or any Subsidiary to make or change any Tax election or accounting method. If it is "more likely than not" (within the meaning of Treasury Regulation Section 1.6662-4(d)(2)) that the Tax election or accounting method used by the Company or any Subsidiary prior to the Closing was a proper election or method, Buyer shall indemnify and hold Seller and its Affiliates harmless against any Tax resulting from such action. If the Tax election or accounting method used by the Company or any Subsidiary prior to the Closing does not meet the "more likely than not" standard referred

to in the preceding sentence, but was supported by "substantial authority" (within the meaning of Treasury Regulation Section 1.6662-4(d)(3)), then Buyer shall indemnify and hold harmless Seller and its Affiliates against 50 percent of any Tax resulting from such action. At the time such Return is delivered to Seller pursuant to Section 8.03(h), Buyer shall notify Seller in writing (i) if any Tax election or accounting method in effect for the Company or any Subsidiary has been changed, (ii) if in Buyer's view such prior election or method did not meet the "more likely than not" standard or lacked "substantial authority" and (iii) the cost to Seller of the change of such election or method. If Seller disagrees with any position taken by Buyer in such written notice, the parties shall proceed in good faith to resolve the matter and, if they are unable to do so within 10 business days, such dispute shall be resolved by the Accounting Referee in accordance with Section 13.07.

(d)  Buyer shall promptly pay or shall cause prompt payment to be made to Seller of all refunds of Taxes and interest thereon, as well as all Tax benefits arising from the carryback of income or gains arising in a Post-Closing Tax Period against Tax attributes (except refunds of Taxes or Tax benefits (A) resulting from the Buyer's making or changing any Tax election in conformity with Section 8.03(c) or (B) reflected on a Return that does not include Seller or any of its Affiliates and which is attributable to carrybacks of losses or credits from a Post-Closing Tax Period to a Pre-Closing Tax Period) received by, or credited to the Tax liability of, Buyer, any Affiliate of Buyer, the Company, or any Subsidiary attributable to (i) Income Taxes paid by Seller (or Income Tax attributes of the Seller Group), the Company or any Subsidiary (or any predecessor or Affiliate of Seller) with respect to any Pre-Closing Tax Period, (ii) Miscellaneous Taxes paid by Seller, the Company or any Subsidiary (or any predecessor or Affiliate of Seller) with respect to any Pre-Balance Sheet Tax Period or (iii) penalties or additions to Tax with respect to Miscellaneous Taxes paid by Seller, the Company or any Subsidiary (or any predecessor or Affiliate of Seller) with respect to any Pre-Closing Tax Period.

(e)  All Transfer Taxes shall be borne by Buyer, except that the aggregate liability for any New York State Real Estate Transfer Tax or New York City Real Property Transfer Tax shall be shared equally by Buyer and Seller and the aggregate liability, if any, for the transfer of both the Montgomery, Alabama distribution center and the Montgomery Toy LLC membership interests shall be borne by Seller. The party that is required by applicable law to make the filings, reports, returns or payments with respect to any Transfer Tax shall do so, and the other party shall cooperate with respect thereto as necessary. Within a reasonable period prior to the date on which a Transfer Tax that the parties share equally is required to be paid, the parties shall agree on the amount of such Transfer Tax and the basis on which the amount of such Transfer Tax is to be computed and the party that is not making the payment to the Taxing Authority shall compensate the paying party in accordance with this Section 8.03(e) prior to the date on which such Transfer Tax is required to be paid.

(f)  Seller shall include the income of the Company and the Subsidiaries in Seller's federal consolidated Income Tax Return, and shall file all state, foreign and local Income Tax Returns of the Company and the Subsidiaries, for all Tax periods ending on or before the Closing Date and shall be responsible for remitting all Taxes reflected on such Income Tax Returns.

(g)  With respect to Income Tax Returns referred to in Section 8.03(f) for the Tax period ending on the Closing Date, Buyer shall cause the Company and the Subsidiaries to prepare and provide to Seller one or more packages of information materials as are reasonably necessary for the purpose of preparing each such Income Tax Return (the "Tax Packages"). Each Tax Package shall be completed in all material respects in accordance with the standards that Seller has established for its other subsidiaries.  If Buyer reasonably believes that such standards differ materially from Seller's past practices for the Company and the Subsidiaries, Buyer shall provide written notice to Seller setting forth in detail the specific differences.  If within 10 business days after receipt of such notice Seller notifies Buyer that it disagrees that such standards differ materially from Seller's past practices, Buyer and Seller will negotiate in good faith to resolve such dispute.  If Buyer and Seller fail to resolve such dispute within 10 days, such dispute shall be resolved by the Accounting Referee in accordance with Section 13.07.  If it is agreed or determined that such standards differ materially from Seller's past practices for the Company and the Subsidiaries, Seller shall (at Seller's option) either bear all reasonable costs of preparing such Tax Packages in excess of those that would have been incurred had they been prepared in a manner consistent with Seller's past practices for the Company and the Subsidiaries or prepare such additional materials as may be necessary at its expense.  Buyer shall use reasonable efforts to deliver the Tax Packages to Seller as soon as practicable after the Closing Date, but in no event later than the date that is six months after the Closing Date; provided that if Seller notifies the Company that Seller wishes to devote its resources (and/or those of its agents), at Seller's cost and expense, to facilitate the preparation of the Tax Packages on a more expedited basis, the Company and each of its Subsidiaries shall reasonably cooperate with Seller (and shall cause their respective Affiliates, agents, auditors, representatives, officers and employees reasonably to cooperate with Seller), at a cost and expense shared equally by Buyer and Seller, in order to prepare the Tax Packages as quickly as reasonably possible thereafter.  Within 30 days after the filing of such Income Tax Returns, Seller shall provide Buyer with copies of each separate company pro forma Income Tax Return and any other Income Tax Return pertaining exclusively to the Company and the Subsidiaries.

(h)  Buyer shall prepare and file, or cause to be prepared and filed, on a timely basis all Income Tax Returns required to be filed by the Company and each Subsidiary for any Tax period of the Company or any Subsidiary that includes (but does not end on) the Closing Date and shall be responsible for remitting all Taxes reflected on such Returns (subject to reimbursement to the extent provided in Section 8.06 below).  Except as provided in Section 8.03(c), any such Return shall be prepared in a manner consistent with past practice and without a change of any election or any accounting method and shall be submitted by Buyer to Seller (together with schedules, statements and, to the extent requested by Seller, supporting documentation) at least 45 days prior to the due date (including extensions) of such Return.  Seller shall have the right to review all work papers and procedures used to prepare any such Return.  If Seller, within 10 business days after delivery of any such Return, notifies Buyer in writing that it objects to any items in such Return or to any position taken by Buyer in the notification described in Section 8.03(c), the parties shall proceed in good faith to resolve the disputed items and, if they are unable to do so within 10 business days, such dispute shall be resolved by the Accounting Referee in accordance with Section 13.07; provided that if the Accounting Referee shall determine that two or more alternative positions with respect to the matter in question are equally supported by applicable

44

law, then, at Buyer's option, either (i) Seller's position shall be taken on the relevant Return and Seller shall pay to Buyer any additional Tax shown on such Return resulting from such position to the extent it relates (pursuant to Section 8.06(b)) to the Post-Closing Tax Period or (ii) Buyer's position shall be taken on the relevant Return and Buyer shall pay to Seller any additional Tax shown on such Return resulting from such position to the extent it relates (pursuant to Section 8.06(b)) to the Pre-Closing Tax Period; and provided further that if a disputed item is subject to the provisions of Section 8.03(c) as well as the provisions of this Section 8.03(h), the provisions of Section 8.03(c) shall govern. Upon resolution of all disputed items, the relevant Return shall be adjusted to reflect such resolution and shall be binding upon the parties without further adjustment.

(i) Seller shall prepare or cause to be prepared and file or cause to be filed all Miscellaneous Tax Returns due on or before the Closing Date (taking into account extensions) and shall be responsible for remitting all Miscellaneous Taxes reflected on such Miscellaneous Tax Returns. Seller shall deliver copies of such Miscellaneous Tax Returns to the Company, and the Company shall retain such copies in accordance with Section 8.05. Buyer shall prepare and file or cause to be prepared and filed in accordance with the procedures and methods set forth in Section 8.03(h) all Miscellaneous Tax Returns due after the Closing Date (taking into account extensions) for periods which include the Pre-Closing Tax Period and shall remit all Taxes reflected on such Returns (subject to reimbursement by Seller to the extent provided in Section 8.06 below). Buyer shall, within a reasonable period after each month end, submit to Seller a Schedule in reasonable detail outlining the Miscellaneous Returns filed during such month which include Taxes for the Pre-Balance Sheet Tax Period, and the amount of Taxes paid with respect to the Pre-Balance Sheet Tax Period. Seller, at its expense, may at reasonable times audit the Miscellaneous Tax Returns including the Pre-Balance Sheet Tax Period at any time prior to June 30, 2002. If Seller, in connection with such audit, and no later than December 31, 2002, notifies Buyer that its allocation of Miscellaneous Taxes to the Pre-Balance Sheet Tax Period is excessive, the parties shall proceed in good faith to resolve the matter and, if they are unable to do so within 10 business days, such dispute shall be resolved by the Accounting Referee in accordance with Section 13.07.

(j) Any Return prepared by Seller with respect to the Company or any Subsidiary for a Pre-Closing Tax Period, pursuant to Section 8.03(f) or (i), shall be prepared in a manner consistent with past practice and without a change of any election or any accounting method.

(k) Buyer shall cause the Company and each of its Subsidiaries to close its books and prepare a general ledger trial balance for each legal entity for (i) the period beginning January 30, 2000 and ending with the Closing Date, (ii) the accounting period ending on the Balance Sheet Date, and (iii) the final accounting period ending with the Closing Date. All appropriate entries shall be made including, but not limited to, the allocation of overhead expenses, intercompany sales, general and administrative expenses, management fees, intercompany service fees and inventory holding charges, and intercompany interest expense. The general ledgers for the separate legal entities shall be provided in hard copy form as well as in an electronic format. The hard copy general ledger for the separate legal entities shall be submitted by Buyer to Seller not later than 30 business days after the Closing Date. Seller shall have the

45

right to review the general ledgers for the separate legal entities to insure that they are complete and prepared in a manner consistent with prior accounting practices. Seller, within 15 calendar days after delivery of the general ledgers for the separate legal entities, shall notify Buyer of any errors and omissions that it finds. Buyer shall proceed in good faith to correct the errors and omissions within 10 business days. If Buyer is unable to or cannot correct such errors and omissions, or there is a dispute as to what constitutes an error or omission, such dispute shall be resolved by the Accounting Referee in accordance with Section 13.07. Seller, at its option, may notify the Company that Seller wishes to devote its resources (and/or those of its agents) in order to facilitate the completion of correct and accurate general ledgers for the separate legal entities. Buyer shall reasonably cooperate with Seller so that such general ledgers can be finalized. Once Seller has determined that the general ledgers for the separate legal entities are complete and accurate, Buyer, within 15 days of such determination, shall provide Seller with the general ledgers in an electronic format which can be uploaded into the "Corptax." Furthermore, Buyer shall prepare and provide to Seller tax depreciation schedules for all fixed assets owned at the Closing Date plus the computation of Tax gain or loss for all fixed assets disposed of from January 30, 2000 to the Closing Date. Tax depreciation and book depreciation for the year shall be summarized by legal entity. Additionally, the depreciation records for each individual asset showing date of purchase, Tax accumulated depreciation (regular, AMT, and ACE), and tax depreciation for the 2000 Tax year (regular, AMT, and ACE) shall be provided to Seller in hard copy form no later that six months after the Closing Date. Buyer shall make commercially reasonable good faith efforts in satisfying its obligations under this Section 8.03(k).

8.04.  <u>Termination of Existing Tax Sharing Agreements</u>.  Any and all existing Tax sharing agreements (written or unwritten, formal or informal) between the Company or any Subsidiary and any member of the Seller Group shall be terminated as of the Closing Date. After such date neither the Company, any Subsidiary, Seller nor any Affiliate of Seller shall have any further rights or liabilities thereunder.

8.05.  <u>Cooperation on Tax Matters</u>.  Seller and Buyer shall reasonably cooperate, and shall cause their respective Affiliates, agents, auditors, representatives, officers and employees reasonably to cooperate, in preparing and filing all Tax Returns (including amended returns and claims for refund), including maintaining and making available to each other all records necessary in connection with Taxes and in resolving all disputes and audits with respect to all Tax periods. Buyer and Seller agree to retain or cause to be retained all books and records pertinent to the Company and the Subsidiaries until the applicable period for assessment under applicable law (giving effect to any and all extensions or waivers) has expired, except for books and records destroyed in the ordinary course of business, and to abide by or cause the abidance with all record retention agreements entered into with any Taxing Authority. Buyer, Seller, the Company and the Subsidiaries agree to give the other reasonable written notice prior to transferring, discarding or destroying any books relating to Tax matters prior to the expiration of such periods, and, if Seller so requests, the Company or any Subsidiary shall allow Seller to take possession of such books and records proposed by the Company or any such Subsidiary to be transferred, discarded or destroyed. Buyer and Seller shall cooperate with each other in the conduct of any audit or other proceedings involving the Company or any Subsidiary for any Tax purposes (to the extent that such parties are not materially prejudiced thereby), and each shall

execute and deliver such powers of attorney and other documents as are necessary to carry out the intent of this Section 8.05.  For any Income Tax Return of the Company or any Subsidiary that Seller is responsible for filing and that requires the signature of an officer of the Company or such Subsidiary, Seller shall present a completed Income Tax Return for the signature of an appropriate officer designated by the Company or such Subsidiary.  Seller shall give such officer any support for the Tax Return reasonably requested by such officer.  The officer shall sign the return and deliver it to Seller as soon as reasonably practicable.

8.06.  Indemnification by Seller.  (a)  Seller hereby indemnifies Buyer against and agrees to hold it harmless from any (i) Buyer's Tax Loss, and (ii) Tax attributable to the Section 338(h)(10) Election, other than any Tax imposed for a Post-Closing Tax Period which is attributable to the Price Allocation; provided that Seller shall have no liability for the payment of any Tax or Buyer's Tax Loss for which Buyer explicitly assumes ultimate responsibility pursuant to this Article VIII.

(b)  For purposes of this Section 8.06, in the case of any Miscellaneous Taxes that are imposed on a periodic basis and are payable for a Tax period that includes (but does not end on) the Balance Sheet Date, the portion of such Miscellaneous Taxes related to the portion of such Tax period ending on the Balance Sheet Date shall (i) in the case of any Miscellaneous Taxes that are reflected on Schedule 8.06(b)(i), be deemed to be the amount of such Taxes indicated on Schedule 8.06(b)(i) as "allocated to Seller," (ii) in the case of Miscellaneous Taxes that are not reflected on Schedule 8.06(b)(i) and that are not based upon or related to sales, gross receipts, wages, capital expenditures or expenses, be deemed to be the amount of such Miscellaneous Taxes for the entire Tax period multiplied by a fraction the numerator of which is the number of days in the Tax period ending on the Balance Sheet Date and the denominator of which is the number of days in the entire Tax period, and (iii) in the case of any Miscellaneous Taxes based upon or related to sales, gross receipts, wages, capital expenditures or expenses, be deemed equal to the amount which would be payable if the relevant Tax period ended on the Balance Sheet Date; provided that store licenses and permits (such as vendor permits, food licenses, Virginia litter license, California environmental license and so forth) shall be, consistent with past policies and practices, allocated to such Tax period ending on the Balance Sheet Date on a cash-paid basis.  Also for purposes of this Section 8.06, in the case of any Income Taxes that are imposed on a periodic basis and are payable for a Tax period that includes (but does not end on) the Closing Date, the portion of such Income Taxes related to the portion of such Tax period ending on the Closing Date shall be deemed equal to the amount which would be payable if the relevant Tax period ended on the Closing Date.  Any Tax credits relating to a Tax period that begins before and ends after the Closing Date shall be taken into account as though the relevant Tax period ended on the Closing Date.  All determinations necessary to give effect to the foregoing allocations shall be made in a manner consistent with prior practice of the Company and the Subsidiaries, provided that such prior practice is "more likely than not" (within the meaning of Treasury Regulation Section 1.6662-4(d)(2)) a proper practice.  If at least 45 days prior to the payment of any Tax subject to this Section 8.06(b) Buyer shall notify Seller in writing that in Buyer's view such practice does not meet the "more likely than not" standard and Seller disagrees, the matter shall be resolved by the Accounting Referee in accordance with Section 13.07.

(c)  Seller shall pay Buyer the amount of any Buyer's Tax Loss for which Seller is responsible pursuant to this Section 8.06 not later than 30 days after receipt by Seller of written notice from Buyer stating that a Buyer's Tax Loss has been incurred by Buyer, any of its Affiliates or, effective after the Closing, the Company or any Subsidiary and the amount thereof and of the indemnity payment requested, _provided_ that if Seller objects either to the fact or amount of liability, and the parties within such 30-day period do not resolve the dispute, the matter shall be resolved by the Accounting Referee in accordance with Section 13.07.

(d)  If any claim or demand for Taxes, in respect of which Buyer seeks indemnity from Seller pursuant to this Section 8.06 (other than Taxes shown as due on a Return pursuant to Section 8.03(e), (h) or (i)), is asserted in writing against Buyer, any of its Affiliates, the Company or any Subsidiary, Buyer shall promptly notify Seller of such claim or demand within sufficient time that would allow Seller to timely respond to such claim or demand, and shall give Seller such information with respect thereto as Seller may reasonably request; _provided_ that the failure to give such notice shall not relieve Seller from any obligation hereunder except where, and solely to the extent that, such failure actually prejudices the rights of Seller.  If Seller does not agree that such claim or demand is subject to indemnification under this Section 8.06, and the parties do not resolve the dispute promptly, the matter shall be resolved by the Accounting Referee in accordance with Section 13.07.  If Seller agrees that such claim or demand is subject to indemnification under this Section 8.06, or if the Accounting Referee so determines, Seller may discharge, at any time, its indemnification obligation by paying to Buyer the amount of the applicable Buyer's Tax Loss, calculated on the date of such payment.  Seller may, at its own expense, participate in and, upon notice to Buyer, assume the defense of any such claim, suit, action, litigation or proceeding (including any Tax audit).  If Seller assumes such defense and if the relevant claim, suit, action, litigation or proceeding relates to a Tax period that includes (but does not end on) the Balance Sheet Date (in the case of Miscellaneous Taxes) or the Closing Date (in the case of Income Taxes), as applicable, Buyer shall have the right (but not the duty) to participate in the defense thereof and to employ counsel, at its own expense, separate from the counsel employed by Seller, and Seller shall not settle such claim without Buyer's prior written consent (which shall not be unreasonably withheld).  Whether or not Seller chooses to defend or prosecute any claim, all of the parties hereto shall cooperate in the defense or prosecution thereof, to the extent that such parties are not materially prejudiced thereby.  Seller shall not be liable under this Section 8.06 for (i) any Tax claimed or demanded by any Taxing Authority, the payment of which was made without Seller's prior written consent (which shall not be unreasonably withheld) unless Seller refused to participate in the proceedings and assume the defense, or (ii) any settlements entered into without the consent of Seller (which shall not be unreasonably withheld), or resulting from any claim, suit, action, litigation or proceeding in which Seller was not permitted an opportunity to participate.  Notwithstanding anything herein to the contrary, Buyer may, at its own expense, initiate a challenge to any real property assessment relating to a Pre-Balance Sheet Tax Period.

8.07.  <u>Indemnification by Buyer</u>.  Buyer hereby indemnifies Seller against and agrees to hold it harmless from any Taxes and Seller's Expense for which Buyer is responsible pursuant to Article VIII, including any Taxes and Seller's Expense resulting from a breach of representation

48

or covenant of Buyer set forth in Article VIII. Other than with respect to Taxes shown as due on a Return pursuant to Section 8.03(e) or (h), Seller agrees to give prompt notice to Buyer of the assertion of any claim, or the commencement of any action or proceeding, in respect of which indemnity may be sought under this Article VIII; provided that the failure to give such notice shall not relieve Buyer from any obligation hereunder except where, and solely to the extent that, such failure actually prejudices the rights of Buyer. If Buyer does not agree that such claim or demand is subject to indemnification under this Section 8.07, and the parties do not resolve the dispute promptly, the matter shall be resolved by the Accounting Referee in accordance with Section 13.07. If Buyer agrees that such claim or demand is subject to indemnification under this Section 8.07, or if the Accounting Referee so determines, Buyer may discharge, at any time, its indemnification obligation by paying to Seller the amount of such Taxes and Seller's Expense, calculated on the date of such payment. Buyer may participate in and assume the defense of any such suit, action or proceeding at its own expense. If Buyer assumes such defense, Seller shall have the right (but not the duty) to participate in the defense thereof and to employ counsel, at its own expense, separate from the counsel employed by Buyer, and Buyer shall not settle such claim without Seller's prior written consent (which shall not be unreasonably withheld). Whether or not Seller chooses to defend or prosecute any claim, the parties hereto shall cooperate in the defense or prosecution thereof. Buyer shall not be liable under this Section 8.07 for (i) any Tax claimed or demanded by any Taxing Authority, the payment of which was made without Buyer's prior written consent (which shall not be unreasonably withheld) unless Buyer refused to participate in the proceedings and assume the defense, or (ii) any settlements entered into without the consent of Buyer (which shall not be unreasonably withheld), or resulting from any claim, suit, action, litigation or proceeding in which Buyer was not permitted an opportunity to participate.

8.08. Tax Treatment of Indemnity. Buyer and Seller agree that any indemnity payment under this Agreement shall be treated for all Tax and financial reporting purposes as an adjustment to the Purchase Price.

ARTICLE IX

EMPLOYEE BENEFITS

9.01. Employees. With respect to each individual who, as of the Closing Date, is employed (including Persons absent from active service by reason of illness, disability or leave of absence, whether paid or unpaid) by the Company or any of its Subsidiaries (the "Transferred Employees"), Buyer shall cause the Company or such Subsidiary to continue the employment of each Transferred Employee. Nothing in this Agreement shall be construed to obligate Buyer, the Company or any of its Subsidiaries to continue the employment of any Transferred Employee for any period of time following the Closing Date.

9.02. Seller Employee Benefit Plans. (a) Each of the Benefit Arrangements shall be terminated on the Closing Date with respect to the employees of the Company or any of its Subsidiaries without liability to the Buyer, except such Benefit Arrangements that are maintained solely by the Company and except as set forth on Schedule 9.02(a). Seller and/or its Affiliates

shall retain and pay when due all liabilities and obligations relating to all Benefit Arrangements through the Closing Date, except as set forth in Section 9.02(a). In particular, but not in limitation of the foregoing, the Seller shall retain and pay when due all liabilities and obligations arising under or with respect to the Seller's Savings Plan, Supplemental Savings Plan, medical, dental, group life insurance and long-term disability, whether or not insured, with respect to the Transferred Employees through to and including the Closing Date, except that (i) to the extent that payments with respect to such liabilities or obligations constitute Permitted Payments or Permitted Charges, such payments shall be taken into account for purposes of calculating Final Cash Consideration pursuant to Section 2.03 and (ii) Buyer shall pay when due, or, if previously paid by Seller, shall promptly reimburse Seller for, all claims incurred in the ordinary course between the Balance Sheet Date and the Closing Date for self-insured medical and dental benefits for the Transferred Employees not covered by insurance, to the extent that such amounts are not taken into account in calculating the Final Cash Consideration; provided, that nothing contained in this Section 9.02(a) is intended to relieve the Seller and/or its Affiliates of any obligation to provide healthcare continuation coverage with respect to which it is otherwise obligated under applicable law. No assets of Seller's Benefit Arrangements shall be transferred to Buyer or any of its Affiliates or to any plan of Buyer or any of its Affiliates. With respect to the Seller's Savings Plan, Buyer shall make a contribution to such Savings Plan to fund the matching contribution for eligible participants for the period from the Balance Sheet Date through to and including the Closing Date within the period required by law.

(b)     The Seller and its Affiliates shall take all actions reasonably necessary on or prior to the Closing to cause all participants who are employees of the Company or its Subsidiaries to become immediately and fully vested in any and all benefits accrued under the Seller's Savings Plan, Supplemental Savings Plan and any Benefit Arrangement that is a defined benefit plan, effective as of the Closing Date.

(c)     With respect to the crediting of matching contributions and profit sharing contributions to the Seller's Savings Plan and the Seller's Supplemental Savings Plan for the current plan year, the employees of the Company and its Subsidiaries on the Closing Date will be treated as having met the requirement that such employees be employed on the last day of the current plan year.

(d)     As soon as reasonably practicable following the Closing Date, the Seller shall take all actions reasonably necessary to identify and cure defects in the Seller's Savings Plan and Seller's Supplemental Savings Plan, including, without limitation, the audit of participants' accounts and the allocation of contributions and earnings thereto by an independent certified public accountant. Seller shall retain and pay all liabilities arising from any such defects. With respect to the Seller's Supplemental Savings Plan, as soon as reasonably practicable after the Closing Date, the Seller will determine the accurate account balances allocable to the Company's employees who are participants therein, and promptly following such determination shall inform the Company in writing of the amount allocable to each such participant. The Seller shall thereupon transfer cash to Buyer in an amount equal to the aggregate account balances of such participants, subject only to the consent of the participants, if required, whereupon the Buyer shall credit such amounts to the accounts of such participants in the Buyer's Supplemental

Savings Plan, and the amounts shall thereafter be payable under the terms and conditions of Buyer's Supplemental Savings Plan.

(e)    All severance agreements and retention agreements in effect with respect to employees of the Company shall be terminated by Seller prior to the Closing Date, and Seller shall retain and pay any liabilities or obligations arising with respect to such agreements.

(f)    During the period in which the Transitional Services Agreement contemplated by this Agreement is in effect, Buyer agrees to cause the Company and its Subsidiaries to provide benefits to Transferred Employees that are substantially similar in the aggregate as those benefits in effect on the Closing Date (except equity-related compensation) provided to Transferred Employees.

9.03.  <u>No Third Party Beneficiaries</u>.  No provision of this Article shall create any third party beneficiary or other rights in any employee or former employee (including any beneficiary or dependent thereof) of Seller or of any of its Affiliates or the Company or any of its Subsidiaries in respect of continued employment (or resumed employment) with either Buyer, the Company or any of its Subsidiaries, and no provision of this Article IX shall create any such rights in any such Persons in respect of any benefits that may be provided, directly or indirectly, under any Employee Plan or Benefit Arrangement or any plan or arrangement which may be established by Buyer or any of its Affiliates.  No provision of this Agreement shall constitute a limitation on rights to amend, modify or terminate after the Closing Date any such plans or arrangements of Buyer, any of its Affiliates, the Company or any of its Subsidiaries.

ARTICLE X

CONDITIONS TO CLOSING

10.01.  <u>Conditions to the Obligations of Each Party</u>.  The obligations of Buyer and Seller to consummate the Closing are subject to the satisfaction or waiver of the following conditions:

(a)  No provision of any applicable law or regulation and no judgment, injunction, order or decree shall prohibit the consummation of the Closing.

(b)  All actions by or in respect of or filings with any governmental body, agency, official or authority required to permit the consummation of the Closing shall have been obtained.

10.02.  <u>Conditions to Obligation of Buyer</u>.  The obligation of Buyer to consummate the Closing is subject to the satisfaction or waiver of the following further conditions:

(a)(i)  Seller shall have performed in all material respects all of its obligations hereunder required to be performed by it at or prior to the Closing Date and (ii) the representations and warranties of Seller contained in this Agreement and in any certificate delivered by Seller

pursuant hereto, disregarding all qualifications and exceptions contained therein relating to materiality or Material Adverse Effect, shall be true at and as of the Closing Date, as if made at and as of such time with only such exceptions as would not in the aggregate reasonably be expected to have a Material Adverse Effect; provided, that this clause (ii) shall not apply to any breach by Seller of a representation or warranty contained in Article VIII with respect to any Tax for which Seller is liable from the first dollar and without limit.

(b)  Buyer shall have received an opinion of counsel to or counsel of Seller, dated the Closing Date covering the matters described in Exhibit C attached hereto.

(c)  Seller shall have (i) received all Required Consents and all consents, authorizations or approvals from the governmental agencies referred to in Section 3.03(a), in each case in form and substance reasonably satisfactory to Buyer, and no such consent, authorization or approval shall have been revoked and (ii) transferred or caused to be transferred to a Subsidiary of the Company the distribution center located in Montgomery, Alabama pursuant to documentation reasonably satisfactory to Buyer.

(d)  Buyer shall have received Employment Agreements executed by Michael Glazer, Salvatore Vasta, Robert Feldman and Thomas Alfonsi in substantially the forms attached hereto as Exhibits D-1, D-2, D-3 and D-4, respectively.

(e)  Buyer shall have received a Transitional Services Agreement executed by Seller in substantially the form attached hereto as Exhibit E and a Warrantholders Agreement executed by Seller in substantially the form attached hereto as Exhibit F.

(f)  Buyer shall have received all documents it may reasonably request relating to the existence of Seller and the authority of Seller for this Agreement, all in form and substance reasonably satisfactory to Buyer.

(g)  Buyer shall have obtained the Financing (or alternative financing on substantially equivalent terms and conditions), unless Buyer shall have failed to have obtained such financing primarily as a result of Buyer's failure to pay any fees or expenses required to be paid by Buyer in connection therewith.

(h)  Each officer and director of the Seller or any of its Affiliates (other than Michael Glazer) shall have cancelled any outstanding membership interest options held by such officer or director in KBkids.com LLC pursuant to documentation reasonably satisfactory to Buyer.

10.03.  <u>Conditions to Obligation of Seller</u>. The obligation of Seller to consummate the Closing is subject to the satisfaction of the following further conditions:

(a)(i)  Buyer shall have performed in all material respects all of its obligations hereunder required to be performed by it at or prior to the Closing Date, and (ii) the representations and warranties of Buyer contained in this Agreement and in any certificate delivered by Buyer

pursuant hereto shall be true in all material respects at and as of the Closing Date, as if made at and as of such time.

(b)  Seller shall have received an opinion of counsel to Buyer, dated the Closing Date, covering the matters described in Exhibit G.

(c)  Buyer shall have received all consents, authorizations or approvals from governmental agencies referred to in Section 4.03, in each case in form and substance reasonably satisfactory to Seller, and no such consent, authorization or approval shall have been revoked.

(d)  The lenders involved in the Financing shall have transferred the Company Dividend Note Amount to Mall of America Kay-Bee Toy, Inc.; Seller shall have received the HCC Note and the Warrants; and Buyer shall have caused to be executed and delivered a Warrantholders Agreement in the form attached as Exhibit F.

(e)  Seller shall have received copies of Employment Agreements executed by Michael Glazer, Salvatore Vasta, Robert Feldman and Thomas Alfonsi in substantially the forms attached hereto as Exhibits D-1, D-2, D-3 and D-4, respectively.

(f)  Seller shall have received a Transitional Services Agreement executed by Buyer in substantially the form attached hereto as Exhibit E.

(g)  Seller shall have received all documents it may reasonably request relating to the existence of Buyer and the authority of Buyer for this Agreement, all in form and substance reasonably satisfactory to Seller.

## ARTICLE XI

## SURVIVAL; INDEMNIFICATION

11.01.  <u>Survival</u>.  The covenants, agreements, representations and warranties of the parties hereto contained in this Agreement or in any certificate delivered pursuant to Article X shall survive the Closing and remain in full force and effect until the date that is eighteen months after the Closing Date; <u>provided</u>, that (i) the covenants, agreements, representations and warranties contained in Section 3.20 and Articles VIII and IX shall survive until expiration of the applicable statutory period of limitations (giving effect to any waiver, mitigation or extension thereof) and for 30 days thereafter, if later; (ii) the representations and warranties contained in Section 3.21 shall survive the Closing until the date that is three years after the Closing Date; (iii) the covenants, agreements, representations and warranties contained in Sections 5.09, 5.12, 6.05, 7.04, 7.05 and this Article XI shall survive the Closing for the term or terms set forth therein and for 30 days thereafter; and (iv) the covenants, agreements, representations and warranties set forth in Sections 3.05, 3.06, 4.07(b), 4.10, 5.06, 6.01, 6.02, 7.01, 7.06, 7.07 and 11.05 and Article XIII shall continue in full force and effect without limit. Notwithstanding the preceding sentence, any covenant, agreement, representation or warranty in respect of which indemnity may be

sought under this Article XI shall survive the time at which it would otherwise terminate pursuant to the preceding sentence, if notice of the inaccuracy or breach thereof giving rise to such right to indemnity shall have been given (with reasonable specificity, in light of the facts then known) to the party against whom such indemnity may be sought prior to such time. For purposes of the immediately preceding sentence, Buyer and Seller shall each be deemed to have given the other party adequate notice of a claim for Losses in connection with the matters subject to indemnification pursuant to Section 11.05.

11.02.    Indemnification.    (a) Seller hereby indemnifies Buyer, its Affiliates, the Company, its Subsidiaries and their respective directors and officers (the "Buyer Indemnitees") against and agrees to hold them harmless from any and all Losses incurred or suffered by any Buyer Indemnitee arising out of or relating to any breach or inaccuracy of any representation or warranty, or any breach of any covenant or agreement, made or to be performed by Seller pursuant to this Agreement or in any certificate delivered pursuant to Article X; provided that (i) Seller shall not be liable under this Section 11.02(a) unless the aggregate amount of Losses with respect to all matters referred to in this Section 11.02(a) exceeds $5,000,000 and then only to the extent of such excess and (ii) Seller's maximum liability under this Section 11.02(a) shall not exceed $25,000,000. Notwithstanding the foregoing, any Losses incurred or suffered by any Buyer Indemnitee arising out of fraud by the Seller or arising out of or relating to any breach or inaccuracy of any representation or warranty, or any breach of any covenant or agreement, contained in Section 2.03, 2.04, 3.05, 3.06, 3.23, 5.06, 5.07, 5.08, 5.09, 5.12, 7.04, 7.07, 11.05 or 13.03 or in Article VIII or IX shall not be subject to the limitations on Losses set forth in clauses (i) and (ii) above or in Section 11.04(b) but rather such Buyer Indemnitee shall be entitled to recovery from the first dollar.

(b)    Buyer hereby indemnifies Seller, its Affiliates and their respective directors and officers (the "Seller Indemnitees") against and agrees to hold them harmless from any and all Losses incurred or suffered by Seller arising out of or relating to any breach or inaccuracy of any representation or warranty, or any breach of any covenant or agreement made or to be performed by the Buyer pursuant to this Agreement or in any certificate delivered pursuant to Article X; provided that (i) Buyer shall not be liable under this Section 11.02(b) unless the aggregate amount of Seller's Losses with respect to all matters referred to in this Section 11.02(b) exceeds $5,000,000 and then only to the extent of such excess and (ii) Buyer's maximum liability under this Section 11.02(b) shall not exceed $25,000,000. Notwithstanding the foregoing, any Losses incurred or suffered by any Seller Indemnitee arising out of fraud by the Buyer or arising out of or relating to any breach or inaccuracy of any representation or warranty, or any breach of any covenant or agreement, contained in Section 2.03, 2.04, 4.05, 4.07(b), 4.10, 6.04, 7.04, 7.06, 7.07, 11.05 or 13.03 or in Article VIII or IX shall not be subject to the limitations on Losses set forth in clauses (i) and (ii) above or in Section 11.04(b) but rather such Seller Indemnitee shall be entitled to recovery from the first dollar.

(c)    For purposes of clarification, the parties acknowledge and agree that this Section 11.02 shall be enforced in accordance with its terms and that any indemnification claim for breach of the covenants contained in this Section 11.02 shall not be subject to the limitations on

54

Losses set forth in clauses (i) and (ii) of Section 11.02(a) or Section 11.02(b), as the case may be, or Section 11.04(b).

(d)    For purposes of indemnification under this Section 11.02, any limitation or qualification as to materiality set forth in each representation and warranty shall be disregarded in determining the accuracy of such representation or warranty, it being the intention of the parties that the limitations contained in Sections 11.02(a)(i) and 11.02(b)(i) substitute for any such limitation or qualification as to materiality.

11.03.  Procedures; Exclusivity.    (a)  Promptly after the receipt by any party seeking indemnification under Section 11.02 (the "Indemnified Party") of notice of the commencement of any action, claim, suit or proceeding (each an "Action") against such Indemnified Party by a third party (other than any Action relating to Taxes or any Tax Return, as to which the provisions of Article VIII shall control), such Indemnified Party shall, if a claim with respect thereto is or may be made against any party (an "Indemnifying Party") pursuant to Section 11.02 or (except as set forth therein) Section 11.05, give such Indemnifying Party written notice of such Action. The failure to give such notice shall not relieve any Indemnifying Party from any obligation hereunder except where, and solely to the extent that, such failure actually prejudices the rights of such Indemnifying Party. Such Indemnifying Party shall the right to defend such Action, at such Indemnifying Party's expense and with counsel of its choice reasonably satisfactory to the Indemnified Party, provided that the Indemnifying Party (i) delivers written notice to the Indemnified Party within ten days of receipt of notice of such Action pursuant to the first sentence of this Section 11.03(a) stating that it is assuming the defense of such Action and acknowledges full responsibility for all Losses arising from or related to such Action and (ii) conducts the defense of such Action in a commercially reasonable manner. If the Indemnifying Party assumes the defense of such Action, the Indemnifying Party shall conduct such defense in a commercially reasonable manner through judgment or settlement in accordance with this Section 11.03, and the Indemnified Party shall reasonably cooperate in such defense to the extent the Indemnified Party is not prejudiced thereby. So long as the Indemnifying Party is conducting the defense of such Action as provided in the previous sentence, the Indemnified Party may participate in the defense of such Action by retaining separate counsel at its sole cost and expense, and neither the Indemnifying Party nor the Indemnified Party will consent to the entry of any judgment or enter into any settlement with respect to such Action without the prior written consent of the other, which consent shall not be unreasonably withheld, delayed or conditioned. In the event the Indemnifying Party does not or ceases to conduct the defense of such Action as provided in this Section 11.03, (x) the Indemnified Party may defend against, and consent to the entry of any judgment or enter into any settlement with respect to, such Action in any manner it may reasonably deem to be appropriate; provided, that the Indemnified Party shall not consent to the entry of any judgement or enter into any settlement with respect to such Action without the prior written consent of the Indemnifying Party, which consent shall not be unreasonably withheld, delayed or conditioned; (y) subject to the limitations set forth in this Article XI, the Indemnifying Party will reimburse the Indemnified Party promptly and periodically for its costs and expenses in connection with such Action and (z) subject to the limitations set forth in this Article XI, the Indemnifying Party will remain responsible for any other Losses the Indemnified Party may suffer as a result of such Action. If the Indemnified Party or the Indemnifying Party

presents to the other party any proposed entry of judgment or settlement to which the other party does not consent within ten business days, the non-consenting party shall, and hereby agrees to, indemnify the proposing party against all Losses relating to such Action to the extent in excess of the amount of such Losses based upon the proposed settlement. The indemnification provided by the immediately preceding sentence shall be in addition to that provided by the other provisions of this Article XI, shall be from the first dollar and shall not be subject to the limitations on Losses set forth in Sections 11.02(a) or (b) or Section 11.04(b).

(b) After the Closing, this Article XI will provide the exclusive remedy for any breach or inaccuracy of any representation or warranty, or breach of any covenant or other agreement (other than those contained in Sections 2.03, 2.04, 5.05, 5.06, 5.09, 5.10, 6.01, 6.02, 6.04, 7.01, 13.06, 13.07 and 13.12 and Articles VIII and IX) set forth in this Agreement or in the certificates delivered pursuant to Article X hereof or other claim based upon this Agreement. Without limiting the generality of the foregoing, Buyer and, effective at the Closing, the Company and its Subsidiaries, hereby waive all rights for contribution or any other rights or recovery (except as otherwise provided in Section 11.02) with respect to any Losses arising under or relating to Environmental Laws, whether now or hereafter in effect, that it might have by statute or otherwise against Seller or any of its Affiliates. Notwithstanding the foregoing, neither Buyer nor Seller waives any rights it may have to make a claim alleging fraud by the other party, and each party may pursue any rights available to it at law or in equity with respect to any such claim.

(c) For purposes of clarification, the parties acknowledge and agree that this Section 11.03 shall be enforced in accordance with its terms and that any indemnification claim for breach of the covenants contained in this Section 11.03 shall not be subject to the limitations on Losses set forth in clauses (i) and (ii) of Section 11.02(a) or Section 11.02(b), as the case may be, or Section 11.04(b).

11.04.  Limitation of Indemnification.  Notwithstanding the foregoing provisions of this Article XI, an Indemnifying Party's obligation to indemnify an Indemnified Party under Article XI shall be subject to the following additional limitations:

(a)  No indemnification shall be required to be made by Buyer or Seller to the extent that the Losses incurred or suffered by the Indemnified Party have been taken into account in connection with the determination of Final Cash Consideration.

(b)  No indemnification shall be required to be made by Buyer or Seller with respect to any claim for indemnity which individually is less than $10,000 but only up to an aggregate maximum amount of $250,000 for all such claims.

(c)  The Losses required to be paid by the Indemnifying Party pursuant to this Article XI shall be reduced to the extent of any amounts actually received by the Indemnified Party or any of its Affiliates after the Closing Date pursuant to the terms of any insurance policies covering such Losses.

(d) Each of the parties agrees that to the extent the other party indemnifies it from any claim for Losses, the Indemnified Party shall assign its rights to such claim to the Indemnifying Party to the extent of any amounts actually received by the Indemnified Party from the Indemnifying Party.

(e) To avoid double recovery, the Losses required to be paid by the Indemnifying Party pursuant to this Article XI shall be reduced by any amounts of such Losses actually paid by the Indemnifying Party pursuant to Article VIII or Article IX.

11.05. <u>Other Indemnification</u>. (a) Seller hereby indemnifies each Buyer Indemnitee against and agrees to hold them harmless from any and all Losses arising out of or related to (i) any matter which is or may be alleged in the KB Store No. 1013 Litigation and (ii) the matters set forth in Appendix III from the first dollar and without limitation as to amount.

(b) Subject to Section 11.05(d), Seller hereby indemnifies each Buyer Indemnitee against and agrees to hold each of them harmless from any and all Losses arising out of or related to any matter which is or may be alleged in the Shared Lawsuits.

(c) Buyer shall control the defense of the Shared Lawsuits, and Seller shall be entitled to participate in the defense of the Shared Lawsuits at its own expense; <u>provided</u>, that Buyer shall obtain the prior written consent of Seller (which consent shall not be unreasonably withheld, delayed or conditioned) before entering into any settlement or entry of judgment with respect to such matters. If the Buyer presents to the Seller any proposed entry of judgment or settlement relating to a Shared Lawsuit to which the Seller does not consent within ten business days, the Seller shall, and hereby agrees to, indemnify the Buyer from all Losses relating to such Shared Lawsuit to the extent in excess of the amount of such Losses based upon the proposed settlement. Each party shall cooperate, and cause their respective Affiliates (including for this purpose, in the case of Buyer after the Closing, the Company and its Subsidiaries) to cooperate in the defense or prosecution of such matters and shall furnish or cause to be furnished such records, information and testimony and attend such conferences, discovery proceedings, hearings, trials or appeals as may be reasonably requested in connection therewith to the extent the Indemnified Party is not prejudiced thereby.

(d) The amount of any Losses payable under this Section 11.05 with respect to any matter which is or may be alleged in the Shared Lawsuits shall be allocated as follows: (i) Seller shall bear that portion of the total Losses incurred or suffered in connection with any matter with is or may be alleged in such Shared Lawsuit equal to the total amount of Losses with respect to any matter which is or may be alleged in such Shared Lawsuit multiplied by a fraction (x) the denominator of which is the total number of days during the period commencing on May 5, 1996 and ending on the date on which the alleged wrongful action or conduct upon which damages are based ceases or ceased (or the date of settlement or final judgment if such conduct or action does not cease) and (y) the numerator of which is the number of days during the period commencing on May 5, 1996 and ending on the Closing Date or, if earlier, the date on which such alleged wrongful action or conduct ceased and (ii) Buyer shall bear the remainder of such total Losses.