# EXHIBIT I

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          :        Chapter 11
                                :
KB Toys, Inc., et al.,          :
                                :
        Debtor(s).              :        Bankruptcy #04-10120  (JBR)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Wilmington, DE
August 23, 2004
11:30 a.m.

TRANSCRIPT OF OMNIBUS HEARING
BEFORE THE HONORABLE JOEL B. ROSENTHAL
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For The Debtor(s):              M. Blake Cleary, Esq.
                                Young, Conaway, Stargatt
                                & Taylor, LLP
                                The Brandywine Bldg.
                                1000 West St.-17th Fl.
                                Wilmington, DE 19801

                                Mark N. Polebaum, Esq.
                                Wilmer Cutler Pickering
                                Hale & Dorr, LLP
                                2445 M. street, N.W.
                                Washington, DC 20037

For The Official Committee:     Susan Balaschak, Esq.
of Unsecured Creditors          Traub Bonacquist & Fox
                                655 Third Ave.-21st Fl.
                                New York, NY 10017

                                Kimberly D. Newmarch, Esq.
                                Richards Layton & Finger
                                One Rodney Square
                                Wilmington, DE 19899




| | |
|---|---|
| For Fleet Bank: | Peter Duhig, Esq.<br>Klett Rooney Lieber<br>& Schorling, PC<br>The Brandywine Bldg.<br>1000 West Street-Ste. 1410<br>Wilmington, DE 19801 |
| For Big Lots Stores: | Michael DeBaecke, Esq.<br>Blank Rome, LLP<br>Chase Manhattan Centre<br>1201 Market Street-Ste. 800<br>Wilmington, Delaware 19801 |
| | William Kloss, Jr., Esq.<br>Vorys Sater Seymour<br>& Pease, LLP<br>52 East Gay Street<br>Columbus, OH 43216 |
| For Beta Systems, Inc.: | Regina Iorii, Esq.<br>Ashby & Geddes<br>222 Delaware Ave.-17th Fl.<br>Wilmington, Delaware 19899 |
| For Airborne Express: | Suzanne M. Hill, Esq.<br>Potter Anderson & Corroon, LLP<br>Hercules Plaza<br>1313 N. Market Street<br>Wilmington, DE 19801 |
| For Mills: | Marc Phillips, Esq.<br>Connolly Bove Lodge & Hutz, LLP<br>The Nemours Building<br>1007 North Orange Street<br>Wilmington, DE 19801 |
| For Inland Southern Mngt.:<br>Group, Inland Siz Corners: | Christina Thompson, Esq.<br>Connolly Bove Lodge & Hutz, LLP<br>The Nemours Building<br>1007 North Orange Street<br>Wilmington, DE 19801 |

3

1  Audio Operator:                    Brandon J. McCarthy

2  Transcribing Firm:                 Writer's Cramp, Inc.
                                      6 Norton Rd.
3                                     Monmouth Jct., NJ 08852
                                      732-329-0191
4
   Proceedings recorded by electronic sound recording, transcript
5  produced by transcription service.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    THE CLERK:  All rise.  The United States Bankruptcy

2    Court for the District of Delaware is now in session, the

3    Honorable Joel B. Rosenthal presiding.  You can be seated,

4    please.  This is the case of KB Toys, Inc., Case #04-10120.

5        MR. CLEARY:  Good morning, Your Honor.  May it please

6    the Court.  Blake Cleary of Young, Conaway, Stargatt & Taylor

7    on behalf of KB Toys, Inc. and its affiliated Debtors and

8    Debtors-In-Possession.

9        THE COURT:  Good morning.

10       MR. CLEARY:  Referring to today's agenda, dated August

11   12th, here's the Docket #1335, and working the way through with

12   the agenda, the first two items or matters, as reflected on the

13   agenda that have been adjourned with Your Honor's permission,

14   to September 27th, 2004, which brings us to agenda item

15   #3,which is the Motion of Hartford Fire Insurance Company and

16   Hartford Casualty Insurance Company from relief from the

17   automatic stay to allow cancellation of certain maturity bonds

18   and for adequate protection, it appears at Docket #813.  Your

19   Honor, as the agenda reflects the parties are working on a

20   resolution of this matter.  We are finalizing the terms of the

21   stipulation which we hope to submit with Your Honor's

22   permission pursuant to a Certificate of Counsel.  Unfortunately

23   as we stand here today, the parties have not finalized that

24   stipulation, so with Your Honor's permission, we'd like to

25   defer that Motion and submit the stipulation that's been worked

1  don't hear from them until you try to do something.  So, to

2  some extent, they're contributing to the -- they always come in

3  and complain to me that they're running this 11 on our backs.

4  Well, they know where the Court House is.  But I just want to

5  make sure that you understand that you don't get a free pass

6  just because you're negotiating a modification to your lease.

7           MR. CLEARY:  We understand, Your Honor.

8           THE COURT:  Okay.

9           MR. CLEARY:  Your Honor, unless Your Honor has any

10  further questions, we'd respectfully request that the Court

11  enter the Proposed Form of Order.  Again, it resolves each of

12  the objections listed on today's agenda.

13           THE COURT:  Anybody want to be heard?

14           ALL:  (No verbal response).

15      (Pause in proceedings)

16           THE COURT:  All right, I've signed the Order.

17           MR. CLEARY:  Thank you, Your Honor.  That brings us to

18  agenda item #11 which is the Debtors Motion to Dismiss an

19  adversary proceeding, #04-53134, which is caption Big Lot

20  Stores, Inc. v. KB Acquisition Corp.  Your Honor, with me today

21  is Mark Polebaum for the law firm of Wilmer, Cutler, Pickering,

22  Hale & Dorr who will be addressing that Motion.  Let me yield

23  the podium.

24           THE COURT:  Mr. Polebaum?

25      (Pause in proceedings)

1    MR. POLEBAUM:  Good afternoon, Your Honor, Mark

2  Polebaum of Wilmer, Cutler, Pickering, Hale & Dorr, counsel to

3  the Debtors in this adversary proceeding.  Your Honor, the

4  Debtors have filed a Motion to Dismiss and submit that the case

5  is actually quite a simple case.  KB Acquisition Corp. and Big

6  Lots are parties to a Stock Purchase Agreement by which KBAC,

7  and I'll use that abbreviation, if I may for KB Acquisition

8  Corp. -- parties to a Stock Purchase Agreement by which KBAC

9  purchased the shares of KB Toys US, Inc.  Big Lots claims that

10  certain tax refunds that have either been received by KB Toys

11  US, Inc., or its subsidiaries, or which may be received in the

12  future are, in fact, property that is owned by Big Lots.  KBAC

13  denies that Big Lots owns the contested tax refunds.  In his

14  Move to Dismiss, Big Lots complained because one, for Big Lots

15  to prevail on any of its four counts, it must proves that Big

16  Lots owns the contested tax refunds and two, that Big Lots has

17  not plead any facts on which the Court could conclude that Big

18  Lots owns the contested tax refunds.  Your Honor, there is no

19  dispute that KBAC purchased the shares of KB Toys, US pursuant

20  to the Stock Purchase Agreement that I referred to and the form

21  of the Stock Purchase Agreement is attached to both the

22  Plaintiffs and Defendants pleadings in this case and that

23  agreement, I believe, is properly before the Court, nor is

24  there any dispute that KBAC -- that the purchase -- that KBAC's

25  purchase was made pursuant to the Stock Purchase Agreement

1   dated December 7th, 2000 and that Big Lots claim of ownership
2   to these contested tax refunds arises under that Stock Purchase
3   Agreement.  Resolution of this matter and KB's Motion to
4   Dismiss requires the Court to determine whether the Stock
5   Purchase Agreement provides for transfer of ownership of the
6   contested tax refunds to Big Lots.  Because in the absence of
7   such a transfer, it is a basic uncontestable principle of
8   corporate law, that when ownership of a corporate entity passes
9   by transfer of that entity shares, that all of the assets and
10  liabilities of the entity follow the entity, unless otherwise
11  provided for.  Big Lots has tried to put the matter upside down
12  by alleging in paragraph 81 of its Amended Complaint, that the
13  Stock Purchase Agreement does not provide for a transfer by Big
14  Lots of the contested tax refunds to KBAC or its affiliates.
15  The Amended Complaint further states that the contested tax
16  refunds remained property of Big Lots.  However, the contested
17  tax refunds were never property of Big Lots.  That's the whole
18  point.  The contested tax refunds were property of KB US and
19  its subsidiaries.  And, therefore, the question is, did any of
20  KB US and its subsidiaries transfer the contested tax refunds
21  to Big Lots in connection with the Stock Purchase Agreement?
22  In a Stock Purchase Agreement, the assets owned by the entity
23  whose shares are being sold are not separately conveyed, they
24  simply continue to be owned by the same entity but the only
25  owner of the entity changes.  For Big Lots to prevail on its

1   claim, it must establish, or at least plead facts, on which the
2   Court could conclude that KB Toys US or its subsidiaries
3   transferred the contested tax refunds to Big Lots.  On a Motion
4   to Dismiss, the Court is called on to asses whether facts have
5   been plead to support such a claim.  And in making that
6   assessment, the Court is required to accept as true, all facts
7   that are plead as well as reasonable inferences.  The case law
8   also makes perfectly clear however, that on a Motion to
9   Dismiss, the Court is not required, as the Third Circuit said
10  in the Rockefeller Center Properties case, cited in our Motion
11  to Dismiss, "To credit bald assertions or legal conclusions in
12  properly alleged in the Complaint, similarly, legal conclusions
13  draped in the guides of factual allegations may not benefit
14  from the presumption of truthfulness."  And that's at page 216
15  of that opinion, Your Honor.  Under this standard, the Court
16  may, and should ignore, the bald assertions in legal
17  conclusions, alleged in paragraph 81 of the Complaint to the
18  effect that the contested tax refunds were not sold and
19  remained property of Big Lots.  Rather, the Court needs to
20  asses whether Big Lots has alleged any facts which support
21  these assertions and legal conclusions.  What then does Big
22  Lots rely on to support the bald assertion and legal conclusion
23  that Big Lots owns the contested tax refunds?  There are three
24  sources of -- three parts of the agreement that Big Lots relies
25  on for that assertion, all of which come out of Article 8 of

1    the Stock Purchase Agreement.  First, Big Lots relies on

2    Section 8.03(b) of the Stock Purchase Agreement.  That section

3    contains a covenant of KBAC to not permit its subsidiaries to

4    take any action that would give rise to tax liability of the

5    seller.  Now Big Lots claims this section shows, excuse me,

6    that certain tax attributes -- and this is quoting from their

7    brief -- belonged to and remained property of the Seller, Big

8    Lots.  No such inference can possibly be read into Section

9    8.03(b).  First, this section is merely a covenant by KBAC that

10   it will not permit KB US, or its subsidiaries, to take any

11   action that would create a tax liability to seller.  A covenant

12   restricting KBAC's actions does not transfer ownership to

13   contested tax refunds.  Second, Section 8.03(b) addresses the

14   creation of tax liability of the seller.  It does not address

15   entitlement to tax refunds owned by KB US and its subsidiaries.

16   Third, Section 8.03(d) deals with entitlement to tax benefits.

17   There's a specific section of the Stock Purchase Agreement --

18             THE COURT:  What section?

19             MR. POLEBAUM:  8.03(d) and we have a specific section

20   dealing with entitlement to tax benefits, that's the section

21   that should be looked to to determine entitlement to the tax

22   refunds, not trying to infer something that is otherwise not

23   present in Section 8.03(b).  Fourth, Big Lots focuses on the

24   words tax attribute and seller group to infer that Big Lots

25   continues to own the contested tax refunds.  However, seller

1  group is defined in the agreement for purposes of the pre-
2  closing period to include KB US and its subsidiaries.  And
3  that's in the definitions sections leading into Section 8.03.
4  In effect, Section 8.03(b) is an agreement by KBAC to not take
5  actions which affect the tax liabilities of KB US and its
6  subsidiaries for pre-closing periods that result in a tax
7  liability to Big Lots because Big Lots was party to
8  consolidated tax returns filed for the pre-closing period.  The
9  part of Section 8.03(b) which Big Lots has not quoted in its
10  brief, but which the Court should be aware of is the second
11  portion of Section 8.03(b) which includes a mirror identical
12  undertaking by Big Lots to not take any actions that would
13  create liability for the buyer and it is literally identical
14  language, they are reciprocal covenants.  And, you know, is the
15  Court to interpret the identical Big Lots covenant to mean that
16  Big Lots was transferring its tax attributes to KB US and its
17  subsidiaries or to KBAC?  The suggestion interpretation of
18  8.03(b) is frankly absurd and does not properly survive a
19  Motion to Dismiss.  Next, Big Lots relies on Section 8.03(d) to
20  support its assertion in conclusion that Big Lots continues to
21  own the contested tax refunds.  On the contrary, Your Honor,
22  Section 8.03(d) clearly establishes that KB US and its
23  subsidiaries continued to own the contested tax refunds.
24  Section 8.03(d) provides and contains a promise by KBAC to pay,
25  or cause to be paid, to Big Lots, an amount of money that's

1    measured by the amount of contested tax refunds that may be
2    collected in the future.  If the tax refunds were owned by Big
3    Lots, why would there be a Section 8.03(d)?  Section 8.03(d)
4    creates an obligation to pay, its a promise to pay, it is a
5    pre-petition, unsecured promise by KBAC to make payments.
6    Those payments are measured by an amount equal to the amount of
7    contested tax refunds that are collected in the future.
8    There'd be no purpose for that section, Your Honor, if the tax
9    refunds were, as claimed by Big Lots, owned by Big Lots.  These
10   are the only sections of the Stock Purchase Agreement that Big
11   Lots points to as proof that the contested tax refunds were
12   transferred to Big Lots.  And I would ask the Court to compare
13   Sections 8.03(b) and 8.03(d) to Section 2.01.  Section 2.01 of
14   the Stock Purchase Agreement is the section in which the
15   parties agreed that there would be a transfer of assets.  And
16   there's very clear language of conveyance in Section 2.01.  The
17   seller's agree to sell and the buyer's agree to buy.  These are
18   words of transfer and the parties knew how to use such words
19   when they intended to transfer an asset.  I'd also ask the
20   Court to look at Section 5.11 of the Stock Purchase Agreement.
21   There, the parties state, that they intend that certain assets
22   to Jet Aircraft, which were owned by subsidiaries of KB US,
23   that those were not intended by the parties to be part of the
24   transaction and should not be part of the assets that would be
25   owned by the entities at the time the shares in the entities

1  were transferred.  So Section 5.11 provided that the interest -
2  - the membership interest in the LLC's which were owned by KB
3  US would be transferred out of KB US and to Big Lots prior to
4  the closing of the transaction.  A specific example in Section
5  5.11 where the parties identified an asset that they did not
6  want to have included as part of the package of assets owned by
7  an entity that was being conveyed and the parties made specific
8  provision for treatment of those assets.  When the Court
9  compares Section 5.11 to 8.03(b) and 8.03(d), the Court will
10 see that there's absolutely no similarity between those
11 sections.  The parties agreed in 8.03(d) how to deal with tax
12 refunds that are collected post-closing but arise out of the
13 payment of taxes pre-closing, and there was a promise to pay.
14 Parties made arrangements for treatment of those post-closing
15 received tax refunds and it was by an unsecured promise to pay,
16 that's how the parties agreed to deal with the -- and Section
17 5.11 is a stark comparison as to -- another way by which you
18 could have dealt with the issue but it was not dealt that way.
19 It was dealt with the words used in 8.03(d) and that's an
20 unsecured promise to pay.  The only property that was conveyed
21 by -- or pursuant to the Stock Purchase Agreement, is the
22 shares in KB US and that's in Section 2.01 of the Stock
23 Purchase Agreement.  Sections 2.03 and Sections 2.04 provide
24 for calculation or preparation of balance sheets as of the
25 closing date to determine whether there needs to be a working

1  capital base adjustment to the purchase price.  There is not a

2  word in the Stock Purchase Agreement, and certainly not a word

3  in the Stock Purchase Agreement that Big Lots is pointed to, in

4  which the contested tax refunds were transferred to Big Lots or

5  in which KBAC and Big Lots agreed that if an asset was not

6  shown on a closing date balance sheet, that they asset was

7  deemed conveyed by the entity that otherwise owned the asset to

8  Big Lots.  The only agreed upon consequence to come from the

9  closing date balance sheet is contained in Section 2.04 of the

10  Stock Purchase Agreement and that provides for an adjustment to

11  the purchase price based on the levels of working capital.

12  With that as background, let me turn to Big Lots' final

13  argument in opposition to KBAC's Motion to Dismiss, which is

14  essentially as follows:  that there was a closing date balance

15  sheet, that the closing date balance sheet does not include as

16  assets of KB US and its subsidiaries, the contested tax

17  refunds, and that the absence of a balance sheet entry for the

18  contested tax refunds constitutes and agreement by KBAC as of

19  the closing date to cause -- to transfer, to cause its

20  subsidiaries to transfer the contested tax refunds to Big Lots.

21  The arguments wrong, Your Honor, for at least two reasons.  The

22  balance sheet evidence is inadmissible parol evidence and --

23  that's the first reason.  The second reason is that the alleged

24  agreement is fabricated out of whole cloth.  There is not a

25  word in the Stock Purchase Agreement that remotely says what

1   Big Lots very much wants the agreement to say, but simply
2   doesn't say.  In that agreement, that Big Lots wants the
3   agreements to say is something that cannot properly be
4   reasonably inferred by the Court and cannot be an agreement
5   created by extrinsic evidence.  In addition to these failures,
6   as a matter of law, I note more in passing than anything else,
7   that there is no claim by Big Lots that the contested tax
8   refunds that may have been received or may be received in the
9   future, have any relationship to the various line items that
10  Big Lots points to in the comparison of the October 28th to the
11  December 7th balance sheets, just differentials, however,
12  there's no reason for the Court to focus on the details of
13  those balance sheets because they are simply not admissible, or
14  permitted to be admitted, to contradict any of the terms of the
15  Stock Purchase Agreement.  Section 13.10 of the Stock Purchase
16  Agreement states that the agreement is complete and integrated.
17  The agreement consists of the text of the Stock Purchase
18  Agreement and the schedules, exhibits, and appendices that are
19  listed on pages 65 and 66 of the Stock Purchase Agreement.  And
20  if the Court reviews the list of schedules, exhibits and
21  appendices that are included on pages 65 and 66 of the Stock
22  Purchase Agreement, the Court will note that there is no
23  mention of either the October balance sheet or the December
24  balance sheet.  So the Court has before it an integrated
25  agreement which then triggers the parol evidence rule which

1    prohibits any evidence to be admitted that would be in
2    contradiction to the Stock Purchase Agreement.  The Stock
3    Purchase Agreement, the Debtors submit, is very clear.  There
4    is a transfer of shares, there is a purchase price and an
5    adjustment to the purchase price based on a post-closing date
6    balance sheet.  And there is a simple, unsecured promise to pay
7    by KBAC an amount equal to tax refunds received by KB US or its
8    subsidiaries on account of pre-closing taxes paid by KB US or
9    its subsidiaries.  Use of the closing date balance sheet to
10   claim that the parties agree to transfer ownership to the tax
11   refunds directly contradicts Section 8.03(d) and is prohibited
12   by the parol evidence rule.  Even if, Your Honor, the balance
13   sheet were admissible, there is still nothing in the Stock
14   Purchase Agreement which provides for the transfer of these
15   contested tax refunds of KB US, or its subsidiaries or, nor is
16   there anything in the Stock Purchase Agreement that if there is
17   an asset that was not on a closing date balance sheet, that is
18   was somehow conveyed to Big Lots.  On the contrary, the
19   agreement is specific as to the use of the balance sheet and
20   that's in Section 2.4 of the Stock Purchase Agreement and that
21   is the provision for a purchase price adjustment, depending on
22   working capital.  What we have here, Your Honor, in this
23   adversary proceeding is an effort by an unsecured Creditor to
24   re-write a pre-petition agreement to avoid the consequences of
25   being an Unsecured Creditor.  However, the agreement says what

1  it says.  It is clear, it is unambiguous.  Big Lots and KBAC

2  agreed in Section 8.03(d) that KBAC would pay amounts to Big

3  Lots based on tax refunds received in the future after the

4  closing date.  That section is unequivocal as are its

5  consequences.  And Big Lots has tried to impermissably re-write

6  the contract to avoid these consequences.  No sufficient facts

7  have been pled on which the Court could make a finding that the

8  contested tax refunds are owned by Big Lots.  Ownership of the

9  contested tax refunds is a necessary element to each of the

10  four counts in the Complaint and the Motion to Dismiss should

11  therefore, be allowed.

12          THE COURT:  Thank you.

13          MR. POLEBAUM:  Thank you, Your Honor.

14          THE COURT:  Thank you, Mr. Polebaum.  Counsel for Big

15  Lots?

16          MR. KLOSS:  May it please the Court.  I am Bill Kloss

17  of Vorys, Sater, Seymour & Pease in Columbus, Ohio for Big

18  Lots.  The Motion to Dismiss in this case -- the written Motion

19  to Dismiss is really based upon two propositions and that's

20  been confirmed in this mornings argument.  One is factual and

21  one is legal.  The first three parts of the Complaint -- I'm

22  sorry, the Motion, address the declaratory relief, the

23  accounting and request for money, judgment and the sole -- and

24  also its a conversion -- and the sole argument, first is, that

25  there are insufficient facts have been alleged.  There's not a

1  single cite -- case citation that parallels the arguments, the

2  factual arguments, that have been made today to support that.

3  In its purest form, that part of the Motion to Dismiss is

4  simply there's insufficient facts alleged in the complaint.  It

5  doesn't make a claim.  The last argument in the Motion to

6  Dismiss -- and that wasn't addressed here today but I do want

7  to address it briefly, is in fact, the sole legal argument that

8  was raised in the written papers here.  And that one is that

9  the claim of Big Lots -- or claims of Big Lots are barred by

10  the contractual statutory -- contractual Statute of Limitations

11  under Section 11.01.  It appears as if the Debtor has abandoned

12  that argument.

13            THE COURT:  You've abandoned it?

14            MR. POLEBAUM:  Yes, Your Honor.

15            MR. KLOSS:  Okay.

16            THE COURT:  Move on.

17            MR. KLOSS:  Okay.  Well, then I'll move on, Your

18  Honor --

19            THE COURT:  Good.

20            MR. KLOSS:  To save time.

21            THE COURT:  Good.

22            MR. KLOSS:  The appearance is in fact, the reality.

23  Thank you.

24            THE COURT:  Well, isn't that nice for a change?

25            MR. KLOSS:  The --

28

1      THE COURT:  And it's only Monday.

2      MR. KLOSS:  It is, the day can --

3      THE COURT:  It's going to be a great week.

4      MR. KLOSS:  The week can only get better.  So, we're

5  down to the sole argument that the Complaint is factually

6  deficient.  And in the written Motion and also as I hear on the

7  arguments say, the written Motion says, "No words in the Stock

8  Purchase Agreement on which Big Lots relies for its claim to

9  ownership of the refunds."  That is the purported factual

10  dismiss -- deficiency.  The Debtors have not cited a single

11  case to support their argument where similar circumstances

12  where there've been an argument over who owns tax attributes or

13  tax benefits that are addressed, and a Stock Purchase Agreement

14  under these circumstances.  They have repeatedly argued in

15  their written documents, and also today, where is the specific

16  language in the agreement saying that the tax attributes were

17  retained by Big Lots.  Well, I'm gonna concede, if you were

18  looking for a sentence that says that exact thing in the Stock

19  Purchase Agreement, you're not gonna find it.  But the flip

20  side is true also.  Where is that exact language, it isn't an

21  803(d).  It isn't an 803(b) that provides in it's purest form,

22  a sentence that says the tax attributes that we're fighting

23  about were part of the assets and liabilities of these

24  companies purchase the stock -- purchase by the stock purchases

25  agreement.  We can all agree that this was, in fact, a Stock

1  Purchase Agreement.  And in fact, where in fact, in the
2  argument -- or in the agreements, is there any mention of any
3  particular specific asset that we all can agree were
4  transferred here.  There is not mention of the pencils, of the
5  stock -- of the office supplies, of other assets on a asset by
6  asset basis, or a liability by a liability basis, that went and
7  were transferred as a result of this sale by virtue of the
8  stock purchase.  That just simply isn't in here and the reason
9  is it would be unwieldy, and almost impossible, to list out on
10 a individual down-to-the-T asset by asset basis of what's
11 contained in these companies on the day of the sale.  Could you
12 imagine the list that would be included if such a thing was
13 required?  But we -- I think we would also agree -- I think the
14 Debtors would also agree that they are only entitled to
15 ownership of the assets and the liabilities that were contained
16 in the companies that they purchased, the stock they purchased
17 on the day of the sale.  And we could also agree that a
18 companies assets and liabilities at any given time, the only
19 way to sufficiently identify what they are, are in financial
20 statements and in the categories of the financial statements.
21 So if you want to know what is contained -- what is owned by a
22 company or a what a companies liabilities at a particular
23 moment in time, what you must do is create a financial
24 statement that says, "Here's a list of them.  This is what we
25 own." The company has nothing but --



1      THE COURT:  Does a financial statement list the

2   assets?

3      MR. KLOSS:  By category.  I will agree its -- you

4   don't break it down to pencil, but by broad sweeping category,

5   if the company owns a, office supplies or accounts receivable

6   or a tax refund, and in this case, tax refunds are identified,

7   are an asset in this particular instance -- if they were tax

8   liabilities they would be set forth in the liability section.

9      THE COURT:  But let me ask you this?

10      MR. KLOSS:  Sure.

11      THE COURT:  Mr. Polebaum made the point that these tax

12   attributes were never owned by Big Lots, that they were owned

13   by these one or two -- I think it was --

14      MR. KLOSS:  Subsidiaries.

15      THE COURT:  Yes, subsidiaries, they -- and that

16   there's nothing in this document to show that they ever became

17   property of Big Lots.

18      MR. KLOSS:  What there is in the documents is an

19   absence of a listing of the assets on the combined financial

20   statements --

21      THE COURT:  All right, let's assume for purposes of

22   discussion -- I'm not sure that it's necessary, but there's no

23   specific listing.  How does that make the default ownership of

24   Big Lots as opposed to the affiliates who -- that generated

25   these tax attributes?

1    MR. KLOSS:  Well, we can ask that same question both

2  ways and that would create an issue --

3    THE COURT:  I understand.

4    MR. KLOSS:  That would create --

5    THE COURT:  How does it get to be -- I'm asking you

6  what's the logic of the sequence that because its not on the

7  balance sheet, it defaults to the seller of stock, which is

8  what you're arguing to me?

9    MR. KLOSS:  In essence, that is exactly what we are

10  arguing and in fact, that is precisely the type of factual

11  debate that cannot -- we are entitled on a Motion to Dismiss.

12  Big Lots is entitled to all presumptions in its favor.  And the

13  presumption is if --

14    THE COURT:  Are reasonable.

15    MR. KLOSS:  Reasonable, certainly, certainly.  I will

16  agree with that.  We are entitled to all reasonable

17  presumptions.  And certainly those assets didn't disappear and

18  we are -- it is reasonable to conclude that they were retained

19  by Big Lots and in fact, to answer --

20    THE COURT:  But you say retained.

21    MR. KLOSS:  The, the --

22    THE COURT:  How does it get retained?  You never owned

23  them in the first place.

24    MR. KLOSS:  To answer the question, the 803 language

25  referred to, which requires the pay-over is by virtue of the

1  nature of this asset.  The taxing authorities are always going

2  to pay without regard to who owns them, always are going to pay

3  the original taxpayer.  And the original taxpayer can do

4  whatever it chooses to do with its rights to receive the

5  refunds, and here, that is why that language is in existence in

6  the agreement.  It's the only way that asset could be retained

7  by Big Lots.  And we are, I believe, entitled on a Motion to

8  Dismiss, for the facts to be construed in our favor that these

9  assets were never transferred.  There's nothing in -- where is

10  the language in the document that says specifically, "These tax

11  attributes are transferred -- are part of the assets of this

12  company on the day of the sale?"  There aren't.

13          THE COURT:  Well --

14          MR. KLOSS:  Then --

15          THE COURT:  Absent this agreement, they would be

16  assets of the affiliates that generated them, is that correct?

17  The subsidiaries?

18          MR. KLOSS:  Absent --

19          THE COURT:  Absent the sale, the disagreement, the

20  asset sale of this Stock Purchase Agreement, those attributes

21  would remain in those affiliates?

22          MR. KLOSS:  I -- that's correct.

23          THE COURT:  Okay.

24          MR. KLOSS:  That's correct.  And again, --

25          THE COURT:  As would all its other assets?

1    MR. KLOSS:  That's -- and that's -- what is inside the
2 asset box?  You're absolutely correct.
3    THE COURT:  So, we are saying is because that entity,
4 which had a bundle of rights, made a sale, and they didn't list
5 everything other than they listed the stock, that I can infer
6 from that by the assets not being listed, that something was
7 carved out and that's a reasonable inference?
8    MR. KLOSS:  That's exactly correct.
9    THE COURT:  You better take me down that road --
10    MR. KLOSS:  Okay.
11    THE COURT:  -- a little further.
12    MR. KLOSS:  Well, well -- and how you get to that
13 point here is, you look at the Stock Purchase Agreement.  Under
14 803(k) of the Stock Purchase Agreement, it was an absolute
15 requirement that the buyer, here the Debtors, prepare financial
16 statements, closing day financial statements.  And that was to
17 occur post-closing, post-signing of this December 7, 2000 Stock
18 Purchase Agreement.  And the purpose, of course, among other
19 things, is the price allocation, is to identify on the day of
20 the closing, so anybody who desires to know what assets and
21 liabilities were contained in those companies on the day of the
22 closing --
23    THE COURT:  Where does it say that?
24    MR. KLOSS:  I'm sorry?
25    THE COURT:  Where does it say that?

34

1    MR. KLOSS:  803(k) requires that the financial

2    statements be prepared by the buyer subject to --

3    THE COURT:  But where does it say that the purpose of

4    that is so that everybody in the world knows what was sold and

5    what wasn't?

6    MR. KLOSS:  That's intrinsic in the whole concept of a

7    corporate entity, is if you want to know -- unless you have a

8    line-by-line listing down to the pencil of every asset -- if

9    you want to know what sold as a part of an entities assets and

10    liabilities at any particular time or what's its assets and

11    liabilities are at any particular time, you've got to have a

12    set of financial statements.

13    THE COURT:  Well, then why was the agreement specific

14    in 5.11?

15    MR. KLOSS:  Because of the nature of the assets.  A

16    plane is a tangible assets that can be held -- that is held in

17    a title and can be stuck in a hanger.  Again, by virtue of the

18    nature of these tax -- and these are things that I think are

19    absolutely appropriate as summary judgment level -- on a full

20    blown summary judgment level to address.  That's why this is

21    inappropriate and in fact, we have filed a summary judgment on

22    top of the Motion to Dismiss.  That -- those are factual issues

23    that need to be resolved.  But again, by virtue of this asset,

24    the taxing authority is always going to pay a refund back to

25    the taxpayer.  You can't make -- you can't change that.  And

that is true even if the taxpayer doesn't own that asset.  In

essence, the taxpayer will hold that refund if it doesn't own,

in this case, more or less in trust, for lack of a better

description, for its owner.  And that's exactly why we couldn't

take -- we couldn't simply say, "These tax refunds are going to

be paid to us." It's not a car, it's not a pencil, it's not an

airplane.  An airplane, all's we needed to do was keep it in

our hanger and retain the title for it.  It's the nature of the

asset.  And that is -- those are the precise issues that -- or

can be flushed out on summary judgment.  The 803(k) argument --

if the financial statements were not produced in connection --

or, strike that -- were not authored or prepared by the Debtors

in connection with this transaction -- that'd be a breech of

the agreement.  Among other things, it is in fact, an

adjustment to the purchase price.  Why would one adjust the

purchase price?  Because a company, especially a retail company

like the KB entities, its assets or their assets in this case,

vary day to day.  On the beginning of a day, it'll have a

certain amount of inventory, a certain amount of cash on hand,

a certain amount of asset level that may be different, and in

fact, assuredly will be different at the end of the day.

That's why the working capital adjustment is also important

because in the end, the financials are used so the final

purchase price can be determined, the final purchase is

determined by the exact status of the assets and the

1   liabilities on the day of the closing.  And in fact, if the tax

2   attributes had been sold -- we could all agree the tax

3   attributes we're talking about would have been assets, then

4   they should have been on the financial statements and they

5   would have been paid for, but they were not.  Because the sales

6   price under this agreement is driven solely by the assets and

7   the liabilities on the day of closing.  So I agree with Mr.

8   Polebaum.  It was used for, among other things, a working

9   capital adjustment to determine the status of the assets and

10  the liabilities on the day of that closing, so the purchase

11  price could be landed upon.  And the argument -- the evidence

12  here is, and the allegations of the complaint show that the

13  assets of the tax -- excuse me, the assets, the tax refunds,

14  were not contained --

15        THE COURT:  Mr. Polebaum, as I understand it, does not

16  dispute that you have a claim.  A matter a fact, I think he

17  acknowledged that you have a promise to pay, an unsecured

18  promise to pay.  That's different --

19        MR. KLOSS:  Yes.

20        THE COURT:  That's a breech of contract --

21        MR. KLOSS: Yes.

22        THE COURT:  -- to claim.  That's different than an

23  ownership claim.

24        MR. KLOSS:  That's right.

25        THE COURT:  And how do you -- you expressed that if

1   they didn't provide the financial statement or they didn't

2   include something, then it wasn't paid for.  But it was going

3   to be paid for here, it was just not a secured promissory note

4   or not a secured transaction.  How does that switch it from an

5   unsecured promise to an ownership claim?  Where in this

6   document does it say that the reason it's not listed in the

7   balance sheet is because it's not been paid for and it's not

8   being transferred?  We own it.

9        MR. KLOSS:  It does -- if you're looking -- and I've

10  conceded that, Your Honor.  If you're looking for language

11  either way that says, this is not -- these tax attributes are

12  not being transferred -- if you're looking for an exact phase

13  along those lines --

14       THE COURT:  I'm really looking for something that I

15  can hook onto --

16       MR. KLOSS:  Well --

17       THE COURT:  -- that says maybe they weren't

18  transferred.

19       MR. KLOSS:  Well then --

20       THE COURT:  I haven't found it yet.

21       MR. KLOSS:  All's you have to hook onto is the

22  financial statements.  And we have provided the financial

23  statements and the argument that they are prohibited by parol

24  evidence is just simply wrong.  They didn't argue it in their

25  reply brief -- excuse me, the opening brief argued in the reply

1  but we kind of -- we did begin to argument, presuming they were
2  gonna braise that, but the bottom line is, Harmon on contracts
3  probably gives one of the better, simple definitions on parol
4  evidence.   Parol evidence prevents antecedent agreements cannot
5  -- antecedent agreements cannot be used to contradict
6  unambiguous integrated documents.   Well, this is not parol
7  evidence primarily, using these financial statements.   They are
8  not parol evidence for three reasons.   First of all, the
9  financials aren't antecedent agreements.   They were not
10 prepared before the closing, before the 12/7 document that
11 we're talking about.   They were prepared after the closing,
12 they were prepared by the buyer KB and they were prepared
13 pursuant to the current terms and conditions of the agreement.
14 So they're not antecedent agreements.   The financials are part
15 and parcel of the Stock Purchase Agreement.   Second, there is
16 nothing -- there is not language in the Stock Purchase
17 Agreement that these financials contradict.   There are not a
18 contradictory statement.   There is not a -- we want to hone in
19 and the KB, or the Debtors here, want to look for that specific
20 language to link on.   But there's no specific language to link
21 on either way.   There is nothing that these financials
22 contradict.   Third, beyond common sense, they want to use the
23 1310 integration clause.   Well, the pure -- the plain words,
24 the plain language of 13 guts their claim.   The 13 says, "This
25 agreement constitutes the entire agreement between the parties

1  with respect to the subject matter hereof." Then it goes on --
2  this is the important phrase, "No representation, inducement,
3  promise, understanding, condition or warranty not set forth
4  herein or," is the operative word, "in the agreements or
5  documents delivered in connection herewith has been made or
6  relied upon by either party." That's the integration clause.
7  The documents -- the financial documents that we're talking
8  about that give the precise status of the assets and liability
9  on the day of this closing were delivered -- are precisely the
10 documents delivered in connection herewith, referenced in the
11 very integration clause that they want to rely upon. Those
12 documents were required to be prepared and delivered in a
13 certain period of time and approved by the seller. So, to
14 argue that these financial documents are parol evidence, flies
15 in the face of the very integration clause that the Debtors
16 want to use here. That last part, "documents delivered in
17 connection herewith," is what is pure and unambiguous evidence
18 that these should be considered. The bottom line is this, we
19 don't disagree that the Stock Purchase Agreement is an
20 integrated document. The question is, what is the sum total of
21 that fully integrated document? It certainly just isn't the 66
22 page document that the parties have attached. It certainly
23 doesn't include that plus the schedules. What it includes is
24 specifically what it references in the integration agreement.
25 The documents -- the document itself, the agreements and

1  documents full -- or documents delivered in connection
2  herewith.  So certainly these financials are included within
3  the Stock Purchase Agreement.  And again, it is beyond dispute
4  because you can look there, you're entitled, there is not
5  listing, we have provided copies of pre-closing documents --
6  excuse me, pre-closing financials that show the asset and the
7  day of the closing financials show no asset for the tax
8  attributes about which we're fighting.  Reasonable minds can
9  conclude that those were part of the assets and liabilities
10  contained in the corporate box on the day of the transfer.  And
11  if they are not contained in the corporate box, we are entitled
12  to the reasonable presumption that they were retained by the
13  seller.  The Motion to Dismiss standard here in the Third
14  Circuit in Delaware is exceptionally high.  This shouldn't be
15  dismissed -- the claim shouldn't be dismissed unless it's
16  beyond doubt the Plaintiff can prove no set of facts to support
17  claim -- to support the claim which would entitle it to relief.
18  There certainly -- and also that the Complaint does not provide
19  adequate notice to the Defendant to frame an answer.  Certainly
20  the complaint here makes that criteria, reaches that standard.
21  If Big Lots shows that there was not transfer of the assets --
22  in other words, that those assets were not part of the
23  companies whose stock was sold on December 7, 2000, then it is
24  undisputed that its entitled to the relief in the Complaint.
25  It was -- those were part of the assets of the companies that

1  were owned by Big Lots on December 6th, 2000, they were not

2  transferred so the reasonable presumption is they remained Big

3  Lots property.  This is a case that should not be resolved on a

4  Motion to Dismiss.  There are a variety of factual issues that

5  are -- exist here.  There are a variety of facts and

6  circumstances that need to be flushed out on discovery and this

7  case should be heldover through discovery and through the

8  Summary Judgment Motion to stage so we can do additional

9  discovery to see -- to have testimony to see precisely what

10  KB's position is in this matter.  So, on that -- in that

11  regard, the Motion to Dismiss here should be denied, Judge.

12          THE COURT:  Thank you, Mr. Kloss.

13          MR. KLOSS:  Thank you.

14          THE COURT:  Briefly, Mr. Polebaum.

15          MR. POLEBAUM:  Your Honor, I think there are only two

16  issues that I'd like to address.  The first is the sales price

17  adjustment and I think the Court said it, but I just want to

18  make sure that I heard the Court correctly.  There is a sales

19  price adjustment mechanism set forth in Stock Purchase

20  Agreements and in Section 2.04.  It is KB's position that

21  Section 8.03(d) is a specific provision of the agreement

22  dealing with future tax refunds as in one received by KB US and

23  its subsidiaries.  And it imposes an obligation to pay the

24  amount of those refunds over to Big Lots.  And therefore, it

25  would end up having to pay twice for that same refund if it was

1   otherwise used in calculating any adjustment to the working

2   capital of the purchase price. And I believe that that was the

3   point that the Court was driving at in its questioning of my

4   colleague. With respect to parol evidence, Your Honor, I think

5   there are two -- there are a couple of different points I want

6   to address on that issue. One is, Big Lots is stating that the

7   balance sheets are not antecedent agreements. Then, if they're

8   not antecedent agreements, they must be subsequent agreements.

9   And if they're subsequent agreements, then they need to satisfy

10  the amendment and waiver provisions of the Stock Purchase

11  Agreement and I believe that's in Section 13.07 of the

12  agreement which says that it has to be not only in writing, but

13  also signed by the buyer and the seller. And no such writing

14  has been signed by the buyer has been produced by Big Lots.

15  Secondly, Big Lots argued that there's nothing -- no agreement

16  in the Stock Purchase Agreement that's being contradicted by

17  the balance sheet. And that's simply not the case. 8.03(d) is

18  a very specific provision dealing with what happens with future

19  tax refunds received by KB US and who is to pay them and to

20  whom they're to be paid. That's a very specific agreement.

21  And Big Lots is attempting to use these balance sheets to

22  contradict that very specific agreement. And than lastly, on

23  Section 13.10, the integration clause, the integration clause

24  consists of two sentences. The first sentence is the sentence

25  that I referred the Court to -- which, this is the entire

1   agreement.  And then the second sentence, which is the sentence

2   that Big Lots is referring -- is relying on, because it makes

3   reference to other documents being delivered in connection with

4   this agreement, I want to make -- point out to the Court that

5   the second sentence in Section 13.10 says that nobody's relying

6   on any of that stuff unless its in the Stock Purchase

7   Agreement.  That's all that Section 13.10 says -- the second

8   sentence says.  The second sentence of 13.10 does not expand

9   the scope of what the agreement was, what it says is that -- is

10  that no reps, warranties, etc. have been made or may be relied

11  on in anything other than.  and so the point is that the second

12  sentence in fact, could also be interpreted to mean that

13  nothing in the balance sheet could possibly be used to amend,

14  modify, waive, supplement or contradict the Stock Purchase

15  Agreement.  And those are the only points that I wanted to

16  address, Your Honor. Thank you.

17          THE COURT:  Thank you.  Very well, I will take this

18  matter under advisement and give you my decision as quickly as

19  possible.  Anything further?

20          MR. CLEARY:  Your Honor, I don't believe so.

21          THE COURT:  Thank you all.

22          ALL:  Thank you, Judge.

23      (Court adjourned)

24

25

44

CERTIFICATION

1   I certify that the foregoing is a correct transcript from the
2   electronic sound recording of the proceedings in the above-
    entitled matter.
3

4   _____            9-23-04
    Signature of Transcriber                 Date

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Writer's Cramp, Inc.*

*Certified Court Transcribers*

*732-329-0191*