# EXHIBIT 5

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | : | Chapter 11 |
| | : | |
| KB TOYS, INC., *et al.*, | : | Case No. 04-10120 (JBR) |
| | : | (Jointly Administered) |
| Debtors. | : | |
| | : | |
| _____ | : | |
| | : | |
| BIG LOTS STORES, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| Vs. | : | Adversary No. 04-53134 (JBR) |
| | : | |
| KB ACQUISITION CORPORATION, | : | **Objections Due:10/7/04 @4:00 P.M.** |
| | : | **Hearing Date: TBD** |
| Defendant. | : | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO STRIKE ITEMS DESIGNATED BY PLAINTIFF TO BE INCLUDED IN THE RECORD ON APPEAL [ADV. DKT. NO. 117]

Plaintiff Big Lots Stores, Inc. ("Plaintiff") hereby responds in opposition to Defendants' Motion to Strike Items Designated by Plaintiff to be Included in the Record on Appeal (the "Motion to Strike"):

1.     On August 23, 2004, the Court held oral argument on the Defendants' Motion to Dismiss.

2.     On August 25, 2004, the Court entered an order (the "Dismissal Order") dismissing the above-captioned action for the reasons set forth in the Memorandum Opinion (the "Opinion") issued contemporaneously therewith. [Adv. Dkt. Nos. 109 and 110, respectively]

3.     On September 2, 2004, Plaintiff timely filed a Notice of Appeal of the Dismissal Order and Opinion. [Adv. Dkt. No. 114]

4.      On September 13, 2004, Plaintiff timely filed its Designation of Items to be Included in the Record on Appeal and Statement of Issues on Appeal (the "Designation of Record"). [Adv. Dkt. No. 116] Items numbered 18 and 19 are Plaintiff's Motion for Summary Judgment and Opening Brief in Support of Summary Judgment, respectively, which documents were filed in the adversary proceeding on May 20, 2004. [Adv. Dkt. Nos. 98, 99]

5.      At the time of entry of the Dismissal Order, Plaintiff's Motion for Summary Judgment was not fully briefed because the parties had agreed that briefing on summary judgment could await the Court's decision on the pending Motion to Dismiss. This agreement to defer briefing was approved by the Court on May 28, 2004. [Adv. Dkt. 100]

6.      During oral argument on the Motion to Dismiss, counsel for Plaintiff urged the Court to deny the Motion to Dismiss, in part, because the issues raised by the Motion to Dismiss were more properly addressed on the merits in the context of Plaintiff's pending motion for summary judgment, perhaps following some discovery. (August 23, 2004, Transcript at 34, 35). (Relevant pages attached as Exhibit "1" hereto.) The Court ultimately disagreed, and entered the Dismissal Order two days later.

## ARGUMENT

7.      Plaintiff respectfully urged the Court to deny the Motion to Dismiss and address the issues raised by the pleadings in the context of Plaintiff's pending motion for summary judgment. The Court disagreed its decision should await summary judgment. But that is not a reason to strike the summary judgment papers from the Designation of Record. Neither Rule 8006 nor the cases cited by Defendants in support of the relief requested by the Motion to Strike require otherwise.

2

8.    Bankruptcy Rule 8006 broadly provides that the appellant shall file and serve a designation of the "items to be included in the record on appeal", and that the appellee may file and serve a designation of "additional items to be included in the record on appeal". Rule 8006 further provides that the "record on appeal shall include the items so designated by the parties, the notice of appeal, the judgment, order, or decree appealed from, and any opinion, findings of fact, and conclusions of law of the court." The plain and broad language of Rule 8006, the starting point for deciding the Motion to Strike, is not nearly as limited as Defendants wish or suggest.

9.    Generally, the record on appeal "should contain the documentation necessary to afford the reviewing court a complete understanding of the case." John P. Maguire & Co., Inc. v. Sapir (In re Candor Diamond Corp.), 26 B.R. 844, 846 (Bankr. S.D. N.Y. 1983); In re Neshaminy Office Building Associates, 62 B.R. 798, 802 (E.D. Pa. 1986) ('[T]he record should contain all documents necessary to afford a full understanding of the case") (citations omitted).

10.    This does not mean, as Defendants erroneously suggest, that only documents expressly considered by the bankruptcy court in connection with the Motion to Dismiss are properly designated as part of the record on appeal. See Candor Diamond at 846 ("Documents not considered by the bankruptcy court in reaching its decision may be included in the record on appeal provided that the appellate court is informed that such materials were not considered by the trial court in reaching its decision in the matter appealed."), citing In re Food Fair, Inc., 15 B.R. 569 (Bankr. S.D. N.Y. 1981).[1]

---

[1]    Plaintiff does not concede that this Court, in connection with its ruling on the Motion to Dismiss, did not consider, in any fashion, Plaintiff's pending summary judgment papers. Plaintiff notes that the Dismissal Order and Opinion contain no discussion of whether the Court did or did not consider the summary judgment papers in reaching its decision on the Motion to Dismiss.

3

11.     Defendants do not cite <u>In re Indian Palms Associates, Ltd.</u>, 61 F.3d 197, 204 (3d Cir. 1995), which held in relevant part that the district court could properly consider on appeal documents filed of record in the bankruptcy case, even if such documents were not filed in connection with the motion that initiated the contested matter which ultimately led to the appeal.[2] The <u>Indian Palms</u> court noted that while such documents probably could not be considered for all purposes by the appellate court, they were properly designated as part of the record on appeal, and could be considered at least for certain purposes. <u>Id</u>. at 205-206. The same holds true here – the main issues on appeal relate to whether this action should have been dismissed as a matter of law, without the benefit of factual findings after a record had been developed on Plaintiff's arguments in support of its motion for summary judgment. Items 18 and 19 should remain as part of the Designation of Record.

12.     Defendants cite the case of <u>In the Matter of CPDC, Inc.</u>, 337 F.3d 436, 443 (5th Cir. 2003) for the general proposition that items not part of the record considered by the bankruptcy court cannot be added to the record on appeal. (Motion to Strike, ¶10). A review of the relevant facts and the holding of the <u>CPDC</u> court is instructive. The <u>CPDC</u> court held that it was error for the district court to have allowed CPDC to supplement the record on appeal by adding documents and testimony that were not <u>offered and admitted</u> before the bankruptcy court entered summary judgment. <u>Id</u>. at 443 (emphasis added). The facts of the instant case are readily distinguishable. There can be no dispute that Plaintiff's summary judgment papers were filed and of record for over three months before the Court ruled on the Motion to Dismiss, and there can be no dispute that Plaintiff urged the Court to address the merits of the dispute in the context of Plaintiff's pending summary judgment motion rather than summarily dismiss the

---

[2]     Alternatively, the Third Circuit also held that the doctrine of judicial notice pursuant to Federal Rule of Evidence 201 permitted the district court to consider the portions of the record at issue on the motion to strike. <u>Id</u>. at

4

action on a Motion to Dismiss. Maybe the Court considered the summary judgment papers in reaching its decision on the Motion to Dismiss. Perhaps it chose not to. Whatever the case is, it is no reason to preclude Plaintiff from designating the summary judgment papers as part of the record on appeal. The cases cited by Defendants do not hold otherwise.

13.    Defendants have failed to articulate any harm to them if items 18 and 19 remain part of the Designation of Record, or alternatively, if items 18 and 19 are considered by the appellate court pursuant to the doctrine of judicial notice. Nor can they. Defendants do not know what arguments, if any, Plaintiff intends to make on appeal in connection with items 18 and 19. Moreover, Defendants will be afforded a full opportunity to respond to any such arguments. And, of course, the District Court remains the final arbiter as to whether any of the arguments made by Plaintiff in connection with items 18 and 19 have merit or should even be considered in connection with a ruling on appeal. The Motion to Strike should be denied.

WHEREFORE, for all of the foregoing reasons, Plaintiff respectfully requests entry of an order denying the Motion to Strike items 18 and 19 of the Designation of Record.

Dated: October 7, 2004

BLANK ROME LLP

*Michael DeBaecke*

Michael D. DeBaecke (No. 3186)
1201 N. Market Street, Suite 800
Wilmington, Delaware 19899
(302) 425-6412

and

Robert J. Sidman
William D. Kloss, Jr.
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street
Columbus, Ohio 43215
(614) 464-6422

Attorneys for Big Lots Stores, Inc.

---

206. The same conclusion should hold true here.

120156.01600/40145569v1

# EXHIBIT 1

```
 1

 2                     UNITED STATES BANKRUPTCY COURT
                            DISTRICT OF DELAWARE
 3

 4    IN RE:                          .
                                      .        Chapter 11
 5    KB Toys, Inc., et al.,          .
                                      .
 6            Debtor(s).              .    Bankruptcy #04-10120 (JBR)
      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
 7
                                   Wilmington, DE
 8                                August 23, 2004
                                    11:30 a.m.
 9
                         TRANSCRIPT OF OMNIBUS HEARING
10               BEFORE THE HONORABLE JOEL B. ROSENTHAL
                      UNITED STATES BANKRUPTCY JUDGE
11
      APPEARANCES:
12
      For The Debtor(s):            M. Blake Cleary, Esq.
13                                  Young, Conaway, Stargatt
                                    & Taylor, LLP
14                                  The Brandywine Bldg.
                                    1000 West St.-17th Fl.
15                                  Wilmington, DE 19801

16                                  Mark N. Polebaum, Esq.
                                    Wilmer Cutler Pickering
17                                  Hale & Dorr, LLP
                                    2445 M. street, N.W.
18                                  Washington, DC 20037

19    For The Official Committee:   Susan Balaschak, Esq.
      of Unsecured Creditors        Traub Bonacquist & Fox
20                                  655 Third Ave.-21st Fl.
                                    New York, NY 10017
21
                                    Kimberly D. Newmarch, Esq.
22                                  Richards Layton & Finger
                                    One Rodney Square
23                                  Wilmington, DE 19899

24

25
```

*Writer's Cramp, Inc.*

Certified Court Transcribers

732-929-0191



2

| | | |
|---|---|---|
| 1 | For Fleet Bank: | Peter Duhig, Esq. |
| 2 | | Klett Rooney Lieber & Schorling, PC |
| 3 | | The Brandywine Bldg. 1000 West Street-Ste. 1410 Wilmington, DE 19801 |
| 4 | | |
| 5 | For Big Lots Stores: | Michael DeBaecke, Esq. Blank Rome, LLP |
| 6 | | Chase Manhattan Centre 1201 Market Street-Ste. 800 Wilmington, Delaware 19801 |
| 7 | | |
| 8 | | William Kloss, Jr., Esq. Vorys Sater Seymour |
| 9 | | & Pease, LLP 52 East Gay Street Columbus, OH 43216 |
| 10 | | |
| 11 | For Beta Systems, Inc.: | Regina Iorii, Esq. Ashby & Geddes |
| 12 | | 222 Delaware Ave.-17th Fl. Wilmington, Delaware 19899 |
| 13 | For Airborne Express: | Suzanne M. Hill, Esq. |
| 14 | | Potter Anderson & Corroon, LLP Hercules Plaza |
| 15 | | 1313 N. Market Street Wilmington, DE 19801 |
| 16 | For Mills: | Marc Phillips, Esq. |
| 17 | | Connolly Bove Lodge & Hutz, LLP The Nemours Building |
| 18 | | 1007 North Orange Street Wilmington, DE 19801 |
| 19 | For Inland Southern Mngt.: Group, Inland Siz Corners: | Christina Thompson, Esq. |
| 20 | | Connolly Bove Lodge & Hutz, LLP The Nemours Building |
| 21 | | 1007 North Orange Street Wilmington, DE 19801 |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

3

| | | |
|---|---|---|
| 1 | Audio Operator: | Brandon J. McCarthy |
| 2 | Transcribing Firm: | Writer's Cramp, Inc. |
| 3 | | 6 Norton Rd. |
| | | Monmouth Jct., NJ 08852 |
| | | 732-329-0191 |

4

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

34

1       MR. KLOSS:  803(k) requires that the financial

2 statements be prepared by the buyer subject to --

3       THE COURT:  But where does it say that the purpose of

4 that is so that everybody in the world knows what was sold and

5 what wasn't?

6       MR. KLOSS:  That's intrinsic in the whole concept of a

7 corporate entity, is if you want to know -- unless you have a

8 line-by-line listing down to the pencil of every asset -- if

9 you want to know what sold as a part of an entities assets and

10 liabilities at any particular time or what's its assets and

11 liabilities are at any particular time, you've got to have a

12 set of financial statements.

13       THE COURT:  Well, then why was the agreement specific

14 in 5.11?

15       MR. KLOSS:  Because of the nature of the assets.  A

16 plane is a tangible assets that can be held -- that is held in

17 a title and can be stuck in a hanger.  Again, by virtue of the

18 nature of these tax -- and these are things that I think are

19 absolutely appropriate as summary judgment level -- on a full

20 blown summary judgment level to address.  That's why this is

21 inappropriate and in fact, we have filed a summary judgment on

22 top of the Motion to Dismiss.  That -- those are factual issues

23 that need to be resolved.  But again, by virtue of this asset,

24 the taxing authority is always going to pay a refund back to

25 the taxpayer.  You can't make -- you can't change that.  And

35

1  that is true even if the taxpayer doesn't own that asset.  In
2  essence, the taxpayer will hold that refund if it doesn't own,
3  in this case, more or less in trust, for lack of a better
4  description, for its owner.  And that's exactly why we couldn't
5  take -- we couldn't simply say, "These tax refunds are going to
6  be paid to us."  It's not a car, it's not a pencil, it's not an
7  airplane.  An airplane, all's we needed to do was keep it in
8  our hanger and retain the title for it.  It's the nature of the
9  asset.  And that is -- those are the precise issues that -- or
10  can be flushed out on summary judgment.  The 803(k) argument --
11  if the financial statements were not produced in connection --
12  or, strike that -- were not authored or prepared by the Debtors
13  in connection with this transaction -- that'd be a breech of
14  the agreement.  Among other things, it is in fact, an
15  adjustment to the purchase price.  Why would one adjust the
16  purchase price?  Because a company, especially a retail company
17  like the KB entities, its assets or their assets in this case,
18  vary day to day.  On the beginning of a day, it'll have a
19  certain amount of inventory, a certain amount of cash on hand,
20  a certain amount of asset level that may be different, and in
21  fact, assuredly will be different at the end of the day.
22  That's why the working capital adjustment is also important
23  because in the end, the financials are used so the final
24  purchase price can be determined, the final purchase is
25  determined by the exact status of the assets and the

# EXHIBIT 6

```
 1
 2                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE
 3
                                      .
 4    IN RE:                          .           Chapter 11
                                      .
 5    KB Toys, Inc., et al.,          .
                                      .
 6          Debtor(s).                .     Bankruptcy #04-10120 (JBR)
      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
 7
                              Wilmington, DE
 8                            April 29, 2004
                               12:00 p.m.
 9
                    TRANSCRIPT OF OMNIBUS HEARING
10           BEFORE THE HONORABLE JOEL B. ROSENTHAL
                  UNITED STATES BANKRUPTCY JUDGE
11
      APPEARANCES:
12
      For The Debtor(s):           Joel Waite, Esq.
13                                 Young, Conaway, Stargatt
                                   & Taylor, LLP
14                                 The Brandywine Bldg.
                                   1000 West St.-17th Fl.
15                                 Wilmington, DE 19801

16                                 Mark N. Polebaum, Esq.
                                   Hale & Dorr, LLP
17                                 60 State Street
                                   Boston, MA 02109
18
                                   Mitchel Applebaum, Esq.
19                                 Hale & Dorr, LLP
                                   60 State Street
20                                 Boston, MA 02109

21                                 Michael Pandolfi, Esq.
                                   Hale & Dorr, LLP
22                                 60 State Street
                                   Boston, MA 02109
23
                                   Kristin Collins, Esq.
24                                 Hale & Dorr, LLP
                                   60 State Street
25                                 Boston, MA 02109
```

```
 1    For The Official Committee:    Maura Russell, Esq.
      of Unsecured Creditors         Traub Bonacquist & Fox
 2                                   655 Third Ave.-21st Fl.
                                     New York, NY 10017
 3
                                     Kimberly D. Newmarch, Esq.
 4                                   Richards Layton & Finger
                                     One Rodney Square
 5                                   Wilmington, DE 19899

 6    For Fleet Bank:                Peter Duhig, Esq.
                                     Klett Rooney Lieber
 7                                   & Schorling, PC
                                     The Brandywine Bldg.
 8                                   1000 West Street-Ste. 1410
                                     Wilmington, DE 19801
 9
      For Big Lots Stores:           Michael DeBaecke, Esq.
10                                   Blank Rome, LLP
                                     Chase Manhattan Centre
11                                   1201 Market Street-Ste. 800
                                     Wilmington, Delaware 19801
12
                                     William Kloss, Jr., Esq.
13                                   Vorys Sater Seymour
                                     & Pease, LLP
14                                   52 East Gay Street
                                     Columbus, OH 43216
15
      For Veritas Software:          Ricardo Palacio, Esq.
16                                   Ashby & Geddes
                                     222 Delaware Ave.-17th Fl.
17                                   Wilmington, Delaware 19899

18    For Toy Acquisition (Buyer):   Steven Wilamowsky, Esq.
                                     Wilkie Farr & Gallagher, LLP
19                                   The Equitable Center
                                     787 Seventh Ave.
20                                   New York, NY 10019

21    For Oracle Corporation &:      Kevin J. Mangan, Esq.
      Sears Roebuck                  Monzack & Monaco, PA
22                                   400 Commerce Center
                                     12th & Orange Sts.
23                                   Wilmington, DE 19899

24

25
```

3

```
 1                                  Francis A. Monaco, Jr., Esq.
                                    Monzack & Monaco, PA
 2                                  400 Commerce Center
                                    12th & Orange Sts.
 3                                  Wilmington, DE 19899

 4     For Roberta A. DeAngelis:    Mark Kenney, Esq.
       (Acting US Trustee-Reg. 3)   Office of U.S. Trustee
 5                                  844 King Street-Ste. 2313
                                    Lock Box 35
 6                                  Wilmington, DE 19801

 7     Audio Operator:             Brandon J. McCarthy

 8     Transcribing Firm:          Writer's Cramp, Inc.
                                    6 Norton Rd.
 9                                  Monmouth Jct., NJ 08852
                                    732-329-0191
10
       Proceedings recorded by electronic sound recording, transcript
11     produced by transcription service.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1  that some --

2       MR. KLOSS:  Some of it has been paid over to Big Lots,

3  some of it has not.

4       THE COURT:  Oh, I see, there have been payments.

5       MR. KLOSS:  Yes, Sir, yes, Sir, absolutely.  There

6  have been payments historically.  The payments have stopped, we

7  have asked that payments continue.  And we believe, what we're

8  seeking to protect, the Court's point is well taken, with

9  regard to those already received, that's, I think an issue for

10 a different day.

11      THE COURT:  All right, tell me what the language is

12 that you and Mr. Polebaum obviously can't agree on whether it's

13 an integrated transaction.  Tell me where, in the agreement,

14 you say you still own these tax attributes.

15      MR. KLOSS:  Well, the agreement, Article 8 addresses -

16 - Article 8 in it's entirety, addresses the tax attributes.

17 But within the definitional section, in Article 1, there are a

18 variety of dates identified on Page 2 of the, in fact, Your

19 Honor, I have our proposed exhibit notebook.  Exhibit-1

20 contains the Stock Purchase Agreement and --

21      THE COURT:  Well, then I've got at least twice.

22      MR. KLOSS:  Yes, Sir, okay.  The balance sheet date is

23 identified on Page 2 as October 28, 2000.  And the testimony

24 would establish that that is the date that the transaction was

25 priced and, in fact, what that means is on October 28, 2000, a

1  balance sheet existed identifying assets, and identifying the

2  prices associated with those assets if they were going to be

3  transferred within the companies with this deal.  On --

4       THE COURT:  So that -- you're saying only assets on

5  the October 28th balance sheet were transferred?

6       MR. KLOSS:  No, that's when the assets that were

7  potentially subject to a transfer were priced.  We can present

8  the October 28th balance sheet and the tax refunds, and a

9  variety of other examples, for example, planes were on that

10 balance sheet and they had a price associated with them.  If we

11 go forward to the December 7, 2000 date which is the closing

12 date, under 803, or excuse me, Article 803(k), eventually the

13 buyer is to provide a final balance sheet associated, financial

14 statements associated with, through the date of the closing and

15 we can provide the financial statements that existed at the

16 date of closing.  And what we will find absent from those are

17 reference to the tax refunds and another example is the planes.

18 And that's because those assets were left behind.  They were

19 not purchased, they were not paid for, they were left --

20      THE COURT:  Does this agreement say that?  Usually, I

21 mean, I, you know --

22      MR. KLOSS:  Well, the --

23      THE COURT:  I'm just a country lawyer from Boston, but

24 usually there's a provision that says what assets are sold.

25      MR. KLOSS:  Well, what assets are sold, you look to

1    the company's balance sheet on the date of the closing.

2        THE COURT:  Well what does the agreement say?

3        MR. KLOSS:  The agreement does not -- the section in

4    dispute, the 803(d), talks about that there shall be a payover

5    of the tax refunds and the reason the tax refunds are a little

6    different breed is because the tax refunds, when they were

7    made, number one, we didn't know the exact value on the date of

8    transaction, the closing, they were estimates.  And 803(d)

9    provides that when they are received by the taxpayer, because

10   that's how tax refunds are paid --

11       THE COURT:  I understand.

12       MR. KLOSS:  -- they have to be paid back.  But just

13   because the taxpayer receives them, doesn't mean that they were

14   sold as part of the transaction.  And we can show the financial

15   statements, the balance sheet, and also the journal entries

16   prepared, or which are contained in these exhibits, prepared by

17   the buyer, which show that the journal entries, taking off the

18   assets including the tax refunds and also the airplane, using

19   another example, showing that they were not transferred as

20   assets of these companies on the date of the closing.

21       THE COURT:  And this witness is going to do what?

22       MR. KLOSS:  This witness can take you through the

23   financial documents and the balance sheets, the journal entries

24   and in addition, he can take you through the tax attributes of

25   this deal.  This deal was subject to what is called a Section

1 338(h)(10) election.  And what that does, is even though this

2 is couched in terms of a Stock Purchase Agreement, for the

3 purposes of income tax, it's treated as an asset sale.  And

4 under the 338(h)(10), after the closing, in order -- what

5 happens in a 338(h)(10) transaction is, in essence, old KB,

6 that was owned by Big Lots, is treated as having sold its

7 assets to the new KB.  This is a fictional creation, it is

8 owned by the buyer.  And then old KB is treated as if it

9 liquidates, and the tax attributes that exist up to the date of

10 the closing, flow under 338(h)(10) up to the parent, the old

11 parent, Big Lots.

12         THE COURT:  All right, now that's not a surprise.  You

13 people knew that -- how this deal was going to be treated.

14         MR. KLOSS:  That's right, that's right.

15         THE COURT:  Well, why --

16         MR. KLOSS:  The parties agreed, and in fact,

17 ultimately after the deal is done, a price allocation has to be

18 given to each and every asset acquired in this transaction.

19 And in the price allocation, we will show evidence that there

20 was no price allocated to a number of assets because they were

21 not sold.  Again, using the planes as an example, and using

22 these tax refunds.

23         THE COURT:  So, I'm reading D, on page 43, am I in the

24 right place?

25         MR. KLOSS:  I'm sorry?

48

```
 1          THE COURT:  Am I in the right place?  I'm on page 43

 2   of your agreement, Section 8.02 -- oh, excuse me --

 3          MR. KLOSS:  803.

 4          THE COURT:  -- 8.03(d).

 5          MR. KLOSS:  Yes, Sir.

 6          THE COURT:  And this is your basis for saying that the

 7   agreement requires -- that these weren't sold.  "The buyer

 8   shall promptly pay or shall cause prompt payment to be made to

 9   seller of all refunds of taxes and interest."  That's what

10   you're relying on?

11          MR. KLOSS:  Well, we're relying on -- well, more than

12   that.  This is the allocation to payover.  What we're also

13   relying on are the balance sheet provisions which we've talked

14   about.

15          THE COURT:  All right, well that's evidence that

16   buttresses your argument you never sold them.

17          MR. KLOSS:  Right, which is part of, part and parcel

18   of, and --

19          THE COURT:  So, if you've never sold them, why were

20   they collecting them?

21          MR. KLOSS:  Well, that's the -- unlike a plane, or a

22   car for example, we can take -- it's a titled asset.  We could

23   take possession of the plane, and leave it in our hanger.  And

24   in fact the two planes that were carved out of this deal,

25   that's what we did.  But because of the special nature of the
```

49

1  tax refunds, tax refunds follow the taxpayer.  There was no way

2  that Big Lots could have gone to the taxing authorities and

3  said, "Wait, those remain with us, pay us."  The taxing

4  authorities pay it back to the taxpayer, and the taxpayer is

5  now under the umbrella of KB.  But --

6          THE COURT:  There's nothing here that says that they

7  should pay them in kind or anything like that.

8          MR. KLOSS:  Pay them in kind?  Pay them when received.

9  The issue is the ownership.

10         THE COURT:  Well that's it.  You don't exclusively say

11 here, in this agreement, "And by the way, you don't own them."

12         MR. KLOSS:  Well, you're not --

13         THE COURT:  Mr. Polebaum's point, if I read his

14 memorandum and understand his memorandum, it says that it

15 creates a payment obligation.  It doesn't create ownership

16 rights.  If you wanted ownership rights, you should have said

17 so.

18         MR. KLOSS:  Well we do so say if you look at what the

19 guts of this transaction are that are part of this document in

20 its entirety.  This transaction was priced in a specific way,

21 and included within the price were -- the assets weren't in

22 there and that's what Mr. Watts would testify to.

23         THE COURT:  But your agreement doesn't say that.  Your

24 agreement -- show me where it describes what you're telling me.

25         MR. KLOSS:  Well it describes under the term that the

1   balance sheet date is October 28th.   That establishes the date

2   that it's priced.

3          THE COURT:  And show me the description of the virtual

4   liquidation that you described to me and the reconstitution of

5   a new KB.  Where is that described?

6          MR. KLOSS:  Well there is -- that occurred during the

7   course of the date it was priced, October 28, and the date it

8   was closed.  What we need to determine as to who owns what, is

9   you need to look within the corporate box, what was contained

10  in the box, on 12/7/2000, the date of the closing.  And if you

11  look in that box, you will see those assets are not there and

12  we can find out how and we can show the transfers out of the

13  companies before that deal took place.  Merely saying this is a

14  stock purchase doesn't answer the question as for what you're

15  purchasing.  It's like saying, "I bought a new Ferrari, or I

16  bought a new car."  Well, that doesn't tell you anything.  If

17  you bought a new Chrysler, how is it equipped?  You have to go

18  to the window sticker and say, "Okay, it's got air

19  conditioning, it's got power locks, but it doesn't have a

20  navigation system."  That's the same thing here, you have to

21  look at the {quote}, "specification sheet," of these companies

22  on the day they were transferred which was December 7, 2000,

23  and Mr. Watts can unequivocally establish that what was not an

24  asset of those companies on the date of the transfer were these

25  refunds, also planes, again, drawing on that example.

1          THE COURT:  Why shouldn't I just send you back to the

2   American Arbitration Association, under Section 13907?

3          MR. KLOSS:  We'd be happy to go back to the American

4   Arbitration Association --

5          THE COURT:  I mean, isn't there a mandatory

6   arbitration provision here?

7          MR. KLOSS:  Well, we believe that what -- that the

8   issue is before this Court to address, given that this Debtor

9   is in bankruptcy, we would be happy if the Court would enjoin

10  them to preserve to go back and arbitrate this.  But what we

11  want to assume -- what we want to --

12         THE COURT:  But you have that choice.  You have an

13  arbitration clause.  Let me take a look here.

14         MR. KLOSS:  Well, we have the arbitration clause, but

15  we also have a Debtor in bankruptcy here.  And the Debtor in

16  bankruptcy is taking our assets.  It's on page 61.

17         THE COURT:  Oh, I know where it is.  I don't see why I

18  need testimony.  I mean, even if I accept what you say is

19  accurate, I'm not sure that's terribly helpful to you.

20         MR. KLOSS:  Well, I don't know how --

21         THE COURT:  Finish your proffer.

22         MR. KLOSS:  I'm sorry?

23         THE COURT:   Finish your proffer of what the witness

24  would say.

25         MR. KLOSS:  If he was called to testify, Mr. Watts

1  would tell you that he is the Vice President of Tax for Big

2  Lots and he was involved in the sale of the KB entities to KB

3  Acquisition.  He was involved and helped put together the Stock

4  Purchase Agreement which we have in our notebook as Exhibit-1.

5  It reflects the terms of the transaction and the closing date

6  was on December 7, 2000.  The general section with regard to

7  tax attributes is set forth in Article 8 and it explains the

8  agreement generally.  And that is, with regard to income taxes,

9  that they are the response to the tax attributes, whether it be

10  responsibility for payment or ability to receive a refund, is

11  Big Lots up until the date of the closing.  With regard to

12  miscellaneous taxes, they are Big Lots responsibility to pay or

13  they are entitled to refund up to the date of the balance sheet

14  date, which we've identified as October 28.  So, any taxes that

15  were due to be paid on or before those two dates were

16  responsibility of Big Lots, after were responsibility of the

17  Debtor.  Same holds true with the refunds.  The October 28,

18  2000 balance sheet, which is Exhibit-2, Mr. Watts would say,

19  accurately reflects the status of the assets of the -- that's

20  the consolidated balance sheet, of the KB entities on that

21  date.  You will find there's a highlighted portion on the

22  balance sheet on that date which identifies the tax refunds,

23  again, this is Exhibit-2, that are at issue.  And they're

24  carried on the books as an asset, although they're in the

25  liability section, they're bracketed, meaning they are a

53

1   negative or, in essence, an asset.  The assets that are

2   identified on there are potential tax refunds.  Mr. Watts would

3   also testify that the October 28, 2000 financial statement

4   balance sheet is not representative of the assets and

5   liabilities contained in the companies when they were sold on

6   December 7, 2000, because in the interim period, between

7   October 28, 2000 and December 2000, a variety of assets were

8   carved out.  One of the assets that were carved out were these

9   tax refunds that we were highlighted.  Another one of the

10  assets that were carved out, were about $14 million worth of

11  planes that appear on the October 28, 2000 balance sheet, but

12  did not appear on the 12/7 balance sheet.  That is because they

13  were not part of the transaction.  The seller didn't buy them

14  and, most importantly, the seller, in computing the sales

15  price, did not pay for these assets.  They remained the assets

16  of Big Lots.  Exhibits 3, 4, 5 and 6 are the balance sheets

17  that existed for the closing date.  Exhibits 3 and 4 --

18  Exhibit-3 is an electronic version of the December 7, 2000

19  balance sheet, and that is the -- it's a little confusing, the

20  February 2001 version.  That is the balance sheet that was

21  eventually used for the price allocation computation.  Exhibit-

22  5 and 6 is an electronic version, and what is called a hard

23  copy version of the final December 7, 2000 balance sheet.

24          THE COURT:  Let me stop you, sir.

25      MR. KLOSS:  Yes, Sir.

54

1    THE COURT:  Let me ask you a question.

2    MR. KLOSS:  Sure.

3    THE COURT:  13.10 is the integration clause here?

4    MR. KLOSS:  Yes, Sir.

5    THE COURT:  Don't I have to find, first, that there's

6    some ambiguity before I let you introduce extraneous evidence?

7    MR. KLOSS:  No, I don't think there's any -- I don't

8    think you do and that's because this agreement is not

9    ambiguous.  What you need to do -- this agreement, in essence

10   says, "We have a deal, you're going to buy the stock of this --

11   ", I've just described it as a box, "You're going to buy the

12   stock ownership in this box."  But unless you look at the

13   financial statements that are referenced in the Stock Purchase

14   Agreement, you don't know what is in the box.  I'm not

15   suggesting this agreement is ambiguous as a whole.  That

16   question could be turned --

17   THE COURT:  You're saying it's not complete?

18   MR. KLOSS:  No, I'm not saying it's incomplete.  It is

19   absolutely complete.  But the converse of that is, where is it

20   in that agreement that said these tax refunds were sold in this

21   transaction.

22   THE COURT:  Well --

23   MR. KLOSS:  It says that, it says that it was not in

24   the financial statements that are referred to in this

25   agreement.  You need to look at the status of the companies on

1  the day of the closing, and the December 7, 2000, balance

2  sheet, unequivocally, established that on that date, those

3  assets which appeared, the tax refunds which were highlighted

4  on the 10/28 form, which is Exhibit-2, have been taken out of

5  the company.  You will find the same highlighted portion on

6  Exhibits 3, 4, 5 and 6 and absent from there are any

7  balances --

8           THE COURT:  Stay close to the podium, would you?

9           MR. KLOSS:  I'm sorry.

10          THE COURT:  We have a sound system here.

11          MR. KLOSS:  -- or any balances, I'm sorry, or any

12  balance for the tax refunds.  They simply were taken out of the

13  company.  And how we know they were taken out of the company?

14  Mr. Watts will testify a company puts on its assets -- on its

15  books, or takes assets off its books by using accounting

16  journal entries.  That's what a company does.  It's absolutely

17  paramount that they track their assets, they put them on

18  accurately, and if it's time, because they've been disposed of,

19  take them off, they do it through a journal entry.  And that's

20  what Exhibit-7 is.  Those are the journal entries that were

21  prepared by the buyer in this, that said these --

22          THE COURT:  After the closing?

23          MR. KLOSS:  After the closing that says, "Here are the

24  records that indicate these assets were transferred, or left

25  behind with the buyer.  You can see on the top of Exhibit-7 and

1  on Exhibit-7, each particular section is highlighted.  The

2  entries for each particular asset, the refunds were talking

3  about, are highlighted on those journal entries.  And that is

4  how the assets were taken off the books of KB'S and never were

5  transferred as part of this transaction.  Now, again, this is

6  entirely consistent with the 338(h)(10) election.  The tax

7  attributes, pre-closing, whether it be a liability or be a

8  refund, stayed with Big Lots, flowed up to Big Lots.  And the

9  post-closing attributes, whether it be the obligation or a

10  refund that arises from post-closing activities, goes with the

11  buyer.  The new, under the 338(h)(10) election, the new KB

12  entity that's mirrored, the mirror that's created, starts out

13  with absolutely no tax history.  But in order to start that

14  entity, there has to be basis established for a variety of the

15  assets.  So 338(h)(10) --

16          THE COURT:  You keep talking about that.  Is that

17  transaction, that election, described in here?

18          MR. KLOSS:  Absolutely, it's described in Article 8.

19  If you look --

20          THE COURT:  And does it say --

21          MR. KLOSS:  The parties --

22          THE COURT:  -- where does it say that, "And, oh by the

23  way, all those tax attributes remain the property of the

24  seller?"

25          MR. KLOSS:  Under 803, tax covenance, subsection A on

1　page 41, it puts in there that the parties agree that this, a

2　338(h)(10) election will be made.  And if you do that, under

3　338, what that means is as I've described it.  It is treated as

4　if the old entity sells its new assets to the new entity, is

5　liquidated and the old entities tax attributes flow upstream to

6　the parents.

7　　　　　THE COURT:  Show me that provision, where does it say

8　that?

9　　　　　MR. KLOSS:  It says it in 338(h)(10).

10　　　　THE COURT:  Doesn't say it in this agreement?

11　　　　MR. KLOSS:  No, but this agreement incorporates

12　338(h)(10).  Where does -- this agreement also says it's a

13　Delaware agreement but certainly it wasn't practical to reprint

14　all the Delaware statues that might have to apply in there.

15　　　　THE COURT:  But I -- yeah, I understand that.  But

16　what you're telling me is it doesn't specifically say that.

17　You have to go to 338(h)(10).

18　　　　MR. KLOSS:  338(h)(10) is the treatment associated

19　with this.  Yes, and you can look pursuant, if you go back to

20　what Mr. Watts would testify to, in accordance with a

21　338(h)(10) transaction, there has to be a price allocation

22　done.  In other words, the assets, because this stock sale is

23　treated as an asset sale, and the assets are transferred to a

24　new entity, that new entity has to establish a basis and for

25　that matter, the old entity has to have an end price so its tax

58

1  obligations can be determined.  So what the parties have to do

2  is agree to allocate the price among the assets that are sold.

3  And Exhibits 8 and 9 are the letters that were exchanged

4  between the parties affecting that price allocation, under

5  338(h)(10), the first is, I believe, an April letter from Big

6  Lots saying, "Here is our proposed allocation," because

7  338(h)(10) allocation is subject to negotiation, and ultimately

8  a deal was struck in August of 2001, and that's letter #9.  And

9  it identifies the assets, by classes, and the values that are

10  provided under the purchase price, to those assets.  Mr. Watts

11  would testify that there is not a single tax refund, none of

12  the items that are highlighted on that balance sheet, are not

13  included on any of those classes.  And Mr. Watts would also

14  testify that if that asset, those tax refunds, were transferred

15  to the buyer, as a part of this transaction, as a matter of

16  law, there would have to be a price allocated to them.  That is

17  further evidence of what went or did not go with this

18  transaction.  The same holds true with the planes.  The planes

19  appear on the 10/28 at line #1605.  They do not appear on the

20  12/7 balance sheet because they remained.  In fact, Big Lots

21  still has those planes.

22          THE COURT:  So, all right, so let me -- for purposes

23  of discussion, let's say --

24          MR. KLOSS:  Yes, Sir.

25          THE COURT:  -- let's say I buy your argument.  You

object to me, for purposes of argument, say, "Yeah, okay,

you're owed the money," but how do you get an ownership claim

or a priority in it by security interest or some other means?

1    MR. KLOSS:  Well it's -- and that's why 803, the

2    inclusion of 803, gives this kind of a confusing wrinkle.

3    Because I think, what I'm sensing from you Judge, you say,

4    "Well, if you owned it, why do you need Section 803(d)?  Why

5    does there have to be this allocation?  Why does there have to

6    be something in here that says you got to pay us these amounts,

7    buyer?"  And that's because of the peculiar nature of this

8    asset.  Again, like a plane, like a car, if we didn't transfer

9    it as a part of a deal, we left it in the hanger, we left it in

10    our garage and we use it today.  But tax refunds are different.

11    We were unable, because the taxpayers, who were transferred to

12    the buyer, the taxpayers were the ones who the taxing

13    authorities were going to return the refunds to.  Now, just

14    because you're paid something, doesn't mean it is yours.  And

15    what was -- 803 is the -- 803(d) is designed --

16    THE COURT:  And the converse, of course, is also true.

17    MR. KLOSS:  I'm sorry?

18    THE COURT:  The converse is also true.

19

20

21

22

23

24

25

59

1  still have to show me that you own this asset as opposed to

2  you're owed the money.

3       MR. KLOSS:  No, yeah, we are owned this asset.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    MR. KLOSS:  True, well it's not too dissimilar from a

2  title company.  If a title company, in the connection with the

3  closing of a home, gets a variety of checks on, goes bankrupt

4  and says, "Well, yeah, I know these checks aren't ours but

5  we're going to keep them, we're not going to disburse them,

6  this is just a contractual arrangement."

7    THE COURT:  But there were other things you could have

8  done.

9    MR. KLOSS:  Well, in hindsight, yes, but this is --

10  there is absolutely no evidence, in fact, the only evidence

11  establishes these were not transferred.  There is no evidence

12  on their books, in fact, all the books, every one of those

13  balance sheets that's before you, those journal entries that

14  are before you, those were prepared by the buyer.  And

15  certainly the buyer would not misrepresent because even though

16  it's not a titled asset, these tax refunds aren't titled, they

17  got to go back to the taxpayer, but that doesn't mean they

18  belong, that there hasn't been an agreement that they belong

19  with the seller.  This is typical to these kind of deals.  This

20  is typical what happens in a stock sale agreement.  But there

21  was no other way to shortcut that.  In other words, we couldn't

22  go to the taxing authorities and force them to pay us.  This is

23  the only way it can be done.  That's the way it had to be

24  drafted.

25    THE COURT:  In the old fashioned way we used to do it

61

1    is we changed the damned address.

2           MR. KLOSS:  But the checks would still come -- well,

3    that's right.

4           THE COURT:  And we got a Power of Attorney.

5           MR. KLOSS:  Well, the bottom line is --

6           THE COURT:  And then we filed a UCC and we did lots of

7    other things if we wanted to be sure that we were owed the

8    money.

9           MR. KLOSS:  Well, we're sure that --

10          THE COURT:  And we made our agreements very clear.  We

11   didn't have to go through all sorts of extraneous information

12   to sort it all out.

13          MR. KLOSS:  Well, this was a very complex transaction.

14   In fact, even to compute the sales prices is very difficult to

15   do.  But, the bottom line is that's the way it had to be

16   structured because the checks were going to be made payable to

17   the paid taxpayers.  We couldn't change that with the IRS even

18   though they were owned by us -- continued to be owned by Big

19   Lots.

20          THE COURT:  If you have to go through all sorts of

21   interpretations to get to that, there's nothing in this arena

22   that says in black and white, "By the way, those tax refunds,

23   as of..." October or December or whatever date is the

24   appropriate date, "are not your property, buyer.  They're our

25   property."

62

1      MR. KLOSS:  Well, under 803(b) there is a covenant

2  that they will not use -- a mutual covenant, 803(b) under that

3  as a whole that the seller -- or excuse me -- the buyer is not

4  going to use any tax attributes that are the sellers, and

5  there's likewise a mutual obligation that the seller will not

6  be using any tax attributes that are the buyers.  And how to

7  determine who owns what or who's attributes are there, you've

8  got to look -- you've got to take a snapshot of the company's

9  financial picture on the day of the closing.  What was on its

10  balance sheet, because a tax refund is an asset, that if it

11  exists, even if its an estimate is carried on the balance sheet

12  of the company.  Before it existed and on -- the date of the

13  transaction it didn't exist, and we can show the journal

14  entries that took it off the books.

15      THE COURT:  Okay.  I don't think testimony's going to

16  help -- you've done a very good job explaining to me.  I don't

17  think I have to take the time to --

18      MR. KLOSS:  Okay.

19      THE COURT:  -- hear the witness unless Mr. Polebaum

20  wants to cross examine him.

21      MR. POLEBAUM:  No, Your Honor, I have no interest in

22  doing that.

23      THE COURT:  I didn't think you did.  Thank you

24  counselor.  Anything further?

25      MR. KLOSS:  Well, I think that you've identified also